# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| PRETERM-CLEVELAND, INC., et al., | : : : | Case No. |
| Plaintiffs, | : : | Judge |
| v. | : : : | **PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT** |
| DAVID YOST, et al., | : : | **OF THEIR MOTION FOR TEMPORARY RESTRAINING** |
| Defendants. | : : : : | **ORDER AND/OR PRELIMINARY INJUNCTION** |

## MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs Preterm-Cleveland, Planned Parenthood Southwest Ohio Region, Sharon Liner, M.D., Planned Parenthood of Greater Ohio, Women's Med Group Professional Corporation, and Capital Care Network of Toledo, move to preliminarily enjoin Ohio Senate Bill 23 of the 133rd General Assembly ("S.B. 23" or "the Ban"), which would ban abortion starting at about six weeks in pregnancy, when approximately 90% of abortions in the state are performed, in violation of more than four decades of Supreme Court precedent. Absent an order from this court, the Ban will go into effect on July 10, 2019. Plaintiffs seek to enjoin all Defendants, their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them from enforcing or complying with S.B. 23. Should the Court be unable to enter the requested preliminary injunction before the Ban takes effect on July 10, 2019, Plaintiffs respectfully request the Court enter a temporary restraining order.

Plaintiffs will provide notice to all Defendants today.  To prevent the infliction of irreparable harm to Plaintiffs' patients from the unconstitutional denial of their reproductive rights, Plaintiffs request that this Court issue a ruling prior to July 10, 2019, the effective date of the Ban.

Plaintiffs request that the injunction be granted without bond. If bond is required, Plaintiffs request it be set at $1.00.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER

Ohio has enacted a near-total ban on abortion. Senate Bill 23 ("S.B. 23" or "the Ban") was signed into law on April 11, 2019, over the protest of women, people of color, medical professionals, and religious leaders[1] and with the full knowledge that the Ban is unconstitutional and would draw a legal challenge.[2]  The Ban—which would make it a felony to provide abortion

---

[1] *See* Maggie Prosser, *Ohio Legislature Passes Heartbeat Bill—Now Ready for Gov. DeWine's Signature*, The Columbus Dispatch (April 10, 2019), https://www.dispatch.com/news/20190410/ohio-legislature-passes-heartbeat-bill---now-ready-for-gov-dewines-signature (reporting "scores of protestors both outside and inside the legislative chambers"); *Hearing on S.B. 23*, 133rd Leg. Ses. (2019) (statement of Rep. Galonski) (S.B. 23 takes "a massive step back in history by diminishing women's freedoms"); *id.*(statement of Rep. Russo) (S.B. 23 shows "total disrespect" for women's lives"); *id.*(statement of Rep. Brown) (S.B. 23 "demonstrates no concern at all toward the pregnant woman"); *id.* (testimony of Restoring Our Own Through Transformation) (S.B. 23 "continue[s] the civic disruption of the Black family unit by putting one of the most important family decisions at risk"); *id.* (statement of Ohio American College of Obstetricians & Gynecologists) (urging legislators to vote no on S.B. 23); *id.* (statement of Ohio State Medical Association) (same); *id.* (statement of National Council of Jewish Women Cleveland) (same); *id.* (statement of First Unitarian Universalist Church of Columbus) (same); *id.* (statement of Orchard Hill United Church of Christ in Chillicothe) (same).

[2] Governor DeWine has said publicly that he sees the Ban as an opportunity to advocate for "reversal of existing legal precedents."  *Ohio Gov. Signs Ban on Abortion After 1st Heartbeat*, Associated Press (Apr. 12, 2019), https://www.apnews.com/0b1deb8c1f5d41d8ab4c9e32446a55ce.  Similarly, S.B. 23's sponsor in

2

care starting at approximately six weeks of pregnancy, a point at which many individuals do not even know they are pregnant and long before viability—is unquestionably unconstitutional under forty-six years of Supreme Court precedent, beginning with *Roe v. Wade*, 410 U.S. 113 (1973), which unequivocally held that the State may not ban abortion before the point of viability.

Plaintiffs seek a temporary restraining order and/or a preliminary injunction to block enforcement of S.B. 23. Without this relief, abortion access will be all but eliminated in Ohio, as Plaintiffs will be forced to turn away almost all patients seeking abortion care. Plaintiffs' patients will be stripped of their constitutionally protected freedom to decide whether to continue a pregnancy prior to viability and, as a result, will be subject to serious physical, psychological, and emotional harms, all of which are irreparable. Without an injunction from this court, the Ban will go into effect on July 10, 2019. Plaintiffs respectfully request that the court grant relief before this unconstitutional ban is allowed to inflict irreparable harm.

## STATUTORY FRAMEWORK

If a patient's pregnancy is in the uterus, Ohio law requires the provider who intends to perform an abortion to determine whether there is detectible cardiac activity. If cardiac activity is detected, the Ban makes it a crime to "caus[e] or abet[] the termination of" the pregnancy. S.B. 23 § 1, amending § 2919.195(A). Typically, cardiac activity can be detected around six weeks into pregnancy. Compl. ¶ 32. Pregnancy is dated using the first day of the patient's last menstrual period ("LMP"). Compl. ¶ 35. Thus, six weeks into pregnancy would be approximately two weeks after the patient's missed period. Compl. ¶ 36.

---

the Senate acknowledged that, if upheld, S.B. 23 would create "a new standard" for determining an abortion restriction's constitutionality. Talia Kaplan, *Ohio "Heartbeat" Abortion Ban Passes Senate as Governor Vows to Sign It*, Fox News (Mar. 14, 2019), https://www.foxnews.com/faith-values/ohio-heartbeat-abortion-ban-closer-to-becoming-law.

S.B. 23 permits abortion care after cardiac activity is detected only if the abortion is necessary to prevent the patient's death or to prevent "serious risk of the substantial and irreversible impairment of a major bodily function." S.B. 23, § 1, amending Ohio Rev. Code § 2919.195(B). "'Serious risk of substantial and irreversible impairment of a major bodily function' means any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function," which "includes pre-eclampsia, inevitable abortion, and premature rupture of the membranes[;] may include, but is not limited to, diabetes and multiple sclerosis[;] and does not include a condition related to the woman's mental health." Ohio Rev. Code § 2919.16(K).

A violation of the Ban is a fifth-degree felony, punishable by up to one year in prison and a fine of $2,500. S.B. 23 § 1, amending Ohio Rev. Code § 2919.195(A); Ohio Rev. Code §§ 2929.14(A)(5), 2929.18(A)(3)(e). In addition to criminal penalties, the state medical board may assess a forfeiture of up to $20,000 for each violation of the Ban, S.B. 23 § 1, amending Ohio Rev. Code § 2919.1912(A), and limit, revoke, or suspend a physician's medical license based on a violation of the Ban, *see* Ohio Rev. Code § 4371.22(B)(10). The Plaintiff facilities could face criminal penalties and revocation of their ambulatory surgical facility license for a violation of the Ban at their facilities. A patient may also bring a civil action against a provider who violates the Ban and recover damages in the amount of $10,000 or more. S.B. 23 § 1, amending Ohio Rev. Code § 2919.199(B)(1).

## STATEMENT OF FACTS

One critical and indisputable fact resolves this case: S.B. 23 bans abortion care at and after approximately six weeks in pregnancy, which is prior to viability. Compl. ¶¶ 32, 34.

In a normally developing embryo, cells that form the basis for development of the heart later in gestation produce activity that can be detected with ultrasound. Compl. ¶ 30. Consistent with common medical practice, as well as existing law, *see* Ohio Rev. Code § 2919.191(A), Plaintiffs perform an ultrasound to date the pregnancy and to determine whether there is detectable cardiac activity. Compl. ¶ 31. An ultrasound can be performed either by placing a transducer on the patient's abdomen or by inserting a probe into the patient's vagina. *Id.* Many providers, including providers at Plaintiff clinics, use a vaginal ultrasound to confirm and date early pregnancy. *Id.* Using vaginal ultrasound, cardiac activity is generally detectible beginning at approximately six weeks from the first day of the patient's last menstrual period.[3] Compl. ¶ 32. At that point in pregnancy, no embryo is capable of surviving outside of the womb. Compl. ¶ 34. Thus, S.B. 23 prohibits abortion well before viability. *Id.*

At six weeks in pregnancy, many women[4] are unaware that they are pregnant. Compl. ¶ 39. The menstrual cycle is usually approximately four weeks long, but will vary based on the individual. Compl. ¶ 36. Thus, even a woman with highly regular periods would be four weeks pregnant as measured from her last menstrual period when her missed period occurs. *Id.* A ban on abortion at and after six weeks would only allow two weeks, at most, for a woman to learn that she is pregnant, decide whether to have an abortion, and seek and obtain abortion care. *Id.*

---

[3] S.B. 23 instructs the Ohio Department of Health to adopt rules "specifying the appropriate methods of performing an examination for the purpose of determining the presence of a fetal heartbeat" within 120 days of the passage of the bill. S.B. 23 § 1, amending Ohio Rev. Code § 2919.192.

[4] Plaintiffs use "women" in this memorandum as a short-hand for people who are or may become pregnant, but note that people of all gender identities, including gender non-conforming people and transgender men, may also become pregnant and seek abortion care and would thus also suffer irreparable harm as a result of the Ban.

Those who have irregular periods—which are extremely common and occur for a variety of reasons, including certain common medical conditions, contraceptive use, age, or breastfeeding—or those who experience bleeding during early pregnancy that could be mistaken for a period may be denied the opportunity to obtain abortion care altogether because they may not have even realized that they missed a period. Compl. ¶¶ 37-39.

In addition to the medical reasons that abortion might be difficult or impossible to obtain on this shortened timeline, many patients will face logistical obstacles to obtaining abortion care before six weeks of pregnancy. Compl. ¶ 40. Patients will need to schedule an appointment, gather the resources to pay for the abortion and related costs,[5] and arrange transportation to a clinic, time off of work, and possibly childcare during appointments.[6] Compl. ¶ 42. Minor patients, unless emancipated, must also obtain written consent from a parent or a court order from a judge before they can receive care. Ohio Rev. Code § 2919.121. All of these burdens are increased by an Ohio law mandating that all patients make two in-person trips at least 24 hours apart to the clinic in order to obtain an abortion. Compl. ¶¶ 40-41; Ohio Rev. Code § 2317.56.

For all of the above reasons, the vast majority of abortions in Ohio take place at or after six weeks of pregnancy. Compl. ¶ 44. Thus, S.B. 23 will prohibit almost all abortion care in Ohio. Compl. ¶ 45.

---

[5] Ohio Law prohibits public insurance, including Medicaid, and insurance purchased on the state health exchange from covering abortion services except in the very limited circumstances where a patient's physical health or life is at risk, where the pregnancy is a result of rape and that rape has been reported to law enforcement, or where the pregnancy is the result of incest and that incest has been reported to law enforcement. Ohio Rev. Code §§ 9.04, 3901.87; Ohio Admin. Code § 5160-17-01.

[6] A majority of those having abortions (61%) already have at least one child. Compl. ¶ 47.

The decision to terminate a pregnancy is informed by a combination of diverse, complex, and interrelated factors that are intimately related to the individual's values and beliefs, culture and religion, health status and reproductive history, familial situation, and resources and economic stability. Compl. ¶ 3. A child can place economic and emotional strain on a family and may interfere with an individual's life goals. Compl. ¶ 50. As most patients who seek abortion already have at least one child, families must consider how an additional child will impact their ability to care for the children they already have. *Id.* Even for someone who is otherwise healthy and has an uncomplicated pregnancy, carrying that pregnancy to term and giving birth poses serious medical risk and can have long term medical and physical consequences. Compl. ¶ 51. For a woman with a medical condition caused or exacerbated by pregnancy, or who learns that her fetus has been diagnosed with a severe or lethal anomaly, these risks are increased. *Id.* Pregnancy, childbirth, and an additional child may exacerbate an already difficult situation for those who have suffered trauma, such as sexual assault or domestic violence. Compl. ¶ 52. The near total ban on abortion imposed by S.B. 23 would have a devastating impact on the lives of individuals who want to consider or seek abortion in Ohio, and a disproportionate impact on the lives of Black people, other people of color, and people with low incomes in Ohio.[7] Compl. ¶¶ 53-54.

---

[7] In 2017, Black people made up only 12.9% of Ohio's population, but 40% of people who obtained abortions in Ohio. Indigenous (American Indian) people and other people of color (Asian/Pacific Islander, Multiracial, and Hispanic people) made up 8.8% of the population, but 11.9% of the people that obtain abortions. *Induced Abortions in Ohio*, Ohio Dep't of Health, https://odh.ohio.gov/wps/portal/gov/odh/know-our-programs/vital-statistics/resources/vs-abortionreport2017; *Quick Facts: Ohio*, U.S. Census Bureau, https://www.census.gov/quickfacts/oh. Consistent with national statistics, a large majority of people who obtain abortion care in Ohio are low income. Compl. ¶ 57; *see EMW Women's Surgical Center, P.S.C. v. Glisson*, 2018 WL 6444391 at *8 n.11 (W.D. Ky. Sept. 28, 2018) (crediting recent statistics showing that nationally 75 percent of abortion patients are poor or low-income) (citing Nat'l

## ARGUMENT

Plaintiffs seek a preliminary injunction or, in the alternative, a temporary restraining order, to prevent the Ban from inflicting constitutional, medical, emotional, psychological and other harm on Plaintiffs' patients. In ruling on such a motion, the Court considers four factors, all of which weigh heavily in Plaintiffs' favor: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause a substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)).

As set forth below, Plaintiffs readily satisfy this standard. Because the Ban directly contravenes decades of binding Supreme Court precedent holding that a state may not ban abortion before the point of viability, Plaintiffs will succeed on the merits. In addition, enforcement of the Ban will inflict severe and irreparable harm on Plaintiffs' patients; the balance of hardships weighs decisively in Plaintiffs' favor; and the public interest would be served by blocking the enforcement of this unconstitutional and harmful statute. This Court should therefore grant injunctive relief.

### I. PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR SUBSTANTIVE DUE PROCESS CLAIM.

Plaintiffs are certain to succeed on the merits of their claim that the Ban violates Plaintiffs' patients' liberty rights under the Fourteenth Amendment by banning abortion before

---

Acads. of Scis., Eng'g & Med., *The Safety and Quality of Abortion Care in the United States*, S-6 (2018)).

viability. Nearly five decades ago, the Supreme Court struck down as unconstitutional a state criminal abortion statute proscribing all abortions except those performed to save the life of the pregnant woman. *Roe*, 410 U.S. at 166. Specifically, the Supreme Court held that (1) the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects a woman's right to choose abortion, *id.* at 153-54, and, (2) prior to viability, the State has no interest sufficient to justify a ban on abortion, *id.* at 163-165. Rather, the State may "proscribe" abortion only *after* viability—and even then, it may not ban abortion where necessary to preserve the life or health of the woman. *Id.* at 163-64.

The Supreme Court has repeatedly affirmed this core holding in the more than four decades since *Roe* was decided. For example, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*—handed down more than a quarter century ago—the Court reaffirmed the "central principle" of *Roe* that "[b]efore viability, the State's interests are not strong enough to support a prohibition on abortion." 505 U.S. 833, 846, 871 (1992). Although *Casey* abandoned *Roe*'s strict scrutiny standard in favor of the "undue burden" test, under which a restriction on pre-viability abortion is permitted as long as the law does not have the purpose or effect of placing a "substantial obstacle" in the path of a woman seeking abortion, the Court emphasized:

> Our adoption of the undue burden analysis does not disturb the central holding of *Roe v. Wade*, and we reaffirm that holding. Regardless of whether exceptions are made for particular circumstances, *a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.*

505 U.S. at 879 (emphasis added); *see also id.* at 846 ("*Roe*'s essential holding . . . is a recognition of the right of the woman to choose abortion before viability."); *id.* at 871 (asserting that any state interest is "insufficient to justify a ban on abortions prior to viability even when it is subject to certain exceptions"). These central tenets have been repeatedly reaffirmed by the

Court, including as recently as 2016. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).

Unsurprisingly, attempts to ban abortion prior to viability have been uniformly rejected by the courts. *See e.g*, *Edwards v. Beck*, 786 F.3d 1113, 1117-19 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 895 (2016) (striking down a ban on abortion starting at twelve weeks); *Isaacson v. Horne*, 716 F.3d 1213, 1217, 1231 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 905 (2014) (striking down ban on abortion starting at twenty weeks); *Jane L. v. Bangerter*, 102 F.3d 1112, 1117-18 (10th Cir. 1996), *cert. denied*, 520 U.S. 1274 (1997) (striking down ban on abortion starting at twenty-two weeks); *Sojouner T. v. Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992), *cert denied*, 507 U.S. 972 (1993) (striking down a ban on all abortions); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368-69, 1371-72 (9th Cir. 1992), *cert. denied*, 506 U.S. 1011 (1992) (striking down a ban on all abortions); *Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536, 537-38, 544-45 (S.D. Miss. 2018) (striking down a ban on abortions starting at fifteen weeks); *Bryant v. Woodall*, 363 F. Supp. 3d 611, 630-32 (M.D.N.C. 2019) (striking down a ban on abortions starting at twenty weeks); *see also Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997) (striking down a ban on a second trimester abortion method because it would "inhibit[] the vast majority of second trimester abortions" and "would clearly have the effect of placing a substantial obstacle in the path of a woman seeking a pre-viability abortion"); *Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 749 (S.D. Ohio 2018) (preliminarily enjoining Ohio's ban on abortion when one of the woman's reasons is an indication of Down syndrome, because "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability" (quoting *Casey*, 505 U.S. at 879) (citing *Roe*, 410 U.S. at 163-64)).

Attempts to ban abortion beginning at the detection of cardiac activity have likewise been invalidated. In 2013, North Dakota became the first state to attempt to enact such a ban. That law was struck down. *See MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772-73 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 981 (2016). In 2018, Iowa became the second state to do so; that law was also struck down. *See* Ruling on Motion for Summary Judgment, *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. Iowa*, No. EQCE 83074 (D. Ct. Iowa Jan. 22, 2019). Already this year, a federal court in Kentucky entered an injunction against a 2019 law that, similar to the one challenged here, would have banned nearly all abortions in Kentucky by prohibiting abortion at and after approximately six weeks LMP. *See* Temporary Restraining Order at 2-3, *EMW Women's Surgical Center v. Beshear*, No. 3:19-cv-178, Dkt. No. 15 (W.D. Ky. Mar. 14, 2019); Mem. of Conf. & Order at 2, *EMW Women's Surgical Center v. Beshear*, No. 3:19-cv-17, Dkt. No. 32 (W.D. Ky. Mar. 27, 2019).

Indeed, no court has upheld any pre-viability abortion ban. That is because under the binding precedent of *Casey* and *Roe*, such a ban is inarguably unconstitutional.[8] Plaintiffs have therefore established that they are likely to succeed on the merits of their claim that the Ban violates the substantive due process rights of their patients.

## II. PLANTIFFS' PATIENTS WILL SUFFER IRREPARABLE HARM IF THE BAN TAKES EFFECT.

Plaintiffs' patients will suffer serious and irreparable harm in the absence of a preliminary injunction. The Ban prevents Ohioans from exercising their fundamental constitutional right to reproductive freedom. The denial of constitutional rights is, per se, an irreparable harm. Moreover, Plaintiffs' patients will be prohibited from obtaining a desired

---

[8] Even Ohio state legislators and Governor DeWine have admitted that the Ban is unconstitutional under this binding precedent. *See supra* n.2.

abortion, which can result in physical, emotional, and psychological harms, all of which are irreparable.

The Sixth Circuit has long made clear: "[I]f it is found that a constitutional right is being threatened or impaired, *a finding of irreparable injury is mandated*." *Am. Civil Liberties Union of Ky. v. McCreary Cty.*, 354 F.3d 438, 455 (6th Cir. 2003) (emphasis added) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *accord Mich. State A. Phillip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed." (internal citations omitted)); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (same); *see also Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) ("[T]he loss of constitutional rights for even a minimal amount of time constitutes irreparable harm."). Because it is clear that S.B. 23 impairs Plaintiffs' patients' rights guaranteed by the Fourteenth Amendment to the United States Constitution, it per se inflicts irreparable harm and should be enjoined.

Moreover, forcing women to remain pregnant against their will inflicts physical, emotional, and psychological consequences that alone constitute irreparable harm. *See e.g.*, *Elrod*, 427 U.S. at 373-74; *Planned Parenthood of Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013). As *Roe* recognized, the loss of access to abortion can impose serious harm:

> Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it.

410 U.S. at 153. Further, abortion access is critical to achieving equality. As the Supreme Court observed in *Casey*, access to abortion care has improved women's lives: "The ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." 505 U.S. at 835.

Concerns about achieving equality are especially relevant in Ohio, where the communities most affected by the Ban are constituted by racial and ethnic minorities and people with low incomes, communities that already face multiple barriers to achieving equality. *See* Compl. ¶¶ 54-55, 57. Were S.B. 23 to go into effect, Black Ohioans are likely to suffer some of the gravest consequences. Recent statistics from the U.S. Centers for Disease Control and Prevention show that Black women are three times more likely than White women to die of causes related to pregnancy.[9] Additionally, in Ohio, Black infants are three times more likely than White infants to die before their first birthday.[10] Denying women desired abortions while simultaneously failing to adequately address these disparities will only result in an increase in the number of bad outcomes for Black people.

In sum, the Ban will cause irreparable injury to Plaintiffs' patients, warranting relief from the Ban.

---

[9] Emily E. Petersen et al., *Vital Signs*: *Pregnancy-Related Deaths, United States, 2011-2015, and Strategies for Prevention*, *13 States, 2013-2017*, 68 Morbidity & Mortality Weekly Rep. 423 (May 10, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6818e1.htm?s_cid=mm6818e1_w.

[10] *Ohio Infant Deaths in 2017 Second-Lowest on Record While Racial Disparities in Birth Outcomes Continued*, Ohio Dep't of Health (Dec. 6, 2018), https://odh.ohio.gov/wps/portal/gov/odh/media-center/odh-news-releases/2017-ohio-infant-mortality-report; *see also Hearing on S.B. 23*, 133rd Leg. Ses. (2019) (testimony of New Voices for Reproductive Justice) (calling the racial disparities in the infant mortality rates "the direct result of institutional and environmental harm on multiple fronts"); *id.* (statement of Sen. Sandra Williams) ("Ohio is continuing to fail to close the gap in racial disparities when it comes to infant mortality.").

**III.     THE BALANCE OF HARM TIPS DECIDELY IN PLAINTIFFS' FAVOR.**

While Plaintiffs' patients will suffer numerous irreparable harms without an injunction, Defendants will suffer no injury whatsoever; Plaintiffs' requested relief will simply preserve the status quo that has been in place for more than four decades. *See Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013) (balance of equities favored preliminary relief where injunction against a fifteen-week abortion ban would "essentially continue[] the status quo"). Further, the State of Ohio cannot be harmed by being prevented from violating the Constitution. *See Chamber of Commerce of U.S. v. Edmonson*, 594 F.3d 742, 771 (10th Cir. 2010) (defendant "does not have an interest in enforcing a law that is likely constitutionally infirm"). The balance of harm thus weighs decisively in Plaintiffs' favor.

**IV.     A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.**

Enjoining the Ban clearly serves the public interest. As the Sixth Circuit has made clear, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. Civil Liberties Union Fund of Mich.*, 796 F.3d at 649 (alternations in original) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)); *accord Mich. State*, 833 F.3d at 669 (same); *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012) ("[T]he public interest is promoted by the robust enforcement of constitutional rights . . . ."); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (same). The only way to prevent the public harm that would result from this far-reaching constitutional violation is to enjoin enforcement of the Ban.

**V.     A BOND IS NOT NECESSARY IN THIS CASE.**

This Court should waive the Federal Rule of Civil Procedure 65(c) bond requirement. The Sixth Circuit has long held "that the district court possesses discretion over whether to

require the posting of security." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Insurance Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (emphasis omitted) (quoting *Molton Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995)); *see also Molton Co.*, 55 F.3d at 1176 (affirming district court decision to require no bond because of "the strength of [the plaintiff's] case and the strong public interest involved"). This Court should use its discretion to waive the bond requirement here, where the relief sought will result in no monetary loss for Defendants.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Preliminary Injunction.


Dated: May 15, 2019

Respectfully submitted,

/s/ B. Jessie Hill**
B. Jessie Hill #0074770, *Trial Attorney*
Freda J. Levenson #0045916
American Civil Liberties Union of Ohio, Foundation, Inc.
4506 Chester Ave.
Cleveland, OH 44103
(216) 368-0553 – Jessie Hill
(614) 586-1972 x 125 – Freda Levenson
(614) 586-1974 (fax)
bjh11@cwru.edu
flevenson@acluohio.org
*Counsel for Plaintiff Preterm-Cleveland*

Elizabeth Watson*
Rachel Reeves*
Brigitte Amiri*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
(212) 549-2650 (fax)
ewatson@aclu.org
rreeves@aclu.org
bamiri@aclu.org
*Counsel for Plaintiff Preterm-Cleveland*

Richard Muniz*
Planned Parenthood Federation of America
1110 Vermont Ave NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)
richard.muniz@ppfa.org
*Counsel for Plaintiffs Planned Parenthood Southwest Ohio Region, Planned Parenthood of Greater Ohio, and Sharon Liner, M.D.*

Jennifer L. Branch # 0038893
Alphonse A. Gerhardstein # 0032053
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100
(513) 345-5543 (fax)
agerhardstein@gbfirm.com
jbranch@gbfirm.com
*Counsel for Plaintiffs Planned Parenthood Southwest Ohio Region, Planned Parenthood of Greater Ohio, Sharon Liner, M.D., Women's Med Group Professional Corporation and Capital Care Network of Toledo*

Melissa Cohen*
Planned Parenthood Federation of America
123 William Street, Floor 9
New York, NY 10038
(212) 541-7800
(212) 247-6811 (fax)
melissa.cohen@ppfa.org
*Counsel for Plaintiffs Planned Parenthood Southwest Ohio Region, Planned Parenthood of Greater Ohio, and Sharon Liner, M.D.*

*\*Applications for admission pro hac vice forthcoming*

*\*\* Cooperating Counsel for the ACLU of Ohio Foundation*

**<u>CERTIFICATE OF SERVICE</u>**

   I hereby certify that on May 15, 2019, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties have access to this filing through the Court's system. I further certify that a copy of the foregoing pleading and Notice of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has not yet entered an appearance.

                /s/ B. Jessie Hill
                Trial Attorney for Plaintiffs