# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **PRETERM-CLEVELAND, et al.,** : | |
| : | |
| **Plaintiffs,** : | Case No. 1:19-cv-00360 |
| : | |
| **v.** : | Judge Michael R. Barrett |
| : | |
| **OHIO ATTORNEY GENERAL DAVE YOST,** : | |
| : | |
| **Defendant.** : | |

**DEFENDANTS OHIO DEPARTMENT OF HEALTH, STATE MEDICAL BOARD OF OHIO, AND OHIO ATTORNEY GENERAL DAVE YOST'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER (DOC. 2)**

Respectfully submitted,

DAVE YOST
ATTORNEY GENERAL

*s/ Heather L. Buchanan*
HEATHER L. BUCHANAN (0083032)
BRIDGET C. COONTZ (0072919)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Heather.Buchanan@OhioAttorneyGeneral.gov
Bridget.Coontz@OhioAttorneyGeneral.gov

*Counsel for Defendants Ohio Department of Health, State Medical Board of Ohio, and Ohio Attorney General Dave Yost*

**I.     INTRODUCTION**

On April 11, 2019, Ohio Governor Mike DeWine signed into law the Human Rights and Heartbeat Protection Act ("the Heartbeat Protection Act" or "the Act"). The Heartbeat Protection Act, with certain enumerated exceptions, prohibits an abortion if the unborn child has a detectable heartbeat. Plaintiffs seek to enjoin the Heartbeat Protection Act, asserting it is an unconstitutional ban on pre-viability abortions.

This Court's decision on Plaintiffs' motion for preliminary injunction is likely controlled by decisions in other abortion-related cases that apply a judicially created constitutional construct: viability. To the extent the Heartbeat Protection Act conflicts with existing viability precedent, such precedent controls. Although courts have made viability the central question in cases such as this, they have done so while also recognizing that states can—and should—legislate to protect life.

After making findings regarding fetal cardiac activity, and in recognition of, and consistent with its interest in protecting fetal life, the General Assembly passed the Heartbeat Protection Act. Regulating abortions beginning at the detection of a fetal heartbeat, as the Act does, is a logical expansion of Ohio's legislative authority and its well-established interest in protecting the unborn.

**II.     FACTS AND BACKGROUND**

The Ohio General Assembly passed S.B. 23, the Heartbeat Protection Act, on April 10, 2019. Governor DeWine signed the bill into law one day later, on April 11, 2019.

The Heartbeat Protection Act generally prohibits a person from knowingly and purposefully performing or inducing an abortion of an unborn human whose fetal heartbeat has been detected. Ohio Revised Code § 2919.195(A). The Act contains two exceptions to this provision. First, the prohibition does not apply to a physician who performs a medical procedure

1

designed or intended, in that physician's reasonable medical judgment, to prevent the death of a pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman. Ohio Revised Code § 2919.195(B). Second, the prohibition does not apply if a person has performed an examination for the presence of a fetal heartbeat, in accordance with the person's good-faith understanding of standard medical practice, and no heartbeat is detected. Ohio Revised Code §§ 2919.192(A), 2919.195(C). Except when prevented by a medical emergency in certain cases, a person who knowingly and purposefully performs or induces an abortion without determining whether there is a detectable fetal heartbeat is a guilty of a fifth-degree felony. Ohio Revised Code § 2919.193(A).

The Heartbeat Protection Act also creates a Joint Legislative Committee on Adoption Promotion and Support. This committee serves to further the goal of informing women whose pregnancies are protected under the Act of available options for adoption by studying and reviewing mechanisms intended to increase awareness of the adoption process and/or increase effectiveness of the adoption process. Ohio Revised Code § 2919.1910(A)-(C).

Before passing the Heartbeat Protection Act the General Assembly held five hearings, heard testimony from a variety of legal and medical professionals, concerned citizens, and clergy, and received extensive documentary information into the record. Supported by this evidence the General Assembly issued several findings, including:

- Less than 5% of all natural pregnancies end in spontaneous miscarriage after detection of fetal cardiac activity.

- Fetal heartbeat is a key medical predictor that an unborn human will reach live birth.

- Cardiac activity begins at a biologically identifiable point in time, normally when the fetal heart is formed in the gestational sac.

2

> • Detection of a fetal heartbeat can be accomplished through standard medical practices.
>
> • The State of Ohio has a legitimate interest from the outset of the pregnancy in protecting the health of the woman, and a compelling interest from the outset of the pregnancy in protecting the life of the unborn human who may be born.

S.B. 23 § 3; Ohio Legislative Service Commission Bill Analysis, S.B. 23, at 7, Ex. A.

Plaintiffs Preterm-Cleveland, Planned Parenthood Southwest Ohio Region, Sharon Liner, M.D., Planned Parenthood of Greater Ohio, Women's Med Group Professional Corporation, and Capital Care Network of Toledo (collectively referred to as "Plaintiffs") filed this lawsuit on May 15, 2019, seeking a preliminary injunction barring the Heartbeat Protection Act from going into effect on July 10, 2019.  Doc. 2 at 15-16.

## III.   LAW AND ANALYSIS

### A.   Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  This standard is demanding because an injunction is an "extraordinary remedy." *Id*. at 22.  A plaintiff must establish a "strong" likelihood of success, *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012) (quotation omitted); a mere "possib[ility]" of success does not suffice, *Summit Cnty. Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004).  Similarly, the plaintiff must show a likelihood, not just a possibility, of irreparable injury.  *Winter*, 555 U.S. at 22.

Additionally, because Plaintiffs seek facial relief, they have an even higher burden. *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007).  Within the Sixth Circuit, to succeed on a facial challenge to an abortion regulation, the plaintiffs must show that, "in a large fraction of the cases

3

in which [the abortion restriction] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Cincinnati Women's Servs. v. Taft*, 468 F.3d 361, 367 (6th Cir. 2006) (quoting *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 895 (1992)).

### B. The Heartbeat Protection Act recognizes that medical questions should be answered by employing medical standards, not blanket legal constructs.

Abortion jurisprudence is generally based on the understanding that viability—"the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb"— is the point at which the State's interest in protecting fetal life predominates over the interest of a woman's right to abortion. *Casey*, 505 U.S. at 870. Yet, as both courts and the scientific community have long-recognized, this standard is problematic and unsustainable. *See, e.g., City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 458 (1983) (O'Connor, J., dissenting) (noting that the viability standard "is clearly on a collision course with itself"). In *Casey*, the Supreme Court emphasized this point: "[b]efore viability, *Roe* and subsequent cases treat all governmental attempts to influence a woman's decision on behalf of the potential life within her as unwarranted. This treatment is, in our judgment, incompatible with the recognition that there is a substantial state interest in potential life throughout pregnancy." *Casey*, 505 U.S. at 876. "[U]ndeniably, medical and technological advances along with mankind's ever increasing knowledge of prenatal life since the Court decided *Roe v. Wade* . . . and *Casey* make application of *Casey's* viability standard more difficult[.]" *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015) (per curiam).

To the extent that this Court finds that there exists a conflict between the Act and *Casey*, it will inevitably conclude that, as a matter of law, *Casey* controls. But the issue is not so simple. Ever since the Supreme Court first established viability as the point at which the state's interest

4

becomes compelling, it has left open the question whether a change in circumstances, such as advances in medical technology, can justify pre-viability abortion regulations. *See, e.g., Casey*, 505 U.S. at 861 ("[N]o changes of fact have rendered viability more or less appropriate as the point at which the balance of interests tips."); *see also Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) ("assum[ing] . . . for the purposes of this opinion" that viability is the deciding line instead of holding that viability is the only or absolute demarcation). Undoubtedly, medical technology has advanced significantly since *Roe v. Wade*, 410 U.S. 113 (1973). Thus, the point at which fetal cardiac activity can be detected, and fetal life can be protected, has similarly advanced. The existing blanket approach to viability fails to recognize these advancements, and therefore falls far short of safeguarding the state's interest in protecting life.

The findings made by the Ohio General Assembly in passing the Heartbeat Protection Act are similar to those that the Supreme Court approvingly cited when it upheld the federal Partial-Birth Abortion Ban Act in *Gonzales*. *E.g.*, 550 U.S. at 157-60. In finding the legislation a permissible regulation of pre-viability abortions, the Court outlined policy considerations that courts must take into account to determine whether a statute that regulates pre-viability abortions is constitutionally permissible. *Id*. at 146. Among such considerations were Congressional findings supporting the legislation, including advancements in science and technology that allowed for a more objective and precise understanding that "a fetus is a living organism while within the womb, whether or not it is viable outside the womb." *Id*. at 147. Citing the Congressional finding that the partial-birth abortion procedure was "brutal and inhumane," the Court recognized that "[t]he Act expresses respect for the dignity of human life." *Id*. at 157. Specifically, Congress determined that partial-birth abortion methods shared a "disturbing similarity to the killing of a newborn infant . . . and thus it was concerned with draw[ing] a bright

5

line that clearly distinguishes abortion and infanticide." *Id.* at 158 (alteration in original) (quotation omitted). In *Gonzales,* the partial-birth abortion ban and the Congressional findings on which it was based were a logical extension of the established premise that "[t]he government may use its voice and its regulatory authority to show its profound respect for the life within the woman." *Id.* at 157.

It similarly follows that the Heartbeat Protection Act's extensive legislative findings—which show that the point at which a fetal heart rate is detectable is a certain and strong predictor of survivability of the unborn child—directly relate to "the State's interest in promoting respect for human life at all stages in the pregnancy." *Id.* at 163. The General Assembly heard that recent medical research shows that once a fetal heartbeat is detected, an unborn fetus has a 95-98% chance of surviving to full term. Roegner Test. at 3, Ex. B; Sullivan Test. at 3, Ex. C. Moreover, a fetal heartbeat can be objectively identified through the relatively simple application of medical technologies. Aultman Test. at 4-5, Ex. D. The Heartbeat Protection Act does not limit physicians to current technology, which can quickly be outdated. Doody Test. at 5, Ex. E. Rather, physicians must employ "standard medical practice" in detecting a fetal heartbeat. *Id.* These medical standards can—and should—change as they "grow and improve as technology improves." *Id.*

Thus, what the General Assembly heard when it considered the Act is that it is unsupportable to consider all unborn children "viable" at the exact same gestational point in time. To the contrary, doctors do not determine viability based on objective physical or medical markers, but by *estimating* the gestational age of the fetus based on the infant's measurements from "crown to rump." Forte Test. at 3, Ex. F. Doctors hold varying opinions on when viability actually occurs, and a doctor's estimate can have a high margin of error. *Id.*

Viability is thus a variable point that changes from pregnancy to pregnancy, year to year, based on outside factors such as physician training and available technology and medical resources. Roegner Test. at 2, Ex. B; *see also Isaacson v. Horne*, 716 F.3d 1213, 1224 (9th Cir. 2013) ("The Supreme Court has recognized that viability varies among pregnancies and that improvements in medical technology will both push later in pregnancy the point at which abortion is safer than childbirth and advance earlier in gestation the point of fetal viability."). Such variability poses particular challenges to courts and legislatures when evaluating if a law regulates pre-viability abortion, and can have random and perverse effects, as expressed by the court in *MKB Management Corporation v. Stenehjem*: "How it is consistent with a state's interest in protecting unborn children that the same fetus would be deserving of state protection in one year but underserving of state protection in another is not clear." 795 F.3d 768, 774 (8th Cir. 2015).

The Heartbeat Protection Act protects unborn children after detection of a fetal heartbeat and thus ensures that Ohio affords all unborn children consistent protection. Consistent with Ohio's interest in protecting fetal life, the Act recognizes fetal heartbeat, not fetal viability, as the critical point in time at which the State's interest in potential life becomes compelling enough to warrant regulating abortion procedures.

**C. The Heartbeat Protection Act advances Ohio's interests in preserving and protecting the potentiality of human life.**

The State's interest in preserving and protecting the potentiality of human life is well-established. *Roe* itself acknowledged the "important and legitimate interest in protecting the potentiality of human life." 410 U.S. at 162. As did *Casey*: "the State has legitimate interests from the outset of the pregnancy in protecting . . . the life of the fetus that may become a child." 505 U.S. at 846. Justices O'Conner, Kennedy, and Souter referred to that interest as "profound,"

7

*id*. at 877, and criticized abortion jurisprudence for giving "too little acknowledgment" of "the interest of the State in the protection of potential life." *Id*. at 871. Chief Justice Rehnquist, with Justices White and Kennedy, wrote that "[t]he State's interest, if compelling after viability, is equally compelling before viability." *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 519 (1989) (quotation omitted); *see also Stenehjem*, 795 F.3d at 774 (the "viability standard has proven unsatisfactory because it gives too little consideration to the 'substantial state interest in potential life throughout the pregnancy'") (internal citation omitted)).

The Heartbeat Protection Act advances these interests. As the General Assembly declared in support of the Act, "Ohio has a legitimate interest from the outset of the pregnancy in protecting the health of the woman, and a compelling interest from the outset of the pregnancy in protecting the life of the unborn human individual who may be born." S.B. 23 § 3; Ohio Legislative Service Commission Bill Analysis, S.B. 23, at 7, Ex. A. Regulating abortions beginning at the detection of a fetal heartbeat, as the Act does, is a logical expansion of the Ohio's interest in preserving and protecting the potentiality of human life.

D. **The Remaining Preliminary Injunction Factors Favor the State**

Although at the preliminary injunction phase this Court is bound by *Casey*, an injunction is not in the public interest. The Heartbeat Protection Act responds to recent medical advances that show the point at which a fetal heart rate is detectable is a certain and a strong predictor of survivability of the unborn child. The Act addresses Ohio's legitimate interest, which exists from the outset of pregnancy, in protecting the health of the woman, and a compelling interest from the outset of the pregnancy in protecting the life of the unborn human who may be born. Promoting these interest have been, and should always be, a vital public interest.

Additionally, a decision to grant a preliminary injunction would "subject[] [the State] to ongoing irreparable harm." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in

chambers). As Supreme Court Justices have recognized over the years, "'[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Id*. (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

## IV. CONCLUSION

Though this Court is likely bound by *Casey*, courts have also recognized that states can—and should—legislate to protect life. Such recognition is particularly significant in light of findings regarding the point at which fetal cardiac activity can be detected and when fetal life can be protected. The Heartbeat Protection Act is a logical expansion of Ohio's legislative authority and its well-established interest in protecting the unborn.

        Respectfully submitted,

        DAVE YOST
        ATTORNEY GENERAL

        *s/ Heather L. Buchanan*
        HEATHER L. BUCHANAN (0083032)
        BRIDGET C. COONTZ (0072919)
        Assistant Attorneys General
        Constitutional Offices Section
        30 East Broad Street, 16th Floor
        Columbus, Ohio 43215
        Tel: 614-466-2872 | Fax: 614-728-7592
        Heather.Buchanan@OhioAttorneyGeneral.gov
        Bridget.Coontz@OhioAttorneyGeneral.gov

        *Counsel for Defendants Ohio Department of Health, State Medical Board of Ohio, and Ohio Attorney General Dave Yost*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2019, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by e-mail or facsimile upon all parties for whom counsel has not yet entered an appearance and upon all counsel who have not entered their appearance via the electronic system.

*s/ Heather L. Buchanan*
HEATHER L. BUCHANAN (0083032)
Assistant Attorney General