**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| Preterm-Cleveland, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Case No.: 1:19-cv-00360 |
| ) | |
| vs. ) | Judge Michael R. Barrett |
| ) | |
| David Yost, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

On May 15, 2019, Plaintiffs Preterm-Cleveland, Planned Parenthood Southwest Ohio Region, Sharon Liner, M.D., Planned Parenthood of Greater Ohio, Women's Med Group Professional Corporation, and Capital Care Network of Toledo (collectively, "Plaintiffs") filed a Verified Complaint challenging the constitutionality of Ohio Senate Bill 23 of the 133rd General Assembly.  (Doc. 1).  With their Verified Complaint, Plaintiffs filed a Motion for a Temporary Restraining Order and/or Preliminary Injunction.  (Doc. 2).  During the informal conference held on May 20, 2019 pursuant to S.D. Ohio Civ. R. 65.1, Plaintiffs advised the Court of their preference for a ruling only on their Motion for Preliminary Injunction (and not their Motion for a Temporary Restraining Order) in light of the July 11, 2019 effective date of the statute.  Plaintiffs and the Ohio Attorney General agreed that there was no need for discovery or an evidentiary hearing.  They established a briefing schedule, and asked that the Court render its decision by July 5, 2019 based on the memoranda alone.  This Order follows.

1

I. **BACKGROUND**

A. **Statutory Framework Giving Rise to Plaintiffs' Complaint**

The Ohio General Assembly passed Senate Bill 23 ("S.B. 23" or the "Act"), also known as the "Heartbeat Protection Act," on April 10, 2019. Governor Mike DeWine signed the bill into law the next day, April 11, 2019. It is set to go into effect on July 11, 2019. Ohio law already requires an abortion provider to first determine whether there is detectable cardiac activity.[1] Once in effect, the Act will make it a crime to "caus[e] or abet[] the termination of" the pregnancy. S.B. 23 § 1, amending Ohio Rev. Code § 2919.195(A).

The Act has two exceptions. S.B. 23 allows abortion care after cardiac activity is detected only if the abortion is necessary to prevent the patient's death or "a serious risk of the substantial and irreversible impairment of a major bodily function." S.B. 23, § 1, amending Ohio Rev. Code § 2919.195(B). "'Serious risk of substantial and irreversible impairment of a major bodily function' means any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function," which "includes pre-eclampsia, inevitable abortion, and premature rupture of the membranes[ and] may include, but is not limited to, diabetes and multiple sclerosis[ but] does not include a condition related to the woman's mental health." Ohio Revised Code § 2919.16(K).

---

[1] As currently written, the statute provides: "The person who determines the presence or absence of a fetal heartbeat shall record in the pregnant woman's medical record the estimated gestational age of the unborn human individual, the method used to test for a fetal heartbeat, the date and time of the test, and the results of the test." Ohio Rev. Code § 2919.191(A). In addition, "The person who performs the examination for the presence of a fetal heartbeat shall give the pregnant woman the option to view or hear the fetal heartbeat." *Id.* § 2919.191(C).

A violation of the Act is a fifth-degree felony, punishable by up to one year in prison and a fine of $2,500.  S.B. 23 § 1, amending Ohio Rev. Cod. § 2919.195(A); Ohio Rev. Code §§ 2929.14(A)(5), 2929.18(A)(3)(e).  The state medical board may assess a forfeiture of up to $20,000 for each violation of the Act, S.B. 23 § 1, amending Ohio Rev. Code § 2919.1912(A), and limit, revoke, or suspend a physician's medical license based on a violation of the Act, *see* Ohio Rev. Code § 4371.22(B)(10).  A patient also may bring a civil action against a provider who violates the Act and recover damages in the amount of $10,000 or more.  S.B. 23 § 1, amending Ohio Rev. Code § 2919.199 (B)(1).

**B. Plaintiffs' Verified Complaint**

In a nutshell, S.B. 23 bans abortion care at and after approximately six weeks in pregnancy.  And, in so doing, according to Plaintiffs—a collection of reproductive health care clinics and physicians providing abortion care—violates a woman's right to privacy as guaranteed by the Fourteenth Amendment.

In a normally developing embryo, cells that form the basis for development of the heart later in gestation produce activity that can be detected with ultrasound.  (Doc. 1 ¶ 30 at PageID 10).  Consistent with common medical practice, as well as existing law, *see* Ohio Rev. Code § 2919.191(A), Plaintiffs perform an ultrasound to date the pregnancy and to determine whether there is any detectable cardiac activity.  (*Id.* ¶ 31).  An ultrasound can be performed in one of two ways:  either by placing a transducer on the patient's abdomen or by inserting a probe into the patient's vagina.  (*Id.*).  Many abortion providers, including those at the clinics that are Plaintiffs in this civil action, use vaginal ultrasound to confirm and date early pregnancy.  (*Id.*).  Using vaginal

3

ultrasound, cardiac activity generally is detectable at approximately six weeks in pregnancy, or six weeks LMP.[2] (*Id.* ¶ 32 at PageID 11). At six weeks LMP, an embryo[3] is not capable of surviving outside the womb. (*Id.* ¶ 34). In other words, it is a pre-viability point in pregnancy. (*Id.*).

At six weeks LMP, many women are unaware that they are pregnant. (*Id.* ¶ 36). Typically the menstrual cycle is approximately four weeks long, but varies based on the individual. (*Id.*). Assuming a woman has consistently regular periods, she would be considered four weeks pregnant as measured from her LMP when her missed period occurs. (*Id.*). Those who have irregular periods—caused by common medical conditions, contraceptive use, age or breastfeeding—or those who experience bleeding during early pregnancy that could be mistaken for a period may not even realize that they missed a period. (*Id.* ¶¶ 37–39 at PageID 11–12). But assuming a patient does know that she is pregnant, there are certain logistical obstacles to obtaining abortion care before six weeks in pregnancy. (*Id.* ¶ 40 at PageID 12). She will need to schedule an appointment, make sure of payment,[4] and arrange for transportation, time off of work and possibly childcare[5] during appointments. (*Id.* ¶ 42). A minor patient, unless emancipated, also must obtain written parental consent or a court order. (*Id.* ¶ 43; Ohio Rev. Code § 2919.121). And all patients, regardless of age, must make two in-person

---

[2] Pregnancy is measured from the first day of the patient's last menstrual period ("LMP"). (Doc. 1 ¶ 35 at PageID 11). A full-term pregnancy is approximately 40 weeks LMP. (*Id.*).
[3] The embryonic stage of pregnancy lasts from fertilization until approximately eight-to-ten weeks LMP. (Doc. 1 ¶ 31 at PageID 10 n.4). The embryo becomes a fetus at about 11 weeks LMP. (*Id.*).
[4] Ohio law prohibits public insurance, including Medicaid, and insurance purchased on the state exchange from covering abortion care except when a patient's physical health or life is at risk or when the pregnancy is the result of rape or incest and that rape or incest has been reported to law enforcement. Ohio Rev. Code §§ 9.04, 3901.87; Ohio Admin. Code § 5160-17-01.
[5] A majority (61%) of those patients having abortions already have at least one child. (Doc. 1 ¶ 47 at PageID 13).

trips—at least 24 hours apart—to the clinic before they can obtain an abortion. (Doc. 1 ¶¶ 41, 43 at PageID 12; Ohio Rev. Code § 2317.56). These reasons explain why the vast majority of abortions in Ohio—approximately 90%—take place at or after six weeks LMP. (Doc. 1 ¶44 at PageID 13). S.B. 23, therefore, will prohibit almost all abortion care in Ohio. (*Id.* ¶ 45).

## II.  ANALYSIS

As final relief, Plaintiffs seek an Order from this Court declaring the Act unconstitutional, and a permanent injunction barring its enforcement. The purpose of a preliminary injunction is to preserve the *status quo* prior to entry of the final order. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In considering a preliminary injunction, the court considers four elements: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citations omitted). "These four considerations are factors to be balanced, not prerequisites that must be met." *Kessler v. Hrivnak*, No. 3:11-cv-35, 2011 WL 2144599, at *3 (S. D. Ohio May 31, 2011). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Id.* (citation omitted)

### A. Likelihood of Success

The Court concludes, based on current United States Supreme Court precedent, that Plaintiffs are certain to succeed on the merits of their claim that S.B. 23 is unconstitutional on its face.

The law is well-settled that women possess a fundamental constitutional right of access to abortions. *Roe v. Wade*, 410 U.S. 113, 153-54 (1973). Yet the right to terminate a pregnancy is not absolute: "[A] state may regulate abortion *before viability* as long as it does not impose an 'undue burden' on a woman's right to terminate her pregnancy." *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 443 (6th Cir. 2003) (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 876 (1992) (emphasis added)). The undue burden test recently was summarized by the Supreme Court as follows: "[T]here 'exists' an 'undue burden' on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the '*purpose or effect*' of the provision '*is to place a substantial obstacle* in the path of a woman seeking an abortion before the fetus attains viability.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016) (quoting *Casey*, 505 U.S. at 878 (emphasis added in *Hellerstedt*)). As with the majority of other circuits, the Sixth Circuit follows *Casey*'s "large-fraction test" when considering facial attacks on abortion regulations. *Cincinnati Women's Servs. v. Taft*, 468 F.3d 361, 367 (6th Cir. 2006). Accordingly, Plaintiffs must show that, "in a large fraction of the cases in which [the abortion restriction] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* (quoting *Casey*, 505 U.S. at 895). Plaintiffs' 90% statistic—which Defendants do not challenge—amply suffices. S.B 23, as its sponsors intended,

will have the effect of preventing nearly all abortions in Ohio.  A woman with highly regular periods would have only two weeks, at most, "to learn that she is pregnant, decide whether to have an abortion, and seek and obtain abortion care."  (Doc. 2 at PageID 58).  A woman with irregular periods likely will be denied the opportunity to seek an abortion altogether because she will not realize that she is pregnant in time to choose her fate.  One could characterize the obstacle Ohio women will face as not merely "substantial," but, rather, "insurmountable."  *See Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 754 (S.D. Ohio 2018), *appeal docketed*, No. 18-3329 (6th Cir. Apr. 12, 2018).  As a matter of law, therefore, *Casey* dictates a finding in Plaintiffs' favor on the likelihood of success on the merits.  To their credit, Defendants concede this point.  (Doc. 17 at PageID 104 ("This Court's decision on Plaintiffs' motion for preliminary injunction is likely controlled by decisions in other abortion-related cases that apply a judicially created constitutional construct:  viability.  To the extent the Heartbeat Protection Act conflicts with existing viability precedent, such precedent controls."); at PageID 107 ("To the extent that this Court finds that there exists a conflict between the Act and *Casey*, it will inevitably conclude that, as a matter of law, *Casey* controls."); at PageID 111 ("[A]t the preliminary injunction phase this Court is bound by *Casey*."); and at PageID 112 ("[T]his Court is likely bound by *Casey*.")).

Plaintiffs cite a number of cases in which attempts to ban abortion prior to viability have been rejected.  *See, e.g.*, *Edwards v. Beck*, 786 F.3d 1113 (8th Cir. 2015) (finding unconstitutional Arizona Human Heartbeat Protection Act prohibiting abortion starting at 12 weeks), *cert. denied*, 136 S. Ct. 895 (2016); *Isaacson v. Horne*, 716 F.3d 1213 (9th Cir. 2013) (finding unconstitutional Arizona statute forbidding abortion starting

7

at 20 weeks), *cert. denied,* 134 S. Ct. 905 (2014); *Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536 (S.D. Miss. 2018) (finding unconstitutional Mississippi statute forbidding abortion starting at greater than 15 weeks), *appeal docketed sub nom. Jackson Women's Health Org. v. Dobbs*, No. 18-60868 (5th Cir. Dec. 17, 2018). And, thus far, all other attempts by states to ban abortion <u>beginning at the detection of cardiac activity</u> have been invalidated. *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772–73 (8th Cir. 2015) (North Dakota), *cert. denied*, 136 S. Ct. 981 (2016); *Jackson Women's Health Org., v. Dobbs*, --- F. Supp. 3d ---, No. 3:18-cv-171-CWR-FKB, 2019 WL 2240532 (S.D. Miss. May 24, 2019) (Mississippi), *appeal docketed*, No. 19-60455 (5th Cir. June 24, 2019); *Planned Parenthood of the Heartland, Inc. v. Reynolds*, No. EQCE83074, 2019 WL 312072 (Iowa Dist. Jan. 22, 2019) (Iowa).

In response, Defendants argue that *Casey*'s viability "construct" is flawed because of the ongoing advancement of medical technology. (Doc. 17 at PageID 108). A "blanket approach to viability" fails to account for advancements regarding "the point at which fetal cardiac activity, and fetal life can be protected," and hence "falls far short of safeguarding the state's interest in protecting life." (*Id.*). Not so, say Plaintiffs, and this Court agrees. As noted in *Casey*:

> **We have seen how time has overtaken some of *Roe*'s factual assumptions**: advances in maternal health care allow for abortions safe to the mother later in pregnancy than was true in 1973, and advances in neonatal care have advanced viability to a point somewhat earlier. But these facts go only to the scheme of time limits on the realization of competing interests, and the divergences from the factual premises of 1973 have no bearing on the validity of *Roe*'s central holding, that viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions. The soundness or unsoundness of that constitutional judgment in

8

> no sense turns on whether viability occurs at approximately 28 weeks, as was usual at the time of *Roe*, at 23 to 24 weeks, as it sometimes does today [in 1992], or at some moment even slightly earlier in pregnancy, as it may if fetal respiratory capacity can somehow be enhanced in the future. **Whenever it may occur, the attainment of viability may continue to serve as the critical fact,** just as it has done since *Roe* was decided; **which is to say that no change in *Roe*'s factual underpinning has left its central holding obsolete, and none supports an argument for overruling it.**

*Casey*, 505 U.S. at 860 (internal citations omitted) (emphasis added). And more to the point regarding the question presented to this Court:

> [T]he concept of viability, as we noted in *Roe*, is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the right of the woman. Consistent with other constitutional norms, **legislatures may draw lines which appear arbitrary without the necessity of offering a justification. But courts may not. We must justify the lines we draw. And there is no line other than viability which is more workable**. To be sure, as we have said, **there may be some medical developments that affect the precise point of viability, but this is an imprecision within tolerable limits given that the medical community and all those who must apply its discoveries will continue to explore the matter**. The viability line also has, as a practical matter, an element of fairness. In some broad sense it might be said that a woman who fails to act before viability has consented to the State's intervention of behalf of the developing child.
>
> **The woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce**.

*Id.* at 870–71 (internal citations omitted) (emphasis added).

Defendants refer to testimony considered by the Ohio General Assembly in the course of passing S.B. 23 to the effect that "it is unsupportable to consider all unborn

9

children 'viable' at the exact same gestational point in time." (Doc. 17 at PageID 109 (citing Doc. 17-6, Written Testimony of David F. Forte)).  And "[d]octors hold varying opinions on when viability actually occurs, and a doctor's estimate can have a high margin of error." (*Id.*).  Defendants offer no testimony, however, that viability exists at six weeks LMP.

This Court concludes that S.B. 23 places an "undue burden" on a woman's right to choose a pre-viability abortion, and, under *Casey*, Plaintiffs are certain to succeed on the merits of their claim.  To the extent that the State of Ohio "is making a deliberate effort to overturn *Roe* [*v.Wade*] and established constitutional precedent," *see Jackson Women's Health*, 349 F. Supp. 3d at 544, those arguments must be made to a higher court.

### B. Irreparable Harm

Plaintiffs argue that their patients will suffer serious and irreparable harm in the absence of a preliminary injunction, because allowing the Act to take effect will prevent Ohio women from exercising their constitutional right to reproductive freedom as protected by the Fourteenth Amendment.[6]  "[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *accord Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of [constitutional] freedoms . . . unquestionably constitutes irreparable injury.").

---

[6] While clinics and physicians do not possess a constitutional right to perform abortions, they have standing to assert constitutional challenges on behalf of their patients in the abortion context.  *See Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019).

Inasmuch as this Court has determined that S.B. 23 places an "undue burden" on a woman's right to choose a pre-viability abortion, and thus violates her right to privacy guaranteed by the Fourteenth Amendment, we further determine that its enforcement would, per se, inflict irreparable harm. This second factor, then, weighs in favor of Plaintiffs.

### C. Harm to Others

Plaintiffs argue that, while their patients will suffer irreparable harm without an injunction, Defendants will suffer no injury whatsoever. Plaintiffs are correct. To be sure, *Casey* acknowledged the State's "legitimate interest from the outset of the pregnancy in protecting the . . . life of the fetus that may become a child." *Casey*, 505 U.S. at 846. But that acknowledgement was preceded with the recognition that "[b]efore viability, **the State's interests are not strong enough** to support a prohibition of abortion or the imposition of a substantial obstacle to the women's effective right to elect the procedure." *Id.* (emphasis added). An injunction will preserve the *status quo* that has been in place for more than 40 years since *Roe* was decided, and some 25 years since *Casey* followed. *See Jackson Womens' Health Org. v. Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013). Whether the *status quo* will change upon appeal remains to be seen. The third factor, then, weighs in favor of Plaintiffs.

### D. Public Interest

"[T]he public interest is promoted by the robust enforcement of constitutional rights," *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012), and it is in the public's interest to uphold those rights if

11

they are being denied "absent medical or other legitimate concerns." *Doe v. Barron*, 92 F. Supp. 2d 694, 697 (S.D. Ohio 1999).[7] The fourth factor, then, weighs in favor of Plaintiffs.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (Doc. 2) is **GRANTED**. Specifically, all Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order, are preliminarily enjoined from enforcing or complying with S.B. 23 pending further Order of this Court. Additionally, and consistent with the foregoing reasons, the Court waives the bond requirement set forth in Fed. R. Civ. P. 65(c). *Molton Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (district court has discretion to issue preliminary injunction with no bond).

**IT IS SO ORDERED.**

                                           s/ *Michael R. Barrett*
                                           Michael R. Barrett, Judge
                                           United States District Court

---

[7] Defendants accurately quote Justice Rehnquist in *New Motor Vehicle Bd. v. Orrin W. Fox. Co.*, 434 U.S. 1345, 1351 (1977) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). A retail automobile dealer's right to relocate as defined by state law, however, is hardly comparable to a woman's right to choose as guaranteed by the United States Constitution.