# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **PRETERM-CLEVELAND** | : | **Case No. 1:19-cv-00360** |
| C/O B. JESSIE HILL | : | |
| ACLU of Ohio | : | **Judge: Michael R. Barrett** |
| 4506 Chester Ave. | : | |
| Cleveland, OH 44103 | : | |
| | : | **SUPPLEMENT TO VERIFIED** |
| **PLANNED PARENTHOOD** | : | **COMPLAINT FOR DECLARATORY** |
| **SOUTHWEST OHIO REGION** | : | **AND INJUNCTIVE RELIEF** |
| C/O Gerhardstein & Branch, LPA | : | |
| 441 Vine Street, Suite 3400 | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| **SHARON LINER, M.D.** | : | |
| C/O Gerhardstein & Branch, LPA | : | |
| 441 Vine Street, Suite 3400 | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| **PLANNED PARENTHOOD** | : | |
| **GREATER OHIO** | : | |
| C/O Gerhardstein & Branch, LPA | : | |
| 441 Vine Street, Suite 3400 | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| **WOMEN'S MED GROUP** | : | |
| **PROFESSIONAL CORPORATION** | : | |
| C/O Gerhardstein & Branch, LPA | : | |
| 441 Vine Street, Suite 3400 | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| **CAPITAL CARE NETWORK OF** | : | |
| **TOLEDO** | : | |
| C/O Gerhardstein & Branch, LPA | : | |
| 441 Vine Street, Suite 3400 | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| **NORTHEAST OHIO WOMEN'S** | : | |
| **CENTER** | : | |
| C/O B. JESSIE HILL | : | |
| ACLU of Ohio | : | |
| 4506 Chester Ave. | : | |
| Cleveland, OH 44103 | : | |
| | : | |

      **Plaintiffs,**              :

**vs.**                       :

                         :

**DAVID YOST**           :
**Attorney General of Ohio**   :
30 E. Broad Street, 14th Floor  :
Columbus, OH 43215      :

                         :

**AMY ACTON**           :
**Director, Ohio Department of Health** :
246 N. High Street        :
Columbus, OH 43215      :

                         :

**KIM G. ROTHERMEL, M.D.**  :
**Secretary, State Medical Board of Ohio** :
30 East Broad Street, 3rd Floor :
Columbus, OH 43215      :

                         :

**BRUCE R. SAFERIN, D.P.M.** :
**Supervising Member, State Medical** :
**Board of Ohio**          :
30 East Broad Street, 3rd Floor :
Columbus, OH 43215      :

                         :

**MICHAEL C. O'MALLEY**  :
**Cuyahoga County Prosecutor** :
Justice Center Bld. Floor 8th and 9th :
1200 Ontario Street      :
Cleveland, OH 44113     :

                         :

**JOSEPH T. DETERS**    :
**Hamilton County Prosecutor** :
230 E. Ninth Street, Suite 4000 :
Cincinnati, OH 45202     :

                         :

**RONALD O'BRIEN**     :
**Franklin County Prosecutor** :
373 S. High Street, 14th Floor :
Columbus, OH 43215      :

                         :

**GARY BISHOP**         :
**Richland County Prosecutor** :
38 South Park Street      :
Mansfield, OH 44902     :

                         :

**PAUL J. GAINS**       :

**Mahoning County Prosecutor**
21 W. Boardman Street, 6th Floor
Youngstown, OH 44503

**MATHIAS HECK, JR.**
**Montgomery County Prosecutor**
301 W. Third St.
P.O. Box 972
Dayton, OH 45402

**JULIA R. BATES**
**Lucas County Prosecutor**
700 Adams Street, Suite 250
Toledo, OH 43604

**SHERRI BEVAN WALSH**
**Summit County Prosecutor**
53 University Ave.
Akron, Ohio 44308

      **Defendants.**


## SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by and through their attorneys, bring this Supplemental Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

## INTRODUCTION

1.  This is a constitutional challenge, under 42 U.S.C. § 1983, to Senate Bill 23, 133rd Gen. Assemb. (hereinafter "the Ban"), attached as Exhibit A.

2.  This is also a constitutional challenge to the Ohio Health Director's March 17, 2020 order entitled: "RE: Director's Order for the Management of Non-essential Surgeries and Procedures throughout Ohio" ("Director's Order"), as applied to surgical abortion procedures,

attached as Exhibit B.[1]

3.    In the absence of an injunction, the enforcement of the Director's Order to ban virtually all surgical abortion would ban the only abortion method available for all patients who are over 10 weeks pregnant and the only method available to some patients at any point in pregnancy.

4.    For over forty-six years, U.S. law has recognized the fundamental federal constitutional right to make the profoundly important and personal decision whether or not to terminate a pregnancy.  The U.S. Supreme Court has repeatedly recognized that this right is central to obtaining equality and respecting the dignity, autonomy, and bodily integrity of all individuals.

5.    The decision to terminate a pregnancy is informed by a combination of diverse, complex, and interrelated factors that are intimately related to the individual's values and beliefs, culture and religion, health status and reproductive history, familial situation, and resources and economic stability.  In direct conflict with *Roe v. Wade*, 410 U.S. 113 (1973), and more than four decades of precedent affirming *Roe*'s central holding, the Ban criminalizes almost all pre-viability abortions.  Specifically, the Ban makes it a crime to perform an abortion after detection of cardiac activity, which generally occurs around six weeks in pregnancy, when many women[2] are unaware they are pregnant.  In so doing, the Ban prohibits approximately 90% of abortions

---

[1] https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home/public-health-orders/directors-order-non-essential-surgery-3-17-2020

[2] Plaintiffs use "woman" or "women" in this complaint as a short-hand for people who are or may become pregnant, but note that people of all gender identities, including gender non-conforming people and transgender men, may also become pregnant and seek abortion services and would thus also suffer irreparable harm as a result of the Ban.

currently performed in Ohio and violates Plaintiffs' patients' rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

6. The Ohio Legislature passed the Ban on April 10, 2019, and Governor DeWine signed the Ban on April 11, 2019. If the Ban takes effect as scheduled on July 10, 2019, it will instantly criminalize the performance of almost all abortions in Ohio. Governor DeWine acknowledged that the Ban is blatantly unconstitutional and has stated that the Ban is an opportunity to advocate for "reversal of existing legal precedents."[3]

7. Unless this Court grants a temporary restraining order or preliminary injunction, and later a permanent injunction, Plaintiffs will be forced to turn away patients seeking abortion care. This is a direct violation of Plaintiffs' patients' fundamental constitutional right to decide whether to have an abortion prior to viability, and causes those patients irreparable harm.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

9. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

10. Venue is appropriate under 28 U.S.C § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occur in this judicial district.

## PLAINTIFFS

---

[3] *Ohio Gov. Mike DeWine Signs Ban on Abortion After 1st Heartbeat*, Associated Press (Apr. 12, 2019), https://www.apnews.com/0b1deb8c1f5d41d8ab4c9e32446a55ce. Similarly, S.B. 23's sponsor in the Senate acknowledged that, if upheld, S.B. 23 would create "a new standard" for determining an abortion restriction's constitutionality. Talia Kaplan, *Ohio "Heartbeat" Abortion Ban Passes Senate as Governor Vows to Sign It*, Fox News (Mar. 14, 2019), https://www.foxnews.com/faith-values/ohio-heartbeat-abortion-ban-closer-to-becoming-law.

11. Plaintiff Preterm-Cleveland ("Preterm"), a nonprofit corporation organized under the laws of the State of Ohio, has operated a reproductive health care clinic in Cleveland, Ohio since 1974. Preterm provides a wide range of reproductive and sexual health care services. The abortion providers at Preterm are threatened with criminal penalties, loss of their medical licenses, civil forfeiture, and civil suits if they violate the Ban. Preterm faces criminal penalties and the loss of its ambulatory surgical facility license for violations of the Director's Order. Preterm sues on behalf of itself; its current and future staff, officers, and agents; and its patients.

12. Plaintiff Planned Parenthood Southwest Ohio Region ("PPSWO") is a nonprofit corporation organized under the laws of the State of Ohio. PPSWO and its predecessor organizations have provided a broad range of high-quality reproductive health care to patients in southwest Ohio since 1929. PPSWO's surgery center, located in Cincinnati, provides abortion services. The abortion providers at PPSWO are threatened with criminal penalties, loss of their medical licenses, civil forfeiture, and civil suits if they violate the Ban. PPSWO faces criminal penalties and the loss of its ambulatory surgical facility license for violations of the Director's Order. PPSWO sues on behalf of itself; its current and future staff, officers, and agents; and its patients.

13. Plaintiff Sharon Liner, M.D., is a physician licensed to practice medicine in Ohio with fifteen years of experience in women's healthcare. Dr. Liner is PPSWO's Medical Director, and in that role she supervises physicians providing abortions, develops PPSWO's policies and procedures, and provides health care services including abortion. Dr. Liner has been providing abortions since 2002. Dr. Liner faces criminal penalties if she violates the Director's Order and potential loss of her medical license. She sues on her own behalf and on behalf of her patients.

14.     Plaintiff Planned Parenthood of Greater Ohio ("PPGOH") is a nonprofit corporation organized under the laws of the State of Ohio.  PPGOH was formed in 2012 through a merger of several local and regional Planned Parenthood affiliates that had served patients in Ohio for decades.  PPGOH serves patients in northern, eastern, and central Ohio.  Four PPGOH health centers, located in East Columbus, Bedford Heights, Mansfield, and Youngstown, provide abortion services.  The Mansfield and Youngstown health centers provide only medication abortion services.  The abortion providers at PPGOH are threatened with criminal penalties, loss of their medical licenses, civil forfeiture, and civil suits if they violate the Ban.  PPGOH faces criminal penalties and the loss of its ambulatory surgical facility license for violations of the Director's Order.  PPGOH sues on behalf of itself; its current and future staff, officers, and agents; and its patients.

15.     Plaintiff Women's Med Group Professional Corporation ("WMGPC") owns and operates Women's Med Center of Dayton ("WMCD") in Kettering, Ohio.  WMGPC and its predecessors have been providing abortions in the Dayton area since 1975.  The abortion providers at WMCD are threatened with criminal penalties, loss of their medical licenses, civil forfeiture, and civil suits if they violate the Ban.  WMGPC faces criminal penalties and the loss of its ambulatory surgical facility license for violations of the Director's Order. WMGPC sues on behalf of itself; its current and future staff, officers, and agents; and its patients.

16.     Plaintiff Capital Care Network of Toledo ("CCNT"), a corporation organized under the laws of the State of Ohio, has operated a health care clinic in Toledo, Ohio since 2007.  The abortion providers at CCNT are threatened with criminal penalties, loss of their medical licenses, civil forfeiture, and civil suits if they violate the Ban.  CCNT sues on behalf of itself; its current and future staff, officers, and agents; and its patients.

17. Plaintiff Northeast Ohio Women's Center ("NEOWC") is a corporation organized under the laws of the State of Ohio, and operates health care clinics in Cuyahoga Falls and Shaker Heights. NEOWC faces criminal penalties and the loss of its ambulatory surgical facility license for violations of the Director's Order. NEOWC sues on behalf of itself; its current and future staff, officers, and agents; and its patients.

18. Plaintiffs provide medication abortion, surgical abortion, or both medication and surgical abortion at and after six weeks from the first day of the patient's last menstrual period ("LMP"). In accordance with Ohio law, no Plaintiffs provide abortion care at or after twenty weeks post-fertilization (twenty-two weeks LMP). Ohio Rev. Code § 2919.201.

### DEFENDANTS

19. Defendant David Yost is the Attorney General of the State of Ohio. He is responsible for the enforcement of all laws, including the Ban. Under the Ban, he is also charged with commencing and prosecuting civil forfeiture when directed to do so by the State Medical Board. S.B. 23 § 1, amending Ohio Rev. Code § 2919.1912(B). He also has sought to enforce the Director's Order by sending letters to some of the Plaintiffs telling them "to immediately stop performing non-essential and elective surgical abortions" or ODH "will take all appropriate measures." Furthermore, he may file an enforcement action to close the facility, refer Plaintiffs and their physicians to local prosecutors for criminal prosecution, and refer to the Medical Board for discipline of Plaintiff Dr. Liner or Plaintiffs' physicians. He is sued in his official capacity.

20. Defendant Amy Acton, M.D., M.P.H., is the Director of the Ohio Department of Health ("ODH"), which is responsible for promulgating rules to assist in compliance with the Ban, including rules governing the process for determining whether a fetal heartbeat exists and rules dictating reporting requirements. She is charged with administering ODH. She signed the

Director's Order and has the authority to enforce it. On March 26, 2019, she publicly announced that ODH was investigating three Plaintiff clinics and sent ODH inspectors to those Plaintiff clinics. As a result of her inspections, she can refer any violations to Defendant Yost for enforcement, including an action to close the facility, and she can revoke Plaintiff's ASF licenses. She is sued in her official capacity.

21.     Defendant Kim G. Rothermel, M.D., is the Secretary of the State Medical Board of Ohio, which is charged with enforcing the physician licensing and civil penalties contained in the Ban. The Board also has authority to act against a physician's license based on a commission of an unlawful act. She is sued in her official capacity.

22.     Defendant Bruce R. Saferin, D.P.M., is the Supervising Member of the State Medical Board of Ohio, which is charged with enforcing the physician licensing and civil penalties contained in the Ban. The Board also has authority to act against a physician's license based on a commission of an unlawful act. He is sued in his official capacity.

23.     Defendant Michael C. O'Malley is the Cuyahoga County Prosecutor. He is responsible for the enforcement of all of the criminal laws in Cuyahoga County, where Preterm's clinic, PPGOH's Bedford Heights health center, and NEOWC's Shaker Heights clinic are located, including the criminal provisions contained in the Ban and for violations of the Director's Order. He is sued in his official capacity.

24.     Defendant Joseph T. Deters is the Hamilton County Prosecutor. He is responsible for the enforcement of all of the criminal laws in Hamilton County, where PPSWO's Cincinnati surgery center is located, including the criminal provisions contained in the Ban and for violations of the Director's Order. He is sued in his official capacity.

25.     Defendant Ronald O'Brien is the Franklin County Prosecutor.  He is responsible for the enforcement of all of the criminal laws in Franklin County, where PPGOH's East Columbus health center is located, including the criminal provisions contained in the Ban and for violations of the Director's Order.  He is sued in his official capacity.

26.     Defendant Gary Bishop is the Richland County Prosecutor.  He is responsible for the enforcement of all of the criminal laws in Richland County, where PPGOH's Mansfield health center is located, including the criminal provisions contained in the Ban.  He is sued in his official capacity.

27.     Defendant Paul G. Gains is the Mahoning County Prosecutor.  He is responsible for the enforcement of all of the criminal laws in Mahoning County, where PPGOH's Youngstown health center is located, including the criminal provisions contained in the Ban.  He is sued in his official capacity.

28.     Defendant Mathias H. Heck, Jr. is the Montgomery County Prosecutor.  He is responsible for the enforcement of all of the criminal laws in Montgomery County, where WMGPC's WMCD facility is located, including the criminal provisions contained in the Ban and for violations of the Director's Order.  He is sued in his official capacity.

29.     Defendant Julia R. Bates is the Lucas County Prosecutor.  She is responsible for the enforcement of all of the criminal laws in Lucas County, where CCNT's health center is located, including the criminal provisions contained in the Ban.  She is sued in her official capacity.

30.     Defendant Sherri Bevan Walsh is the Summit County Prosecutor.  She is responsible for the enforcement of all of the criminal laws in Summit County, where NEOWC's

Cuyahoga Falls health center is located, including the criminal provisions contained in the Ban and for violations of the Director's Order.  She is sued in her official capacity.

## LEGAL FRAMEWORK

### The Ban

31.     If a pregnancy is in the uterus, Ohio law requires the provider who intends to perform an abortion to determine whether there is cardiac activity.[4]  If there is cardiac activity, the Ban makes it a crime to "caus[e] or abet[] the termination of" the pregnancy.  S.B. 23 § 1, amending Ohio Rev. Code §§ 2919.192(A), 2919.192(B), 2919.195(A).

32.     The Ban has only two very limited exceptions.  The Ban permits abortion after cardiac activity is detected only if the abortion is necessary (1) to prevent the patient's death, or (2) to prevent a "serious risk of the substantial and irreversible impairment of a major bodily function."  S.B. 23 § 1, amending Ohio Rev. Code § 2919.195(B).  "'Serious risk of the substantial and irreversible impairment of a major bodily function' means any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function."  Ohio Rev. Code § 2919.16(K).  A "medically diagnosed condition that constitutes a 'serious risk of the substantial and irreversible impairment of a major bodily function' includes pre-eclampsia, inevitable abortion, and premature rupture of the membranes," but "does not include a condition related to the woman's mental health."  *Id.*

33.     A violation of the Ban is a fifth-degree felony, punishable by up to one year in

---

[4] The Ban instructs the Ohio Department of Health to adopt rules "specifying the appropriate methods of performing an examination for the purpose of determining the presence of a fetal heartbeat" within 120 days of the Ban's effective date.  S.B. 23 § 1, amending Ohio Rev. Code § 2919.192.

prison and a fine of $2,500. S.B. 23 § 1, amending Ohio Rev. Code § 2919.195(A); Ohio Rev. Code §§ 2929.14(A)(5), 2929.18(A)(3)(e). In addition to criminal penalties, the state medical board may assess a forfeiture of up to $20,000 for each violation of the Ban, S.B. 23 § 1, amending Ohio Rev. Code § 2919.1912(A), and limit, revoke, or suspend a physician's medical license based on a violation of the Ban, *see* Ohio Rev. Code § 4371.22(B)(10). The Plaintiff facilities could face criminal penalties and revocation of their ambulatory surgical center license for a violation of the Ban. A patient may also bring a civil action against a provider who violates the Ban and recover damages in the amount of $10,000 or more. S.B. 23 § 1, amending Ohio Rev. Code § 2919.199(B)(1).

### The Director's Order

34.     In March 2020, the United States and Ohio both declared a state of emergency related to the COVID-19 pandemic. *See* Director's Order at 3; Ohio Exec. Order 2020-01D;[5] Proclamation No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020). The virus has reached every State in the country, including approximately 1653 confirmed cases in Ohio and 29 deaths as of the time of filing.[6] Federal and state officials and medical professionals expect a surge of infections—which may last for a year or eighteen months[7]—testing the limits of the

---

[5] *Available at* https://tinyurl.com/ud789de.

[6] CDC, *Cases in U.S.* (last updated Mar. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html; ODH, *COVID-19*, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/ (last visited Mar. 29, 2020).

[7] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times (Mar. 8, 2020), https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html.

health care system,[8] which is already facing a shortage of personal protective equipment ("PPE"), particularly N95 masks.[9]

35.    In light of this new reality, on March 17, 2020, Dr. Amy Acton, Director of ODH, issued an order barring all "non-essential surgeries and procedures" beginning at 5 p.m. on March 18, 2020. Director's Order at 4.[10]  The order states that its purpose is to "preserv[e] personal protective equipment (PPE) and critical hospital capacity and resources within Ohio." *Id.*

36.    Although the order does not define PPE, Plaintiffs understand that term to refer, for example, to surgical masks, sterile gloves, disposable protective eyewear, disposable gowns, and shoe covers.

37.    The Director's Order defines a "non-essential surgery" as "a procedure that can be delayed without undue risk to the current or future health of a patient," and lists "[e]xamples of criteria to consider," including whether there is a "threat to the patient's life if surgery or [the] procedure is not performed," a "[t]hreat of permanent dysfunction of an extremity or organ system," a "risk of metastasis or progression of staging," or a "risk of rapidly worsening to severe symptoms (time sensitive)."  Director's Order at 4.

38.    The Director's Order remains in effect until the state of emergency declared by

---

[8] *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States*, CDC (last updated Feb. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/guidance-hcf.html

[9] Andrew Jacobs, Matt Richtel & Mike Baker, *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020), https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html.

[10] The Director's Order cites as its authority section 3701.13, which allows ODH to "make special or standing orders or rules for preventing the spread of contagious or infectious diseases" Ohio. Rev. Code § 3701.13.

the Ohio governor no longer exists or ODH rescinds or modifies the order. *Id.* ODH has

indicated that it applies to hospitals and ambulatory surgical facilities ("ASF") in Ohio. *See*

Ohio Rev. Code § 3702.30 (defining ASFs). The Order provides that "[e]ach hospital and

outpatient surgery or procedure provider shall establish an internal governance structure to

ensure the principles outlined above are followed." Director's Order at 4. The Director may

petition for injunctive or other relief. Ohio Rev. Code § 3701.57. In addition, violation of the

Director's Order is a second-degree misdemeanor. Ohio Rev. Code § 3701.352.

## FACTUAL ALLEGATIONS

### Six Week Ban

39.     In a normally developing embryo, cells that form the basis for development of the

heart later in gestation produce activity that can be detected with ultrasound.

40.     Consistent with medical practice, as well as existing law, *see* Ohio Rev. Code

§ 2919.191(A), Plaintiffs perform an ultrasound to date the pregnancy and to determine whether

there is detectable fetal or embryonic cardiac activity.[11] Ultrasounds can be performed either by

placing a transducer on the patient's abdomen or by inserting a probe into the patient's vagina.

Many providers, including providers at Plaintiff clinics, use vaginal ultrasound to confirm and

date early pregnancy.

41.     Using vaginal ultrasound, cardiac activity is generally detectible beginning at

approximately six weeks, zero days LMP.[12]

---

[11] The embryonic stage of pregnancy lasts from fertilization until approximately eight to ten
weeks LMP. Beginning at about eleven weeks LMP, the embryo becomes a fetus.

[12] *See* Thomas Gellhaus, M.D., *ACOG Opposes Fetal Heartbeat Legislation Restricting
Women's Legal Right to Abortion*, American Congress of Obstetricians & Gynecologists (Jan.

42.     Ohio law prohibits abortion after viability, except when that abortion is necessary to preserve the pregnant woman's life or health.[13]  Ohio Rev. Code § 2919.17.

43.     Six weeks LMP is a pre-viability point in pregnancy.  At that point, no embryo is capable of surviving outside of the womb.  Thus, the Ban prohibits abortion well before viability.

**A.  A Ban on Abortion at and After Six Weeks LMP Will Practically Eliminate Abortion Care in Ohio**

35.     Pregnancy is commonly measured from the first day of a woman's last menstrual period.  A full-term pregnancy is approximately forty weeks LMP.

36.     The menstrual cycle is usually approximately four weeks long, but will vary based on the individual.  Thus, even a woman with highly regular periods would be four weeks pregnant as measured from her last menstrual period when her missed period occurs.  A ban on abortion at and after six weeks would only allow two weeks, at most, for a woman to learn that she is pregnant, decide whether to have an abortion, and to seek and obtain abortion care.

37.     Prior to six weeks LMP, many women have none of the physical indicators of pregnancy.  Many women do not menstruate at regular intervals, or they go long stretches without experiencing a menstrual period.  Menstrual patterns commonly vary with age.  Indeed, it is extremely common for women to have irregular periods at some point in their lives.  Additionally, women may experience bleeding in early pregnancy that can be mistaken for a period.

---

18, 2017), https://www.acog.org/About-ACOG/News-Room/Statements/2017/ACOG-Opposes-Fetal-Heartbeat-Legislation-Restricting-Womens-Legal-Right-to-Abortion.

[13] Another provision of Ohio law prohibits abortion after twenty weeks post-fertilization, or twenty-two weeks LMP.  Ohio Rev. Code § 2919.201.

38.     Further, women who have certain common medical conditions, such as obesity, those who are breastfeeding, or those who use hormonal contraceptives may experience irregular periods and therefore may not recognize a missed period before six weeks LMP.

39.     For all of these reasons, a woman may be six weeks pregnant but not realize she has missed a period, much less consider a missed period unusual or a signal that she may be pregnant.

40.     On top of these biological realities, many patients face logistical obstacles that will make it difficult to obtain an abortion before six weeks in pregnancy.

41.     For example, Ohio law mandates that a patient make two in-person trips to the clinic before obtaining an abortion in order to consent, determine whether there is cardiac activity, and receive state-mandated information.  Ohio Rev. Code § 2317.56.  These visits must be at least twenty-four hours apart.  *Id.*

42.      State law prohibits Medicaid and other public insurance programs, as well as private insurance plans listed on Ohio's federally run insurance exchange, from covering abortion.  Ohio Rev. Code §§ 9.04, 3901.87; Ohio Admin. Code § 5160-17-01.  Thus, patients often need time to gather the resources to pay for the abortion and related costs, as well as to arrange transportation to the clinic, time off from work, and possibly arrange for childcare during appointments.

43.      In addition to completing this two-day process, patients under eighteen must obtain written consent from a parent or a court order from a judge before receiving abortion care.  Ohio Rev. Code § 2919.121.

44.     For all of the reasons stated above, approximately 90% of abortions in Ohio occur after six weeks.

45. Thus, the Ban will prohibit almost all abortion care in Ohio.

**Director's Order**

Plaintiffs' Practices to Protect Patients
During the COVID-19 Outbreak and Compliance With Director's Order

46. Plaintiffs are committed to responding to the current public health crisis, including by preserving much-needed medical resources that are in short supply during the pandemic such as PPE.

47. Neither surgical abortion nor medication abortion requires extensive PPE. A typical surgical abortion requires minimal use of some or all of the following: gloves, a surgical mask, protective eyewear, disposable and/or washable gowns, and hair and shoe covers. Medication abortion uses less PPE than surgical abortion as the process of handing patients a pill requires no PPE at all. Since the Order, when a patient is eligible for both surgical and medication abortion, patients are provided a medication abortion, unless surgical abortion is the more appropriate method.

48. Plaintiffs do not use N95 masks, which, upon information and belief, are the PPE that are in shortest supply during the COVID-19 pandemic, for abortion. Furthermore, only a small number of health care staff are physically present for abortion procedures or their preparation/recovery and therefore in need of PPE.

49. Plaintiffs have also taken other precautions to maximize the safety of their patients and staff and to conserve PPE consistent with CDC guidance. For example, they are screening patients for COVID-19 symptoms before each visit. They have reduced patient volume and/or increased appointment spacing between patients. Plaintiffs have also made changes to the flow of patient care in order to comply with social-distancing recommendations by, for exampling, reconfiguring waiting rooms or having patients wait in their cars. Prior to the

COVID-19 outbreak, Plaintiffs welcomed support persons to accompany abortion patients, but Plaintiffs have now decided not to allow such companions (except parents accompanying minors) to enter their health centers in order to reduce the number of overall people that can be near one another.

50.     Patients who are prevented from obtaining abortion care as a result of the Order must still seek medical care to maintain their health and well-being. Thus, pregnant patients will require care from providers using PPE whether the pregnancy is terminated or not.  In the event that this crisis continues for months—as it is expected to do—people will be forced to give birth against their will, necessitating the use of more PPE, and the use of hospital beds.

51.     Plaintiffs promptly adopted policies to implement the Director's Order.[14]  Each policy forbids the performance of "non-essential surgeries and procedures that utilize PPE" until the end of Ohio's declared emergency or the Director's Order is modified or rescinded. Plaintiffs' policies observed that the timeframe for a patient to obtain an abortion is limited given that abortion is banned in Ohio at 22 weeks LMP.

52.     Plaintiffs' policies direct physicians to consider the plain terms of the Director's Order, which states that "a surgery is essential if it cannot 'be delayed without undue risk to the current or future health of a patient' and includes, as examples of criteria to consider, the risk to the patient of rapidly worsening to severe symptoms that make the surgery time sensitive, as well as a progression of staging."  While abortion is an extremely safe medical procedure, it cannot be delayed without increasing the risk to the health of the patient.

53.     Plaintiffs' policies also cite the position of American College of Obstetricians and

_____

[14] Plaintiff Dr. Liner did not adopt such a policy because she is an individual (and not a hospital or ASF); however, as medical director of Plaintiff PPSWO, she was responsible for adoption of its implementing policy.

Gynecologists ("ACOG"), the American Board of Obstetrics & Gynecology, the American Association of Gynecologic Laparoscopists, the American Gynecological & Obstetrical Society, the American Society for Reproductive Medicine, the Society for Academic Specialists in General Obstetrics and Gynecology, the Society of Family Planning, and the Society for Maternal-Fetal Medicine. These trusted national medical organizations issued a joint statement on "Abortion Access During the COVID-19 Outbreak," which provides that "[t]o the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[15]

54. Plaintiffs' policies also cited the Ambulatory Surgery Center Association's "COVID-19: Guidance for ASCs for Necessary Surgery," which concurred with the American College of Surgeons' recommendation that consideration of whether delay of a surgery during the pandemic is appropriate must account for risk to the patient of delay, "including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent."[16]

_____

[15] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak. (Attached as Exhibit D to Liner Declaration in Support of Plaintiffs' Motion for a TRO.)

[16] Ambulatory Surgery Ctr. Ass'n, *COVID-19: Guidance for ASCs on Necessary Surgeries* (last updated Mar. 19, 2020), https://www.ascassociation.org/asca/resourcecenter/latestnewsresourcecenter/covid-19/covid-19-guidance (quoting Am. Coll. of Surgeons, *COVID-19: Recommendations for Management of Elective Surgical Procedures* (Mar. 13, 2020), https://www.facs.org/about-acs/covid-

55. Defendants Yost and Acton's enforcement of the Order began when three Plaintiffs—WMCD, PPSWO, and Preterm—received letters via email from the Ohio Attorney General on March 20 and March 21 ordering those Plaintiffs "to immediately stop performing non-essential and elective surgical abortions" or ODH "will take all appropriate measures."

56. These Plaintiffs responded to the Attorney General by confirming their compliance with the Director's Order, amending their policies to clarify that physicians must make a case-by-case determination of whether the abortion is essential, and offering to share their implementing policies.

57. These three Plaintiffs received no further communication from the Attorney General, but were inspected by ODH all day on March 26 and March 27 by two inspectors per facility. After two days of inspections, the inspectors left without telling the facilities whether or not they had found violation of the Director's Order or any other regulation—a distinct break with established ODH practice and procedure—and instead said their superiors would make that determination at an unspecified later date.

58. On March 26, Director Acton said at a press conference that ODH had "listened to the AG" and began to investigate "violations [of the Order] across the state," including at abortion clinics.[17] At that same press conference, Governor DeWine made clear that he interprets the Director's Order to allow surgical abortion when the abortion "is done to save someone's life[.]" That same day, the Attorney General again threatened "quick enforcement

19/information-for-surgeons/elective-surgery). (Attached as Exhibit E to Liner Declaration in Support of Plaintiffs' Motion for a TRO.)

[17] Gov. Mike DeWine Corona Virus Update March 26, 2020, available at https://www.ideastream.org/gov-mike-dewine-coronavirus-update-march-26-2020.

action" against clinics that continue to provide surgical abortion care.[18]

59.     Enforcement of the Director's Order to ban virtually all surgical abortion would ban the only abortion method available for all patients who are over 10 weeks pregnant and the only method available to some patients at any point in pregnancy.

60.     There are two main methods of abortion: medication abortion and surgical abortion.  Medication abortion involves a combination of two pills: mifepristone and misoprostol.  The patient takes the first medication in the health center and then, typically twenty-four to forty-eight hours later, takes the second medication at a location of their choosing, most often at their home, after which they expel the contents of the pregnancy in a manner similar to a miscarriage.  Surgical abortion is not what is commonly understood to be "surgery"; it involves no incision. It involves the use of instruments and/or gentle suction to safely empty the contents of the uterus.

61.     For some patients, medication abortion is contraindicated or there are other factors that would counsel in favor of a surgical abortion, such as patients with an allergy to the medications or other medical conditions that makes surgical abortion relatively more appropriate.

62.     All plaintiffs provide medication abortion up to ten weeks LMP (through seventy days). Plaintiffs provide surgical abortion up to maximum gestations ranging from fifteen weeks and six days up to twenty-one weeks and six days LMP.[19]

---

[18] Attorney General Yost press release March 26, 2020 states that Attorney General Yost is "the prosecutor" and ODH is the "police officer" and he vowed to "take quick enforcement action once an investigation is completed by [ODH] . . . ." Yost stated that he "stands ready to play our role and pursue legal action on behalf of [ODH]." (Attached as Exhibit C.)

[19] Ohio Revised Code section 2919.123 restricts the first drug to the federally approved label, which is ten weeks. *See* FDA, *Mifeprex (mifepristone) Information* (last updated Feb. 5, 2018), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-

63. According to the latest data from ODH in 2018, 55.7% of Ohio abortions in 2018 occurred before nine weeks gestational age, while 44.3% occurred at or after nine weeks.[20] More than 56% of abortions in the state were surgical abortions.[21]

64. The length of the Director's Order is tethered to the pandemic, which experts believe will last at least one year to eighteen months, if not more.[22] As a result, if applied to ban surgical abortion, the Director's Order could force patients who would otherwise obtain a surgical abortion—that is, all those who are ten or more weeks pregnant and those with earlier pregnancies for whom medication abortion is not appropriate—to "delay" care until the pandemic is over. Director's Order at 4. At least 56% of patients seeking abortion in Ohio fall into those categories.

65. To enforce their interpretation of the Director's Order, Defendants could take action to close the facilities, prosecute Plaintiffs and their staff, and take action on Plaintiffs' physicians' medical licenses.

---

mifepristone-information; Ohio Revised Code section 2919.201 prohibits abortions after twenty-two weeks LMP.

[20] John Paulson & Donna L. Smith, ODH, Induced Abortions in Ohio 24 (2019), https://tinyurl.com/ufxuqpw.

[21] *Id.* at 23.

[22] *See* Grady, *supra* note 7; Am. Coll. of Surgeons, *supra* note 16; *see also* Mark Fisher, *Ohio's Schools May Have to Remain Closed for Rest of School Year, DeWine Says*, Dayton Daily News (Mar. 15, 2020), https://www.daytondailynews.com/news/local/gov-dewine-ohio-schools-may-have-remain-closed-for-rest-school-year/wLWoHUCq2mMWKtZPVStxFM (Gov. DeWine acknowledging schools "absolutely" may be closed for the remainder of the school year).

### B. Impact of Banning Abortion Care in Ohio

66.  The near-total ban on abortion imposed by S.B. 23, and the ban on surgical abortions under the Director's Order, would have a devastating impact on the lives of individuals who want to consider or seek abortion in Ohio.

67.  Approximately one in four women in this country will have an abortion by age forty-five. A majority of those having abortions (61%) already have at least one child, while most (66%) also plan to have a child or additional children in the future.[23]

68.  Legal abortion is one of the safest medical procedures in the United States and is substantially safer than continuing a pregnancy through to childbirth. The risk of death associated with childbirth is approximately fourteen times higher than that associated with abortion, and every pregnancy-related complication is more common among women giving birth than among those having abortions.[24]

69.  If a woman is forced to continue a pregnancy against her will, it can pose a risk to her physical, mental, and emotional health, as well as to the stability and well-being of her family, including existing children.

70.  A child can place economic and emotional strain on a family and may interfere with an individual's life goals. As most patients who seek abortion already have at least one

---

[23] *See* Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, Guttmacher Institute (Oct. 2017), https://www.guttmacher.org/article/2017/10/population-group-abortion-rates-and-lifetime-incidence-abortion-united-states-2008; *Concern for Current and Future Children a Key Reason Women Have Abortions*, Guttmacher Institute (Jan. 7, 2008), https://www.guttmacher.org/news-release/2008/concern-current-and-future-children-key-reason-women-have-abortions; *Abortion Facts*, National Abortion Federation, https://prochoice.org/education-and-advocacy/about-abortion/abortion-facts/.

[24] Elizabeth Raymond & David Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 215 (Feb. 2012).

child, families must consider how an additional child will impact their ability to care for the children they already have.

71. Even for someone who is otherwise healthy and has an uncomplicated pregnancy, carrying that pregnancy to term and giving birth poses serious medical risk and can have long-term medical and physical consequences. For a woman with a medical condition caused or exacerbated by pregnancy or for a woman who learns that her fetus has been diagnosed with a severe or lethal anomaly, these risks are increased.

72. Pregnancy, childbirth, and an additional child may exacerbate an already difficult situation for those who have suffered trauma, such as sexual assault or domestic violence.

73. If a woman is forced to continue a pregnancy against her will, it can pose a risk to her physical, mental, and emotional health, as well as to the stability and wellbeing of her family, including existing children.

74. S.B. 23 and the ban under the Director's Order will have a disproportionate impact on the lives of Black people, other people of color, and people with low incomes in Ohio.

75. Statistics show that in 2017, Black people made up only 12.9% of Ohio's population but 40% of people who obtained abortions in Ohio; Indigenous (American Indian) people and other people of color (Asian/Pacific Islander, Multiracial, and Hispanic people) made up 8.8% of the population, but 11.9% of the people that obtain abortions.[25]

76. Were the Ban to go into effect, or Defendants' enforcement of the Director's Order to ban surgical abortions not enjoined, Black people are likely to suffer some of the

---

[25] *Induced Abortions in Ohio*, Ohio Dep't of Health (2017), https://odh.ohio.gov/wps/portal/gov/odh/know-our-programs/vital-statistics/resources/vs-abortionreport2017; *Quick Facts: Ohio*, U.S. Census Bureau, https://www.census.gov/quickfacts/oh.

gravest consequences. Recent statistics from the U.S. Centers for Disease Control and Prevention show that Black women are three times more likely than White women to die of causes related to pregnancy.[26] In Ohio, Black infants are three times more likely than their White counterparts to die before their first birthday.[27]

77. A large majority of patients who obtain abortion care in Ohio are low income.

78. People who have decided to have an abortion should not be denied access to abortion, nor should their care be delayed. Although abortion is significantly safer than continuing pregnancy through childbirth, the risks associated with abortion increase as pregnancy advances.

79. The COVID-19 pandemic and its fallout do not reduce patients' needs for abortion; if anything, they make timely access to abortion even more urgent, while raising additional obstacles for patients seeking that care. For example, even before the COVID-19 outbreak, people seeking access faced many obstacles. Low-wage workers often have no paid time off or sick leave, so even if a pregnant worker is able to get time off work for an abortion appointment, they will likely have to forgo part of a paycheck. Patients facing long travel distances typically must arrange and pay for transportation and arrange to take time off work. Many patients must also arrange and pay for childcare while they travel to their abortion appointment.

---

[26] Emily E. Petersen et al., *Vital Signs*: *Pregnancy-Related Deaths, United States, 2011-2015, and Strategies for Prevention, 13 States, 2013-2017*, 68 Morbidity & Mortality Weekly Rep. 423 (May 10, 2019),
https://www.cdc.gov/mmwr/volumes/68/wr/mm6818e1.htm?s_cid=mm6818e1_w.

[27] *Ohio Infant Deaths in 2017 Second-Lowest on Record While Racial Disparities in Birth Outcomes Continued*, Ohio Dep't of Health (Dec. 6, 2018),
https://odh.ohio.gov/wps/portal/gov/odh/media-center/odh-news-releases/2017-ohio-infant-mortality-report.

80.     These obstacles are compounded by the various abortion restrictions already in effect in Ohio.  For example, all patients must make two in-person trips at least twenty-four hours apart to a health center in order to obtain an abortion.  Ohio Rev. Code § 2317.56. Minor patients, unless emancipated, must also obtain written consent from a parent or a judicial order before they can receive care.  Ohio Rev. Code § 2919.121.

81.     Now, during the COVID-19 pandemic, patients must navigate these barriers against the backdrop of job insecurity, minimal public transit availability, and limited childcare assistance due to mandatory social distancing and shelter in place orders.[28]  Indeed, jobless claims are soaring due to the virus.[29]  All of these factors can result in delay in obtaining care which, in turn, results in higher financial and emotional costs to the patient.  Those patients who are able to obtain care out of state will face increased risk of exposure to the virus because of this travel and providers treating those patients will still be using PPE in any case.

---

[28]  ODH, *Governor DeWine Announces School Closures* (Mar. 12, 2020), https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home/news-releases-news-you-can-use/governor-dewine-announces-school-closures; ODH, *Governor DeWine Orders Ohio Bars & Restaurants to Close* (Mar. 15, 2020), https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home/news-releases-news-you-can-use/governor-dewine-orders-ohio-bars-restaurants-to-close; ODH, *Governor DeWine Announces Additional Temporary Business Closures* (Mar. 18, 2020), https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home/news-releases-news-you-can-use/governor-dewine-announces-additional-temporary-business-closures; Ohio Exec. Order 2020-04D; *see also* White House, *The President's Coronavirus Guidelines for America* (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf; Rebecca Shabad, *Fauci Predicts Americans Will Likely Need to Stay Home for at Least Several More Weeks*, NBC News (Mar. 20, 2020) https://www.nbcnews.com/politics/donald-trump/fauci-predicts-americans-will-likely-need-stay-home-least-several-n1164701.

[29] Scott Noll, *As Ohio Unemployment Soars, Some People Are Missing Out on Benefits*, News 5 Cleveland (Mar. 19, 2020), https://www.news5cleveland.com/news/local-news/as-ohio-unemployment-soars-some-people-are-missing-out-on-benefits.

82.     Furthermore, while much is unknown about COVID-19, including whether it can complicate pregnancy, some pregnant people who are delayed in accessing abortion may be exposed to additional health risks from the disease.  ACOG has warned that "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as influenza and SARS-CoV.  As such, pregnant women should be considered an at-risk population for COVID-19."[30]

83.     Absent an injunction, Plaintiffs will have no choice but to turn away patients in need of abortion care.  Ohioans' well-being and dignity would suffer irreparably.  The Ban and applying the Director's Order  to ban surgical abortion violate the constitutional rights of Plaintiffs' patients and irreparably harms them.

## CLAIMS FOR RELIEF

### COUNT I

(Substantive Due Process – Six Week Ban)

84.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 83.

85.     By prohibiting abortion prior to viability, the Ban violates Ohioans' right to privacy guaranteed by the Fourteenth Amendment to the U.S. Constitution.

86.     If the Ban is allowed to take effect, Plaintiffs' patients will be subject to irreparable harm for which no adequate remedy at law exists by preventing Plaintiffs' patients from obtaining an abortion in Ohio, thereby causing them to suffer significant constitutional,

---

[30] ACOG, Practice Advisory - Novel Coronavirus 2019 (COVID-19) (March 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

medical, emotional, and other harm.

COUNT II
(Substantive Due Process – Director's Order)

87. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 86.

88. Applying the Director's Order in a way that would ban surgical abortion violates Ohioans' right to privacy guaranteed by the Fourteenth Amendment to the U.S. Constitution.

89. If Defendants' efforts to enforce the Director's Order to ban surgical abortion are not enjoined, Plaintiffs' patients will be subject to irreparable harm for which no adequate remedy at law exists by preventing Plaintiffs' patients from obtaining an abortion in Ohio, thereby causing them to suffer significant constitutional, medical, emotional, and other harm.

COUNT III
(Due Process – Vagueness – Director's Order)

90. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 89.

91. Defendants have created ambiguity as to the circumstances in which Plaintiffs can provide surgical abortion as an "essential" surgery consistent with the Director's Order, making it impossible for Plaintiffs to know what actions are forbidden or required. Plaintiffs therefore do not have adequate guidance as to how to comply with the Director's Order. This lack of clarity invites arbitrary and discriminatory enforcement of the Director's Order.

92. Plaintiffs are unable to determine how to comply with the Director's Order, and yet face criminal penalties and the loss of facility and medical licenses. Therefore, Plaintiffs' rights secured to them by the due process guarantees of the Fourteenth Amendment to the U.S. Constitution are violated.

## COUNT IV
### (Equal Protection – Director's Order)

93.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 92.

94.     By selectively burdening patients' fundamental right to abortion without justification and singling abortion providers and their patients out for differential treatment from providers of other medical services and their patients, Defendants' attempts to enforce the Director's Order to ban surgical abortions violate Ohioans' right to equal protection guaranteed by the Fourteenth Amendment to the U.S. Constitution.

95.     Unless enjoined, Defendants will subject Plaintiffs and their patients to irreparable harm for which no adequate remedy at law exists by preventing patients from or significantly delaying them in obtaining an abortion in Ohio, thereby causing them to suffer significant constitutional, medical, emotional, and other harm

### **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A.      To immediately issue a temporary restraining order and/or preliminary injunction, and later a permanent injunction, restraining Defendants, their employees, agents, and successors in office from enforcing the Ban.

B.      To immediately issue a temporary restraining order and/or preliminary injunction, and later a permanent injunction, restraining Defendants, their employees, agents, and successors in office from enforcing the Director's Order to ban virtually all surgical abortions after 10 weeks LMP or under 10 weeks for whom surgical abortion is the more appropriate method.

C.      To enter a judgment declaring that the Ban and the application of the Director's Order to ban surgical abortions violates the Fourteenth Amendment to the U.S. Constitution.

C.      To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

D.      To grant such other and further relief as the Court deems just and proper.

Dated: March 30, 2020

Elizabeth Watson*
Rachel Reeves*
Brigitte Amiri*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
(212) 549-2650 (fax)
ewatson@aclu.org
rreeves@aclu.org
bamiri@aclu.org
*Counsel for Plaintiff Preterm-Cleveland
and Northeast Ohio Women's Center*

Carrie Y. Flaxman
Richard Muniz*
Planned Parenthood Federation of America
1110 Vermont Ave NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)
carrie.flaxman@ppfa.org***
richard.muniz@ppfa.org
*Counsel for Plaintiffs Planned Parenthood
Southwest Ohio Region, Planned
Parenthood of Greater Ohio, and Sharon
Liner, M.D.*

Hana Bajramovic***
Planned Parenthood Federation of America
123 William Street, Floor 9
New York, NY 10038
(212) 541-7800
(212) 247-6811 (fax)
hana.bajramovic@ppfa.org
*Counsel for Plaintiffs Planned Parenthood
Southwest Ohio Region, Planned
Parenthood Greater of Ohio, and Sharon
Liner, M.D.*

Respectfully Submitted,

/s/ B. Jessie Hill**
B. Jessie Hill #0074770, *Trial Attorney*
Freda J. Levenson #0045916
American Civil Liberties Union of Ohio,
Foundation, Inc.
4506 Chester Ave.
Cleveland, OH 44103
(216) 368-0553 – Jessie Hill
(614) 586-1972 x 125 – Freda Levenson
(614) 586-1974 (fax)
bjh11@cwru.edu
flevenson@acluohio.org
*Counsel for Plaintiff Preterm-Cleveland
and Northeast Ohio Women's Center*

Jennifer L. Branch # 0038893
Alphonse A. Gerhardstein # 0032053
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100
(513) 345-5543 (fax)
agerhardstein@gbfirm.com
jbranch@gbfirm.com
*Counsel for Plaintiffs Planned
Parenthood Southwest Ohio Region,
Planned Parenthood of Greater Ohio,
Sharon Liner, M.D., Women's Med Group
Professional Corporation and Capital
Care Network of Toledo*

*Applications for admission pro hac vice
granted*

** *Cooperating Counsel for the ACLU of
Ohio Foundation*

*** *Application for admission pro hac vice
forthcoming*

# EXHIBIT A

# AN ACT

To amend sections 2317.56, 2919.171, 2919.19, 2919.191, 2919.192, 2919.193, and 4731.22; to amend, for the purpose of adopting new section numbers as indicated in parentheses, sections 2919.191 (2919.192), 2919.192 (2919.194), and 2919.193 (2919.198); and to enact new sections 2919.191 and 2919.193 and sections 2919.195, 2919.196, 2919.197, 2919.199, 2919.1910, 2919.1912, 2919.1913, and 5103.11 of the Revised Code to enact the Human Rights and Heartbeat Protection Act.

*Be it enacted by the General Assembly of the State of Ohio:*

SECTION 1. That sections 2317.56, 2919.171, 2919.19, 2919.191, 2919.192, 2919.193, and 4731.22 be amended; sections 2919.191 (2919.192), 2919.192 (2919.194), and 2919.193 (2919.198) be amended for the purpose of adopting new section numbers as shown in parentheses; and new sections 2919.191 and 2919.193 and sections 2919.195, 2919.196, 2919.197, 2919.199, 2919.1910, 2919.1912, 2919.1913, and 5103.11 of the Revised Code be enacted to read as follows:

Sec. 2317.56. (A) As used in this section:

(1) "Medical emergency" has the same meaning as in section 2919.16 of the Revised Code.

(2) "Medical necessity" means a medical condition of a pregnant woman that, in the reasonable judgment of the physician who is attending the woman, so complicates the pregnancy that it necessitates the immediate performance or inducement of an abortion.

(3) "Probable gestational age of the embryo or fetus" means the gestational age that, in the judgment of a physician, is, with reasonable probability, the gestational age of the embryo or fetus at the time that the physician informs a pregnant woman pursuant to division (B)(1)(b) of this section.

(B) Except when there is a medical emergency or medical necessity, an abortion shall be performed or induced only if all of the following conditions are satisfied:

(1) At least twenty-four hours prior to the performance or inducement of the abortion, a physician meets with the pregnant woman in person in an individual, private setting and gives her an adequate opportunity to ask questions about the abortion that will be performed or induced. At this meeting, the physician shall inform the pregnant woman, verbally or, if she is hearing impaired, by other means of communication, of all of the following:

(a) The nature and purpose of the particular abortion procedure to be used and the medical risks associated with that procedure;

(b) The probable gestational age of the embryo or fetus;

(c) The medical risks associated with the pregnant woman carrying the pregnancy to term.

The meeting need not occur at the facility where the abortion is to be performed or induced, and the physician involved in the meeting need not be affiliated with that facility or with the

physician who is scheduled to perform or induce the abortion.

(2) At least twenty-four hours prior to the performance or inducement of the abortion, the physician who is to perform or induce the abortion or the physician's agent does each of the following in person, by telephone, by certified mail, return receipt requested, or by regular mail evidenced by a certificate of mailing:

(a) Inform the pregnant woman of the name of the physician who is scheduled to perform or induce the abortion;

(b) Give the pregnant woman copies of the published materials described in division (C) of this section;

(c) Inform the pregnant woman that the materials given pursuant to division (B)(2)(b) of this section are published by the state and that they describe the embryo or fetus and list agencies that offer alternatives to abortion. The pregnant woman may choose to examine or not to examine the materials. A physician or an agent of a physician may choose to be disassociated from the materials and may choose to comment or not comment on the materials.

(3) If it has been determined that the unborn human individual the pregnant woman is carrying has a detectable fetal heartbeat, the physician who is to perform or induce the abortion shall comply with the informed consent requirements in section 2919.192 2919.194 of the Revised Code in addition to complying with the informed consent requirements in divisions (B)(1), (2), (4), and (5) of this section.

(4) Prior to the performance or inducement of the abortion, the pregnant woman signs a form consenting to the abortion and certifies both of the following on that form:

(a) She has received the information and materials described in divisions (B)(1) and (2) of this section, and her questions about the abortion that will be performed or induced have been answered in a satisfactory manner.

(b) She consents to the particular abortion voluntarily, knowingly, intelligently, and without coercion by any person, and she is not under the influence of any drug of abuse or alcohol.

The form shall contain the name and contact information of the physician who provided to the pregnant woman the information described in division (B)(1) of this section.

(5) Prior to the performance or inducement of the abortion, the physician who is scheduled to perform or induce the abortion or the physician's agent receives a copy of the pregnant woman's signed form on which she consents to the abortion and that includes the certification required by division (B)(4) of this section.

(C) The department of health shall publish in English and in Spanish, in a typeface large enough to be clearly legible, and in an easily comprehensible format, the following materials on the department's web site:

(1) Materials that inform the pregnant woman about family planning information, of publicly funded agencies that are available to assist in family planning, and of public and private agencies and services that are available to assist her through the pregnancy, upon childbirth, and while the child is dependent, including, but not limited to, adoption agencies. The materials shall be geographically indexed; include a comprehensive list of the available agencies, a description of the services offered by the agencies, and the telephone numbers and addresses of the agencies; and inform the pregnant woman about available medical assistance benefits for prenatal care, childbirth, and neonatal care

and about the support obligations of the father of a child who is born alive. The department shall ensure that the materials described in division (C)(1) of this section are comprehensive and do not directly or indirectly promote, exclude, or discourage the use of any agency or service described in this division.

(2) Materials that inform the pregnant woman of the probable anatomical and physiological characteristics of the zygote, blastocyte, embryo, or fetus at two-week gestational increments for the first sixteen weeks of pregnancy and at four-week gestational increments from the seventeenth week of pregnancy to full term, including any relevant information regarding the time at which the fetus possibly would be viable. The department shall cause these materials to be published ~~only~~ after it consults with ~~the Ohio state medical association and the Ohio section of the American college of obstetricians and gynecologists~~ independent health care experts relative to the probable anatomical and physiological characteristics of a zygote, blastocyte, embryo, or fetus at the various gestational increments. The materials shall use language that is understandable by the average person who is not medically trained, shall be objective and nonjudgmental, and shall include only accurate scientific information about the zygote, blastocyte, embryo, or fetus at the various gestational increments. If the materials use a pictorial, photographic, or other depiction to provide information regarding the zygote, blastocyte, embryo, or fetus, the materials shall include, in a conspicuous manner, a scale or other explanation that is understandable by the average person and that can be used to determine the actual size of the zygote, blastocyte, embryo, or fetus at a particular gestational increment as contrasted with the depicted size of the zygote, blastocyte, embryo, or fetus at that gestational increment.

(D) Upon the submission of a request to the department of health by any person, hospital, physician, or medical facility for one copy of the materials published in accordance with division (C) of this section, the department shall make the requested copy of the materials available to the person, hospital, physician, or medical facility that requested the copy.

(E) If a medical emergency or medical necessity compels the performance or inducement of an abortion, the physician who will perform or induce the abortion, prior to its performance or inducement if possible, shall inform the pregnant woman of the medical indications supporting the physician's judgment that an immediate abortion is necessary. Any physician who performs or induces an abortion without the prior satisfaction of the conditions specified in division (B) of this section because of a medical emergency or medical necessity shall enter the reasons for the conclusion that a medical emergency or medical necessity exists in the medical record of the pregnant woman.

(F) If the conditions specified in division (B) of this section are satisfied, consent to an abortion shall be presumed to be valid and effective.

(G) The performance or inducement of an abortion without the prior satisfaction of the conditions specified in division (B) of this section does not constitute, and shall not be construed as constituting, a violation of division (A) of section 2919.12 of the Revised Code. The failure of a physician to satisfy the conditions of division (B) of this section prior to performing or inducing an abortion upon a pregnant woman may be the basis of both of the following:

(1) A civil action for compensatory and exemplary damages as described in division (H) of this section;

(2) Disciplinary action under section 4731.22 of the Revised Code.

(H)(1) Subject to divisions (H)(2) and (3) of this section, any physician who performs or induces an abortion with actual knowledge that the conditions specified in division (B) of this section have not been satisfied or with a heedless indifference as to whether those conditions have been satisfied is liable in compensatory and exemplary damages in a civil action to any person, or the representative of the estate of any person, who sustains injury, death, or loss to person or property as a result of the failure to satisfy those conditions. In the civil action, the court additionally may enter any injunctive or other equitable relief that it considers appropriate.

(2) The following shall be affirmative defenses in a civil action authorized by division (H)(1) of this section:

(a) The physician performed or induced the abortion under the circumstances described in division (E) of this section.

(b) The physician made a good faith effort to satisfy the conditions specified in division (B) of this section.

(3) An employer or other principal is not liable in damages in a civil action authorized by division (H)(1) of this section on the basis of the doctrine of respondeat superior unless either of the following applies:

(a) The employer or other principal had actual knowledge or, by the exercise of reasonable diligence, should have known that an employee or agent performed or induced an abortion with actual knowledge that the conditions specified in division (B) of this section had not been satisfied or with a heedless indifference as to whether those conditions had been satisfied.

(b) The employer or other principal negligently failed to secure the compliance of an employee or agent with division (B) of this section.

(4) Notwithstanding division (E) of section 2919.12 of the Revised Code, the civil action authorized by division (H)(1) of this section shall be the exclusive civil remedy for persons, or the representatives of estates of persons, who allegedly sustain injury, death, or loss to person or property as a result of a failure to satisfy the conditions specified in division (B) of this section.

(I) The department of job and family services shall prepare and conduct a public information program to inform women of all available governmental programs and agencies that provide services or assistance for family planning, prenatal care, child care, or alternatives to abortion.

Sec. 2919.171. (A)(1) A physician who performs or induces or attempts to perform or induce an abortion on a pregnant woman shall submit a report to the department of health in accordance with the forms, rules, and regulations adopted by the department that includes all of the information the physician is required to certify in writing or determine under ~~sections~~ section 2919.17 ~~and~~ , section 2919.18, divisions (A) and (C) of section 2919.192, division (C) of section 2919.193, division (B) of section 2919.195, or division (A) of section 2919.196 of the Revised Code~~:~~ .

(2) If a person other than the physician described in division (A)(1) of this section makes or maintains a record required by sections 2919.192 to 2919.196 of the Revised Code on the physician's behalf or at the physician's direction, that person shall comply with the reporting requirement described in division (A)(1) of this section as if the person were the physician described in that division.

(B) By September 30 of each year, the department of health shall issue a public report that

provides statistics for the previous calendar year compiled from all of the reports covering that calendar year submitted to the department in accordance with this section for each of the items listed in division (A) of this section. The report shall also provide the statistics for each previous calendar year in which a report was filed with the department pursuant to this section, adjusted to reflect any additional information that a physician provides to the department in a late or corrected report. The department shall ensure that none of the information included in the report could reasonably lead to the identification of any pregnant woman upon whom an abortion is performed.

(C)(1) The physician shall submit the report described in division (A) of this section to the department of health within fifteen days after the woman is discharged. If the physician fails to submit the report more than thirty days after that fifteen-day deadline, the physician shall be subject to a late fee of five hundred dollars for each additional thirty-day period or portion of a thirty-day period the report is overdue. A physician who is required to submit to the department of health a report under division (A) of this section and who has not submitted a report or has submitted an incomplete report more than one year following the fifteen-day deadline may, in an action brought by the department of health, be directed by a court of competent jurisdiction to submit a complete report to the department of health within a period of time stated in a court order or be subject to contempt of court.

(2) If a physician fails to comply with the requirements of this section, other than filing a late report with the department of health, or fails to submit a complete report to the department of health in accordance with a court order, the physician is subject to division (B)(44) of section 4731.22 of the Revised Code.

(3) No person shall falsify any report required under this section. Whoever violates this division is guilty of abortion report falsification, a misdemeanor of the first degree.

(D) ~~Within ninety days of October 20, 2011, the~~ The department of health shall adopt rules pursuant to section 111.15 of the Revised Code to assist in compliance with this section.

Sec. 2919.19. (A) As used in this section and sections 2919.191 to ~~2919.193~~ 2919.1910 of the Revised Code:

~~(A)~~ (1) "Conception" means fertilization.

(2) "Contraceptive" means a drug, device, or chemical that prevents conception.

(3) "DNA" means deoxyribonucleic acid.

(4) "Fetal heartbeat" means cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestational sac.

~~(B)~~ (5) "Fetus" means the human offspring developing during pregnancy from the moment of conception and includes the embryonic stage of development.

~~(C)~~ (6) "Gestational age" means the age of an unborn human individual as calculated from the first day of the last menstrual period of a pregnant woman.

~~(D)~~ (7) "Gestational sac" means the structure that comprises the extraembryonic membranes that envelop the fetus and that is typically visible by ultrasound after the fourth week of pregnancy.

~~(E)~~ (8) "Intrauterine pregnancy" means a pregnancy in which the fetus is attached to the placenta within the uterus of the pregnant woman.

(9) "Medical emergency" has the same meaning as in section 2919.16 of the Revised Code.

~~(F)~~ (10) "Physician" has the same meaning as in section 2305.113 of the Revised Code.

(G) (11) "Pregnancy" means the human female reproductive condition that begins with fertilization, when the woman is carrying the developing human offspring, and that is calculated from the first day of the last menstrual period of the woman.

(H) (12) "Serious risk of the substantial and irreversible impairment of a major bodily function" has the same meaning as in section 2919.16 of the Revised Code.

(I) (13) "Spontaneous miscarriage" means the natural or accidental termination of a pregnancy and the expulsion of the fetus, typically caused by genetic defects in the fetus or physical abnormalities in the pregnant woman.

(14) "Standard medical practice" means the degree of skill, care, and diligence that a physician of the same medical specialty would employ in like circumstances. As applied to the method used to determine the presence of a fetal heartbeat for purposes of section 2919.191 2919.192 of the Revised Code, "standard medical practice" includes employing the appropriate means of detection depending on the estimated gestational age of the fetus and the condition of the woman and her pregnancy.

(J) (15) "Unborn human individual" means an individual organism of the species homo sapiens from fertilization until live birth.

(B)(1) It is the intent of the general assembly that a court judgment or order suspending enforcement of any provision of this section or sections 2919.171 or 2919.191 to 2919.1913 of the Revised Code is not to be regarded as tantamount to repeal of that provision.

(2) Upon the issuance of any court order or judgment restoring, expanding, or clarifying the authority of states to prohibit or regulate abortion entirely or in part, or the effective date of an amendment to the United States Constitution restoring, expanding, or clarifying the authority of states to prohibit or regulate abortion entirely or in part, the attorney general may apply to the pertinent state or federal court for either or both of the following:

(a) A declaration that any one or more sections specified in division (B)(1) of this section are constitutional;

(b) A judgment or order lifting an injunction against the enforcement of any one or more sections specified in division (B)(1) of this section.

(3) If the attorney general fails to apply for the relief described in division (B)(2) of this section within the thirty-day period after an event described in that division occurs, any county prosecutor, with standing, may apply to the appropriate state or federal court for such relief.

(4) If any provision of this section or sections 2919.171 or 2919.191 to 2919.1913 of the Revised Code is held invalid, or if the application of such provision to any person or circumstance is held invalid, the invalidity of that provision does not affect any other provisions or applications of this section and sections 2919.171 and 2919.191 to 2919.1913 of the Revised Code that can be given effect without the invalid provision or application, and to this end the provisions of this section and sections 2919.171 and 2919.191 to 2919.1913 of the Revised Code are severable as provided in section 1.50 of the Revised Code. In particular, it is the intent of the general assembly that any invalidity or potential invalidity of a provision of this section or sections 2919.171 or 2919.191 to 2919.1913 of the Revised Code is not to impair the immediate and continuing enforceability of the remaining provisions. It is furthermore the intent of the general assembly that the provisions of this section and sections 2919.171 or 2919.191 to 2919.1913 of the Revised Code are not to have the

effect of repealing or limiting any other laws of this state, except as specified by this section and sections 2919.171 and 2919.191 to 2919.1913 of the Revised Code.

Sec. 2919.191. Sections 2919.192 to 2919.195 of the Revised Code apply only to intrauterine pregnancies.

Sec. ~~2919.191~~ 2919.192. (A) A person who intends to perform or induce an abortion on a pregnant woman shall determine whether there is a detectable fetal heartbeat of the unborn human individual the pregnant woman is carrying. The method of determining the presence of a fetal heartbeat shall be consistent with the person's good faith understanding of standard medical practice, provided that if rules have been adopted under division ~~(C)~~ (B) of this section, the method chosen shall be one that is consistent with the rules. The person who determines the presence or absence of a fetal heartbeat shall record in the pregnant woman's medical record the estimated gestational age of the unborn human individual, the method used to test for a fetal heartbeat, the date and time of the test, and the results of the test.

~~(B)(1) Except when a medical emergency exists that prevents compliance with this division, no person shall perform or induce an abortion on a pregnant woman prior to determining if the unborn human individual the pregnant woman is carrying has a detectable fetal heartbeat. Any person who performs or induces an abortion on a pregnant woman based on the exception in this division shall note in the pregnant woman's medical records that a medical emergency necessitating the abortion existed and shall also note the medical condition of the pregnant woman that prevented compliance with this division. The person shall maintain a copy of the notes described in this division in the person's own records for at least seven years after the notes are entered into the medical records.~~

~~(2)~~ The person who performs the examination for the presence of a fetal heartbeat shall give the pregnant woman the option to view or hear the fetal heartbeat.

~~(C) The~~ (B) Not later than one hundred twenty days of the effective date of S.B. 23 of the 133rd general assembly, the director of health ~~may promulgate~~ shall adopt rules pursuant to section 111.15 of the Revised Code specifying the appropriate methods of performing an examination for the purpose of determining the presence of a fetal heartbeat of an unborn individual based on standard medical practice. ~~The rules shall require only that an examination shall be performed externally.~~

~~(D)~~ (C) A person is not in violation of division (A) ~~or (B)~~ of this section if that person has performed an examination for the purpose of determining the presence of a fetal heartbeat ~~in the fetus of an unborn human individual~~ utilizing standard medical practice in accordance with rules adopted under division (B) of this section, that examination does not reveal a fetal heartbeat or the person has been informed by a physician who has performed the examination for a fetal heartbeat that the examination did not reveal a fetal heartbeat, and the person notes in the pregnant woman's medical records the procedure utilized to detect the presence of a fetal heartbeat.

~~(E) Except as provided in division (F) of this section, no person shall knowingly and purposefully perform or induce an abortion on a pregnant woman before determining in accordance with division (A) of this section whether the unborn human individual the pregnant woman is carrying has a detectable heartbeat. The failure of a person to satisfy the requirements of this section prior to performing or inducing an abortion on a pregnant woman may be the basis for either of the following:~~

~~(1) A civil action for compensatory and exemplary damages;~~

~~(2) Disciplinary action under section 4731.22 of the Revised Code.~~

~~(F) Division (E) of this section does not apply to a physician who performs or induces the abortion if the physician believes that a medical emergency exists that prevents compliance with that division.~~

~~(G) The director of health may determine and specify in rules adopted pursuant to section 111.15 of the Revised Code and based upon available medical evidence the statistical probability of bringing an unborn human individual to term based on the gestational age of an unborn human individual who possesses a detectable fetal heartbeat.~~

~~(H) A woman on whom an abortion is performed in violation of division (B) of this section or division (B)(3) of section 2317.56 of the Revised Code may file a civil action for the wrongful death of the woman's unborn child and may receive at the mother's election at any time prior to final judgment damages in an amount equal to ten thousand dollars or an amount determined by the trier of fact after consideration of the evidence subject to the same defenses and requirements of proof, except any requirement of live birth, as would apply to a suit for the wrongful death of a child who had been born alive.~~

Sec. 2919.193. (A) Except as provided in division (B) of this section, no person shall knowingly and purposefully perform or induce an abortion on a pregnant woman before determining in accordance with division (A) of section 2919.192 of the Revised Code whether the unborn human individual the pregnant woman is carrying has a detectable heartbeat.

Whoever violates this division is guilty of performing or inducing an abortion before determining whether there is a detectable fetal heartbeat, a felony of the fifth degree. A violation of this division may also be the basis of either of the following:

(1) A civil action for compensatory and exemplary damages;

(2) Disciplinary action under section 4731.22 of the Revised Code.

(B) Division (A) of this section does not apply to a physician who performs or induces the abortion if the physician believes that a medical emergency, as defined in section 2919.16 of the Revised Code, exists that prevents compliance with that division.

(C) A physician who performs or induces an abortion on a pregnant woman based on the exception in division (B) of this section shall make written notations in the pregnant woman's medical records of both of the following:

(1) The physician's belief that a medical emergency necessitating the abortion existed;

(2) The medical condition of the pregnant woman that assertedly prevented compliance with division (A) of this section.

For at least seven years from the date the notations are made, the physician shall maintain in the physician's own records a copy of the notations.

(D) A person is not in violation of division (A) of this section if the person acts in accordance with division (A) of section 2919.192 of the Revised Code and the method used to determine the presence of a fetal heartbeat does not reveal a fetal heartbeat.

Sec. **2919.192** 2919.194. (A) ~~If~~ Notwithstanding division (A)(3) of this section, if a person who intends to perform or induce an abortion on a pregnant woman has determined, under section ~~2919.191~~ 2919.192 of the Revised Code, that the unborn human individual the pregnant woman is

carrying has a detectable heartbeat, the person shall not, except as provided in division (B) of this section, perform or induce the abortion ~~until~~ without meeting all of the following requirements ~~have been met~~ and without at least twenty-four hours ~~have elapsed~~ elapsing after the last of the requirements is met:

(1) The person intending to perform or induce the abortion shall inform the pregnant woman in writing that the unborn human individual the pregnant woman is carrying has a fetal heartbeat.

(2) The person intending to perform or induce the abortion shall inform the pregnant woman, to the best of the person's knowledge, of the statistical probability of bringing the unborn human individual possessing a detectable fetal heartbeat to term based on the gestational age of the unborn human individual the pregnant woman is carrying or, if the director of health has specified statistical probability information pursuant to rules adopted under division (C) of this section, shall provide to the pregnant woman that information.

(3) The pregnant woman shall sign a form acknowledging that the pregnant woman has received information from the person intending to perform or induce the abortion that the unborn human individual the pregnant woman is carrying has a fetal heartbeat and that the pregnant woman is aware of the statistical probability of bringing the unborn human individual the pregnant woman is carrying to term.

(B) Division (A) of this section does not apply if the person who intends to perform or induce the abortion believes that a medical emergency exists that prevents compliance with that division.

(C) The director of health may adopt rules that specify information regarding the statistical probability of bringing an unborn human individual possessing a detectable heartbeat to term based on the gestational age of the unborn human individual. The rules shall be based on available medical evidence and shall be adopted in accordance with section 111.15 of the Revised Code.

(D) This section does not have the effect of repealing or limiting any other provision of the Revised Code relating to informed consent for an abortion, including the provisions in section 2317.56 of the Revised Code.

(E) Whoever violates division (A) of this section is guilty of performing or inducing an abortion without informed consent when there is a detectable fetal heartbeat, a misdemeanor of the first degree on a first offense and a felony of the fourth degree on each subsequent offense.

Sec. 2919.195. (A) Except as provided in division (B) of this section, no person shall knowingly and purposefully perform or induce an abortion on a pregnant woman with the specific intent of causing or abetting the termination of the life of the unborn human individual the pregnant woman is carrying and whose fetal heartbeat has been detected in accordance with division (A) of section 2919.192 of the Revised Code.

Whoever violates this division is guilty of performing or inducing an abortion after the detection of a fetal heartbeat, a felony of the fifth degree.

(B) Division (A) of this section does not apply to a physician who performs a medical procedure that, in the physician's reasonable medical judgment, is designed or intended to prevent the death of the pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman.

A physician who performs a medical procedure as described in this division shall declare, in a written document, that the medical procedure is necessary, to the best of the physician's reasonable

medical judgment, to prevent the death of the pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman. In the document, the physician shall specify the pregnant woman's medical condition that the medical procedure is asserted to address and the medical rationale for the physician's conclusion that the medical procedure is necessary to prevent the death of the pregnant woman or to prevent a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman.

A physician who performs a medical procedure as described in this division shall place the written document required by this division in the pregnant woman's medical records. The physician shall maintain a copy of the document in the physician's own records for at least seven years from the date the document is created.

(C) A person is not in violation of division (A) of this section if the person acts in accordance with division (A) of section 2919.192 of the Revised Code and the method used to determine the presence of a fetal heartbeat does not reveal a fetal heartbeat.

(D) Division (A) of this section does not have the effect of repealing or limiting any other provision of the Revised Code that restricts or regulates the performance or inducement of an abortion by a particular method or during a particular stage of a pregnancy.

Sec. 2919.196. The provisions of this section are wholly independent of the requirements of sections 2919.192 to 2919.195 of the Revised Code.

(A) A person who performs or induces an abortion on a pregnant woman shall do whichever of the following is applicable:

(1) If a purported reason for the abortion is to preserve the health of the pregnant woman, the person shall specify in a written document the medical condition that the abortion is asserted to address and the medical rationale for the person's conclusion that the abortion is necessary to address that condition.

(2) If division (A)(1) of this section does not apply, the person shall specify in a written document that maternal health is not a reason of the abortion.

(B) The person who specifies the information in the document described in division (A) of this section shall place the document in the pregnant woman's medical records. The person who specifies the information shall maintain a copy of the document in the person's own records for at least seven years from the date the document is created.

Sec. 2919.197. Nothing in sections 2919.19 to 2919.196 of the Revised Code prohibits the sale, use, prescription, or administration of a drug, device, or chemical for contraceptive purposes.

Sec. **2919.193** 2919.198. A pregnant woman on whom an abortion is performed or induced in violation of section 2919.191 or 2919.192 2919.193, 2919.194, or 2919.195 of the Revised Code is not guilty of violating any of those sections; is not guilty of attempting to commit, conspiring to commit, or complicity in committing a violation of any of those sections; and is not subject to a civil penalty based on the abortion being performed or induced in violation of any of those sections.

Sec. 2919.199. (A) A woman who meets either or both of the following criteria may file a civil action for the wrongful death of her unborn child:

(1) A woman on whom an abortion was performed or induced in violation of division (A) of section 2919.193 or division (A) of section 2919.195 of the Revised Code;

(2) A woman on whom an abortion was performed or induced who was not given the

information described in divisions (A)(1) and (2) of section 2919.194 of the Revised Code or who did not sign a form described in division (A)(3) of section 2919.194 of the Revised code.

(B) A woman who prevails in an action filed under division (A) of this section shall receive both of the following from the person who committed the one or more acts described in division (A)(1) or (2) of this section:

(1) Damages in an amount equal to ten thousand dollars or an amount determined by the trier of fact after consideration of the evidence at the mother's election at any time prior to final judgment subject to the same defenses and requirements of proof, except any requirement of live birth, as would apply to a suit for the wrongful death of a child who had been born alive;

(2) Court costs and reasonable attorney's fees.

(C) A determination by a court of record that division (A) of section 2919.193 of the Revised Code, division (A)(1), (2), or (3) of section 2919.194 of the Revised Code, or division (A) of section 2919.195 of the Revised Code is unconstitutional shall be a defense to an action filed under division (A) of this section alleging that the defendant violated the division that was determined to be unconstitutional.

(D) If the defendant in an action filed under division (A) of this section prevails and all of the following apply the court shall award reasonable attorney's fees to the defendant in accordance with section 2323.51 of the Revised Code:

(1) The court finds that the commencement of the action constitutes frivolous conduct, as defined in section 2323.51 of the Revised Code.

(2) The court's finding in division (D)(1) of this section is not based on that court or another court determining that division (A) of section 2919.193 of the Revised Code, division (A)(1), (2), or (3) of section 2919.194 of the Revised Code, or division (A) of section 2919.195 of the Revised Code is unconstitutional.

(3) The court finds that the defendant was adversely affected by the frivolous conduct.

Sec. 2919.1910. (A) To ensure that citizens are informed of available options in this state, there is hereby created the joint legislative committee on adoption promotion and support. The committee may review or study any matter that it considers relevant to the adoption process in this state, with priority given to the study or review of mechanisms intended to increase awareness of the process, increase its effectiveness, or both.

(B) The committee shall consist of three members of the house of representatives appointed by the speaker of the house of representatives and three members of the senate appointed by the president of the senate. Not more than two members appointed by the speaker of the house of representatives and not more than two members appointed by the president of the senate may be of the same political party.

Each member of the committee shall hold office during the general assembly in which the member is appointed and until a successor has been appointed, notwithstanding the adjournment sine die of the general assembly in which the member was appointed or the expiration of the member's term as a member of the general assembly. Any vacancies occurring among the members of the committee shall be filled in the manner of the original appointment.

(C) The committee has the same powers as other standing or select committees of the general assembly.

Sec. 2919.1912. (A) The state medical board may assess against a person a forfeiture of not more than twenty thousand dollars for each separate violation or failure of the person to comply with any of the requirements of sections 2919.171, 2919.192, 2919.193, 2919.194, 2919.195, or 2919.196 of the Revised Code. The board shall comply with the adjudication requirements of Chapter 119. of the Revised Code when assessing the forfeiture. The forfeiture may be in addition to criminal penalties that are imposed under other sections of the Revised Code.

(B) An action to recover a forfeiture shall be prosecuted in the name of the state and shall be brought in the court of common pleas of Franklin county. The action shall be commenced and prosecuted by the attorney general when directed by the board.

(C) Moneys collected under division (A) of this section or recovered by an action under division (B) of this section shall be paid to the treasurer of state for deposit into the foster care and adoption initiatives fund created under section 5103.11 of the Revised Code.

Sec. 2919.1913. Sections 2919.171, 2919.19 to 2919.1913, and 4731.22 of the Revised Code, as amended or enacted by this act, shall be known as the "Human Rights and Heartbeat Protection Act."

Sec. 4731.22. (A) The state medical board, by an affirmative vote of not fewer than six of its members, may limit, revoke, or suspend a license or certificate to practice or certificate to recommend, refuse to grant a license or certificate, refuse to renew a license or certificate, refuse to reinstate a license or certificate, or reprimand or place on probation the holder of a license or certificate if the individual applying for or holding the license or certificate is found by the board to have committed fraud during the administration of the examination for a license or certificate to practice or to have committed fraud, misrepresentation, or deception in applying for, renewing, or securing any license or certificate to practice or certificate to recommend issued by the board.

(B) The board, by an affirmative vote of not fewer than six members, shall, to the extent permitted by law, limit, revoke, or suspend a license or certificate to practice or certificate to recommend, refuse to issue a license or certificate, refuse to renew a license or certificate, refuse to reinstate a license or certificate, or reprimand or place on probation the holder of a license or certificate for one or more of the following reasons:

(1) Permitting one's name or one's license or certificate to practice to be used by a person, group, or corporation when the individual concerned is not actually directing the treatment given;

(2) Failure to maintain minimal standards applicable to the selection or administration of drugs, or failure to employ acceptable scientific methods in the selection of drugs or other modalities for treatment of disease;

(3) Except as provided in section 4731.97 of the Revised Code, selling, giving away, personally furnishing, prescribing, or administering drugs for other than legal and legitimate therapeutic purposes or a plea of guilty to, a judicial finding of guilt of, or a judicial finding of eligibility for intervention in lieu of conviction of, a violation of any federal or state law regulating the possession, distribution, or use of any drug;

(4) Willfully betraying a professional confidence.

For purposes of this division, "willfully betraying a professional confidence" does not include providing any information, documents, or reports under sections 307.621 to 307.629 of the Revised Code to a child fatality review board; does not include providing any information, documents, or

reports to the director of health pursuant to guidelines established under section 3701.70 of the Revised Code; does not include written notice to a mental health professional under section 4731.62 of the Revised Code; and does not include the making of a report of an employee's use of a drug of abuse, or a report of a condition of an employee other than one involving the use of a drug of abuse, to the employer of the employee as described in division (B) of section 2305.33 of the Revised Code. Nothing in this division affects the immunity from civil liability conferred by section 2305.33 or 4731.62 of the Revised Code upon a physician who makes a report in accordance with section 2305.33 or notifies a mental health professional in accordance with section 4731.62 of the Revised Code. As used in this division, "employee," "employer," and "physician" have the same meanings as in section 2305.33 of the Revised Code.

(5) Making a false, fraudulent, deceptive, or misleading statement in the solicitation of or advertising for patients; in relation to the practice of medicine and surgery, osteopathic medicine and surgery, podiatric medicine and surgery, or a limited branch of medicine; or in securing or attempting to secure any license or certificate to practice issued by the board.

As used in this division, "false, fraudulent, deceptive, or misleading statement" means a statement that includes a misrepresentation of fact, is likely to mislead or deceive because of a failure to disclose material facts, is intended or is likely to create false or unjustified expectations of favorable results, or includes representations or implications that in reasonable probability will cause an ordinarily prudent person to misunderstand or be deceived.

(6) A departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established;

(7) Representing, with the purpose of obtaining compensation or other advantage as personal gain or for any other person, that an incurable disease or injury, or other incurable condition, can be permanently cured;

(8) The obtaining of, or attempting to obtain, money or anything of value by fraudulent misrepresentations in the course of practice;

(9) A plea of guilty to, a judicial finding of guilt of, or a judicial finding of eligibility for intervention in lieu of conviction for, a felony;

(10) Commission of an act that constitutes a felony in this state, regardless of the jurisdiction in which the act was committed;

(11) A plea of guilty to, a judicial finding of guilt of, or a judicial finding of eligibility for intervention in lieu of conviction for, a misdemeanor committed in the course of practice;

(12) Commission of an act in the course of practice that constitutes a misdemeanor in this state, regardless of the jurisdiction in which the act was committed;

(13) A plea of guilty to, a judicial finding of guilt of, or a judicial finding of eligibility for intervention in lieu of conviction for, a misdemeanor involving moral turpitude;

(14) Commission of an act involving moral turpitude that constitutes a misdemeanor in this state, regardless of the jurisdiction in which the act was committed;

(15) Violation of the conditions of limitation placed by the board upon a license or certificate to practice;

(16) Failure to pay license renewal fees specified in this chapter;

(17) Except as authorized in section 4731.31 of the Revised Code, engaging in the division of fees for referral of patients, or the receiving of a thing of value in return for a specific referral of a patient to utilize a particular service or business;

(18) Subject to section 4731.226 of the Revised Code, violation of any provision of a code of ethics of the American medical association, the American osteopathic association, the American podiatric medical association, or any other national professional organizations that the board specifies by rule. The state medical board shall obtain and keep on file current copies of the codes of ethics of the various national professional organizations. The individual whose license or certificate is being suspended or revoked shall not be found to have violated any provision of a code of ethics of an organization not appropriate to the individual's profession.

For purposes of this division, a "provision of a code of ethics of a national professional organization" does not include any provision that would preclude the making of a report by a physician of an employee's use of a drug of abuse, or of a condition of an employee other than one involving the use of a drug of abuse, to the employer of the employee as described in division (B) of section 2305.33 of the Revised Code. Nothing in this division affects the immunity from civil liability conferred by that section upon a physician who makes either type of report in accordance with division (B) of that section. As used in this division, "employee," "employer," and "physician" have the same meanings as in section 2305.33 of the Revised Code.

(19) Inability to practice according to acceptable and prevailing standards of care by reason of mental illness or physical illness, including, but not limited to, physical deterioration that adversely affects cognitive, motor, or perceptive skills.

In enforcing this division, the board, upon a showing of a possible violation, may compel any individual authorized to practice by this chapter or who has submitted an application pursuant to this chapter to submit to a mental examination, physical examination, including an HIV test, or both a mental and a physical examination. The expense of the examination is the responsibility of the individual compelled to be examined. Failure to submit to a mental or physical examination or consent to an HIV test ordered by the board constitutes an admission of the allegations against the individual unless the failure is due to circumstances beyond the individual's control, and a default and final order may be entered without the taking of testimony or presentation of evidence. If the board finds an individual unable to practice because of the reasons set forth in this division, the board shall require the individual to submit to care, counseling, or treatment by physicians approved or designated by the board, as a condition for initial, continued, reinstated, or renewed authority to practice. An individual affected under this division shall be afforded an opportunity to demonstrate to the board the ability to resume practice in compliance with acceptable and prevailing standards under the provisions of the individual's license or certificate. For the purpose of this division, any individual who applies for or receives a license or certificate to practice under this chapter accepts the privilege of practicing in this state and, by so doing, shall be deemed to have given consent to submit to a mental or physical examination when directed to do so in writing by the board, and to have waived all objections to the admissibility of testimony or examination reports that constitute a privileged communication.

(20) Except as provided in division (F)(1)(b) of section 4731.282 of the Revised Code or when civil penalties are imposed under section 4731.225 of the Revised Code, and subject to section

4731.226 of the Revised Code, violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate, any provisions of this chapter or any rule promulgated by the board.

This division does not apply to a violation or attempted violation of, assisting in or abetting the violation of, or a conspiracy to violate, any provision of this chapter or any rule adopted by the board that would preclude the making of a report by a physician of an employee's use of a drug of abuse, or of a condition of an employee other than one involving the use of a drug of abuse, to the employer of the employee as described in division (B) of section 2305.33 of the Revised Code. Nothing in this division affects the immunity from civil liability conferred by that section upon a physician who makes either type of report in accordance with division (B) of that section. As used in this division, "employee," "employer," and "physician" have the same meanings as in section 2305.33 of the Revised Code.

(21) The violation of section 3701.79 of the Revised Code or of any abortion rule adopted by the director of health pursuant to section 3701.341 of the Revised Code;

(22) Any of the following actions taken by an agency responsible for authorizing, certifying, or regulating an individual to practice a health care occupation or provide health care services in this state or another jurisdiction, for any reason other than the nonpayment of fees: the limitation, revocation, or suspension of an individual's license to practice; acceptance of an individual's license surrender; denial of a license; refusal to renew or reinstate a license; imposition of probation; or issuance of an order of censure or other reprimand;

(23) The violation of section 2919.12 of the Revised Code or the performance or inducement of an abortion upon a pregnant woman with actual knowledge that the conditions specified in division (B) of section 2317.56 of the Revised Code have not been satisfied or with a heedless indifference as to whether those conditions have been satisfied, unless an affirmative defense as specified in division (H)(2) of that section would apply in a civil action authorized by division (H)(1) of that section;

(24) The revocation, suspension, restriction, reduction, or termination of clinical privileges by the United States department of defense or department of veterans affairs or the termination or suspension of a certificate of registration to prescribe drugs by the drug enforcement administration of the United States department of justice;

(25) Termination or suspension from participation in the medicare or medicaid programs by the department of health and human services or other responsible agency;

(26) Impairment of ability to practice according to acceptable and prevailing standards of care because of habitual or excessive use or abuse of drugs, alcohol, or other substances that impair ability to practice.

For the purposes of this division, any individual authorized to practice by this chapter accepts the privilege of practicing in this state subject to supervision by the board. By filing an application for or holding a license or certificate to practice under this chapter, an individual shall be deemed to have given consent to submit to a mental or physical examination when ordered to do so by the board in writing, and to have waived all objections to the admissibility of testimony or examination reports that constitute privileged communications.

If it has reason to believe that any individual authorized to practice by this chapter or any

applicant for licensure or certification to practice suffers such impairment, the board may compel the individual to submit to a mental or physical examination, or both. The expense of the examination is the responsibility of the individual compelled to be examined. Any mental or physical examination required under this division shall be undertaken by a treatment provider or physician who is qualified to conduct the examination and who is chosen by the board.

Failure to submit to a mental or physical examination ordered by the board constitutes an admission of the allegations against the individual unless the failure is due to circumstances beyond the individual's control, and a default and final order may be entered without the taking of testimony or presentation of evidence. If the board determines that the individual's ability to practice is impaired, the board shall suspend the individual's license or certificate or deny the individual's application and shall require the individual, as a condition for initial, continued, reinstated, or renewed licensure or certification to practice, to submit to treatment.

Before being eligible to apply for reinstatement of a license or certificate suspended under this division, the impaired practitioner shall demonstrate to the board the ability to resume practice in compliance with acceptable and prevailing standards of care under the provisions of the practitioner's license or certificate. The demonstration shall include, but shall not be limited to, the following:

(a) Certification from a treatment provider approved under section 4731.25 of the Revised Code that the individual has successfully completed any required inpatient treatment;

(b) Evidence of continuing full compliance with an aftercare contract or consent agreement;

(c) Two written reports indicating that the individual's ability to practice has been assessed and that the individual has been found capable of practicing according to acceptable and prevailing standards of care. The reports shall be made by individuals or providers approved by the board for making the assessments and shall describe the basis for their determination.

The board may reinstate a license or certificate suspended under this division after that demonstration and after the individual has entered into a written consent agreement.

When the impaired practitioner resumes practice, the board shall require continued monitoring of the individual. The monitoring shall include, but not be limited to, compliance with the written consent agreement entered into before reinstatement or with conditions imposed by board order after a hearing, and, upon termination of the consent agreement, submission to the board for at least two years of annual written progress reports made under penalty of perjury stating whether the individual has maintained sobriety.

(27) A second or subsequent violation of section 4731.66 or 4731.69 of the Revised Code;

(28) Except as provided in division (N) of this section:

(a) Waiving the payment of all or any part of a deductible or copayment that a patient, pursuant to a health insurance or health care policy, contract, or plan that covers the individual's services, otherwise would be required to pay if the waiver is used as an enticement to a patient or group of patients to receive health care services from that individual;

(b) Advertising that the individual will waive the payment of all or any part of a deductible or copayment that a patient, pursuant to a health insurance or health care policy, contract, or plan that covers the individual's services, otherwise would be required to pay.

(29) Failure to use universal blood and body fluid precautions established by rules adopted under section 4731.051 of the Revised Code;

(30) Failure to provide notice to, and receive acknowledgment of the notice from, a patient when required by section 4731.143 of the Revised Code prior to providing nonemergency professional services, or failure to maintain that notice in the patient's medical record;

(31) Failure of a physician supervising a physician assistant to maintain supervision in accordance with the requirements of Chapter 4730. of the Revised Code and the rules adopted under that chapter;

(32) Failure of a physician or podiatrist to enter into a standard care arrangement with a clinical nurse specialist, certified nurse-midwife, or certified nurse practitioner with whom the physician or podiatrist is in collaboration pursuant to section 4731.27 of the Revised Code or failure to fulfill the responsibilities of collaboration after entering into a standard care arrangement;

(33) Failure to comply with the terms of a consult agreement entered into with a pharmacist pursuant to section 4729.39 of the Revised Code;

(34) Failure to cooperate in an investigation conducted by the board under division (F) of this section, including failure to comply with a subpoena or order issued by the board or failure to answer truthfully a question presented by the board in an investigative interview, an investigative office conference, at a deposition, or in written interrogatories, except that failure to cooperate with an investigation shall not constitute grounds for discipline under this section if a court of competent jurisdiction has issued an order that either quashes a subpoena or permits the individual to withhold the testimony or evidence in issue;

(35) Failure to supervise an oriental medicine practitioner or acupuncturist in accordance with Chapter 4762. of the Revised Code and the board's rules for providing that supervision;

(36) Failure to supervise an anesthesiologist assistant in accordance with Chapter 4760. of the Revised Code and the board's rules for supervision of an anesthesiologist assistant;

(37) Assisting suicide, as defined in section 3795.01 of the Revised Code;

(38) Failure to comply with the requirements of section 2317.561 of the Revised Code;

(39) Failure to supervise a radiologist assistant in accordance with Chapter 4774. of the Revised Code and the board's rules for supervision of radiologist assistants;

(40) Performing or inducing an abortion at an office or facility with knowledge that the office or facility fails to post the notice required under section 3701.791 of the Revised Code;

(41) Failure to comply with the standards and procedures established in rules under section 4731.054 of the Revised Code for the operation of or the provision of care at a pain management clinic;

(42) Failure to comply with the standards and procedures established in rules under section 4731.054 of the Revised Code for providing supervision, direction, and control of individuals at a pain management clinic;

(43) Failure to comply with the requirements of section 4729.79 or 4731.055 of the Revised Code, unless the state board of pharmacy no longer maintains a drug database pursuant to section 4729.75 of the Revised Code;

(44) Failure to comply with the requirements of section 2919.171, 2919.202, or 2919.203 of the Revised Code or failure to submit to the department of health in accordance with a court order a complete report as described in section 2919.171 or 2919.202 of the Revised Code;

(45) Practicing at a facility that is subject to licensure as a category III terminal distributor of

dangerous drugs with a pain management clinic classification unless the person operating the facility has obtained and maintains the license with the classification;

(46) Owning a facility that is subject to licensure as a category III terminal distributor of dangerous drugs with a pain management clinic classification unless the facility is licensed with the classification;

(47) Failure to comply with ~~any of the~~ any of the ~~requirement~~ requirements regarding ~~making or~~ making or maintaining ~~notes~~ medical records or documents described in division ~~(B)~~ (A) of section ~~2919.191~~ 2919.192, division (C) of section 2919.193, division (B) of section 2919.195, or division (A) of section 2919.196 of the Revised Code ~~or failure to satisfy the requirements of section 2919.191 of the Revised Code prior to performing or inducing an abortion upon a pregnant woman~~;

(48) Failure to comply with the requirements in section 3719.061 of the Revised Code before issuing for a minor a prescription for an opioid analgesic, as defined in section 3719.01 of the Revised Code;

(49) Failure to comply with the requirements of section 4731.30 of the Revised Code or rules adopted under section 4731.301 of the Revised Code when recommending treatment with medical marijuana;

(50) Practicing at a facility, clinic, or other location that is subject to licensure as a category III terminal distributor of dangerous drugs with an office-based opioid treatment classification unless the person operating that place has obtained and maintains the license with the classification;

(51) Owning a facility, clinic, or other location that is subject to licensure as a category III terminal distributor of dangerous drugs with an office-based opioid treatment classification unless that place is licensed with the classification;

(52) A pattern of continuous or repeated violations of division (E)(2) or (3) of section 3963.02 of the Revised Code.

(C) Disciplinary actions taken by the board under divisions (A) and (B) of this section shall be taken pursuant to an adjudication under Chapter 119. of the Revised Code, except that in lieu of an adjudication, the board may enter into a consent agreement with an individual to resolve an allegation of a violation of this chapter or any rule adopted under it. A consent agreement, when ratified by an affirmative vote of not fewer than six members of the board, shall constitute the findings and order of the board with respect to the matter addressed in the agreement. If the board refuses to ratify a consent agreement, the admissions and findings contained in the consent agreement shall be of no force or effect.

A telephone conference call may be utilized for ratification of a consent agreement that revokes or suspends an individual's license or certificate to practice or certificate to recommend. The telephone conference call shall be considered a special meeting under division (F) of section 121.22 of the Revised Code.

If the board takes disciplinary action against an individual under division (B) of this section for a second or subsequent plea of guilty to, or judicial finding of guilt of, a violation of section 2919.123 of the Revised Code, the disciplinary action shall consist of a suspension of the individual's license or certificate to practice for a period of at least one year or, if determined appropriate by the board, a more serious sanction involving the individual's license or certificate to practice. Any consent agreement entered into under this division with an individual that pertains to a second or

subsequent plea of guilty to, or judicial finding of guilt of, a violation of that section shall provide for a suspension of the individual's license or certificate to practice for a period of at least one year or, if determined appropriate by the board, a more serious sanction involving the individual's license or certificate to practice.

(D) For purposes of divisions (B)(10), (12), and (14) of this section, the commission of the act may be established by a finding by the board, pursuant to an adjudication under Chapter 119. of the Revised Code, that the individual committed the act. The board does not have jurisdiction under those divisions if the trial court renders a final judgment in the individual's favor and that judgment is based upon an adjudication on the merits. The board has jurisdiction under those divisions if the trial court issues an order of dismissal upon technical or procedural grounds.

(E) The sealing of conviction records by any court shall have no effect upon a prior board order entered under this section or upon the board's jurisdiction to take action under this section if, based upon a plea of guilty, a judicial finding of guilt, or a judicial finding of eligibility for intervention in lieu of conviction, the board issued a notice of opportunity for a hearing prior to the court's order to seal the records. The board shall not be required to seal, destroy, redact, or otherwise modify its records to reflect the court's sealing of conviction records.

(F)(1) The board shall investigate evidence that appears to show that a person has violated any provision of this chapter or any rule adopted under it. Any person may report to the board in a signed writing any information that the person may have that appears to show a violation of any provision of this chapter or any rule adopted under it. In the absence of bad faith, any person who reports information of that nature or who testifies before the board in any adjudication conducted under Chapter 119. of the Revised Code shall not be liable in damages in a civil action as a result of the report or testimony. Each complaint or allegation of a violation received by the board shall be assigned a case number and shall be recorded by the board.

(2) Investigations of alleged violations of this chapter or any rule adopted under it shall be supervised by the supervising member elected by the board in accordance with section 4731.02 of the Revised Code and by the secretary as provided in section 4731.39 of the Revised Code. The president may designate another member of the board to supervise the investigation in place of the supervising member. No member of the board who supervises the investigation of a case shall participate in further adjudication of the case.

(3) In investigating a possible violation of this chapter or any rule adopted under this chapter, or in conducting an inspection under division (E) of section 4731.054 of the Revised Code, the board may question witnesses, conduct interviews, administer oaths, order the taking of depositions, inspect and copy any books, accounts, papers, records, or documents, issue subpoenas, and compel the attendance of witnesses and production of books, accounts, papers, records, documents, and testimony, except that a subpoena for patient record information shall not be issued without consultation with the attorney general's office and approval of the secretary and supervising member of the board.

(a) Before issuance of a subpoena for patient record information, the secretary and supervising member shall determine whether there is probable cause to believe that the complaint filed alleges a violation of this chapter or any rule adopted under it and that the records sought are relevant to the alleged violation and material to the investigation. The subpoena may apply only to

records that cover a reasonable period of time surrounding the alleged violation.

(b) On failure to comply with any subpoena issued by the board and after reasonable notice to the person being subpoenaed, the board may move for an order compelling the production of persons or records pursuant to the Rules of Civil Procedure.

(c) A subpoena issued by the board may be served by a sheriff, the sheriff's deputy, or a board employee or agent designated by the board. Service of a subpoena issued by the board may be made by delivering a copy of the subpoena to the person named therein, reading it to the person, or leaving it at the person's usual place of residence, usual place of business, or address on file with the board. When serving a subpoena to an applicant for or the holder of a license or certificate issued under this chapter, service of the subpoena may be made by certified mail, return receipt requested, and the subpoena shall be deemed served on the date delivery is made or the date the person refuses to accept delivery. If the person being served refuses to accept the subpoena or is not located, service may be made to an attorney who notifies the board that the attorney is representing the person.

(d) A sheriff's deputy who serves a subpoena shall receive the same fees as a sheriff. Each witness who appears before the board in obedience to a subpoena shall receive the fees and mileage provided for under section 119.094 of the Revised Code.

(4) All hearings, investigations, and inspections of the board shall be considered civil actions for the purposes of section 2305.252 of the Revised Code.

(5) A report required to be submitted to the board under this chapter, a complaint, or information received by the board pursuant to an investigation or pursuant to an inspection under division (E) of section 4731.054 of the Revised Code is confidential and not subject to discovery in any civil action.

The board shall conduct all investigations or inspections and proceedings in a manner that protects the confidentiality of patients and persons who file complaints with the board. The board shall not make public the names or any other identifying information about patients or complainants unless proper consent is given or, in the case of a patient, a waiver of the patient privilege exists under division (B) of section 2317.02 of the Revised Code, except that consent or a waiver of that nature is not required if the board possesses reliable and substantial evidence that no bona fide physician-patient relationship exists.

The board may share any information it receives pursuant to an investigation or inspection, including patient records and patient record information, with law enforcement agencies, other licensing boards, and other governmental agencies that are prosecuting, adjudicating, or investigating alleged violations of statutes or administrative rules. An agency or board that receives the information shall comply with the same requirements regarding confidentiality as those with which the state medical board must comply, notwithstanding any conflicting provision of the Revised Code or procedure of the agency or board that applies when it is dealing with other information in its possession. In a judicial proceeding, the information may be admitted into evidence only in accordance with the Rules of Evidence, but the court shall require that appropriate measures are taken to ensure that confidentiality is maintained with respect to any part of the information that contains names or other identifying information about patients or complainants whose confidentiality was protected by the state medical board when the information was in the board's possession. Measures to ensure confidentiality that may be taken by the court include sealing its records or

deleting specific information from its records.

(6) On a quarterly basis, the board shall prepare a report that documents the disposition of all cases during the preceding three months. The report shall contain the following information for each case with which the board has completed its activities:

(a) The case number assigned to the complaint or alleged violation;

(b) The type of license or certificate to practice, if any, held by the individual against whom the complaint is directed;

(c) A description of the allegations contained in the complaint;

(d) The disposition of the case.

The report shall state how many cases are still pending and shall be prepared in a manner that protects the identity of each person involved in each case. The report shall be a public record under section 149.43 of the Revised Code.

(G) If the secretary and supervising member determine both of the following, they may recommend that the board suspend an individual's license or certificate to practice or certificate to recommend without a prior hearing:

(1) That there is clear and convincing evidence that an individual has violated division (B) of this section;

(2) That the individual's continued practice presents a danger of immediate and serious harm to the public.

Written allegations shall be prepared for consideration by the board. The board, upon review of those allegations and by an affirmative vote of not fewer than six of its members, excluding the secretary and supervising member, may suspend a license or certificate without a prior hearing. A telephone conference call may be utilized for reviewing the allegations and taking the vote on the summary suspension.

The board shall issue a written order of suspension by certified mail or in person in accordance with section 119.07 of the Revised Code. The order shall not be subject to suspension by the court during pendency of any appeal filed under section 119.12 of the Revised Code. If the individual subject to the summary suspension requests an adjudicatory hearing by the board, the date set for the hearing shall be within fifteen days, but not earlier than seven days, after the individual requests the hearing, unless otherwise agreed to by both the board and the individual.

Any summary suspension imposed under this division shall remain in effect, unless reversed on appeal, until a final adjudicative order issued by the board pursuant to this section and Chapter 119. of the Revised Code becomes effective. The board shall issue its final adjudicative order within seventy-five days after completion of its hearing. A failure to issue the order within seventy-five days shall result in dissolution of the summary suspension order but shall not invalidate any subsequent, final adjudicative order.

(H) If the board takes action under division (B)(9), (11), or (13) of this section and the judicial finding of guilt, guilty plea, or judicial finding of eligibility for intervention in lieu of conviction is overturned on appeal, upon exhaustion of the criminal appeal, a petition for reconsideration of the order may be filed with the board along with appropriate court documents. Upon receipt of a petition of that nature and supporting court documents, the board shall reinstate the individual's license or certificate to practice. The board may then hold an adjudication under Chapter

119. of the Revised Code to determine whether the individual committed the act in question. Notice of an opportunity for a hearing shall be given in accordance with Chapter 119. of the Revised Code. If the board finds, pursuant to an adjudication held under this division, that the individual committed the act or if no hearing is requested, the board may order any of the sanctions identified under division (B) of this section.

(I) The license or certificate to practice issued to an individual under this chapter and the individual's practice in this state are automatically suspended as of the date of the individual's second or subsequent plea of guilty to, or judicial finding of guilt of, a violation of section 2919.123 of the Revised Code. In addition, the license or certificate to practice or certificate to recommend issued to an individual under this chapter and the individual's practice in this state are automatically suspended as of the date the individual pleads guilty to, is found by a judge or jury to be guilty of, or is subject to a judicial finding of eligibility for intervention in lieu of conviction in this state or treatment or intervention in lieu of conviction in another jurisdiction for any of the following criminal offenses in this state or a substantially equivalent criminal offense in another jurisdiction: aggravated murder, murder, voluntary manslaughter, felonious assault, kidnapping, rape, sexual battery, gross sexual imposition, aggravated arson, aggravated robbery, or aggravated burglary. Continued practice after suspension shall be considered practicing without a license or certificate.

The board shall notify the individual subject to the suspension by certified mail or in person in accordance with section 119.07 of the Revised Code. If an individual whose license or certificate is automatically suspended under this division fails to make a timely request for an adjudication under Chapter 119. of the Revised Code, the board shall do whichever of the following is applicable:

(1) If the automatic suspension under this division is for a second or subsequent plea of guilty to, or judicial finding of guilt of, a violation of section 2919.123 of the Revised Code, the board shall enter an order suspending the individual's license or certificate to practice for a period of at least one year or, if determined appropriate by the board, imposing a more serious sanction involving the individual's license or certificate to practice.

(2) In all circumstances in which division (I)(1) of this section does not apply, enter a final order permanently revoking the individual's license or certificate to practice.

(J) If the board is required by Chapter 119. of the Revised Code to give notice of an opportunity for a hearing and if the individual subject to the notice does not timely request a hearing in accordance with section 119.07 of the Revised Code, the board is not required to hold a hearing, but may adopt, by an affirmative vote of not fewer than six of its members, a final order that contains the board's findings. In that final order, the board may order any of the sanctions identified under division (A) or (B) of this section.

(K) Any action taken by the board under division (B) of this section resulting in a suspension from practice shall be accompanied by a written statement of the conditions under which the individual's license or certificate to practice may be reinstated. The board shall adopt rules governing conditions to be imposed for reinstatement. Reinstatement of a license or certificate suspended pursuant to division (B) of this section requires an affirmative vote of not fewer than six members of the board.

(L) When the board refuses to grant or issue a license or certificate to practice to an applicant, revokes an individual's license or certificate to practice, refuses to renew an individual's license or

certificate to practice, or refuses to reinstate an individual's license or certificate to practice, the board may specify that its action is permanent. An individual subject to a permanent action taken by the board is forever thereafter ineligible to hold a license or certificate to practice and the board shall not accept an application for reinstatement of the license or certificate or for issuance of a new license or certificate.

(M) Notwithstanding any other provision of the Revised Code, all of the following apply:

(1) The surrender of a license or certificate issued under this chapter shall not be effective unless or until accepted by the board. A telephone conference call may be utilized for acceptance of the surrender of an individual's license or certificate to practice. The telephone conference call shall be considered a special meeting under division (F) of section 121.22 of the Revised Code. Reinstatement of a license or certificate surrendered to the board requires an affirmative vote of not fewer than six members of the board.

(2) An application for a license or certificate made under the provisions of this chapter may not be withdrawn without approval of the board.

(3) Failure by an individual to renew a license or certificate to practice in accordance with this chapter or a certificate to recommend in accordance with rules adopted under section 4731.301 of the Revised Code shall not remove or limit the board's jurisdiction to take any disciplinary action under this section against the individual.

(4) At the request of the board, a license or certificate holder shall immediately surrender to the board a license or certificate that the board has suspended, revoked, or permanently revoked.

(N) Sanctions shall not be imposed under division (B)(28) of this section against any person who waives deductibles and copayments as follows:

(1) In compliance with the health benefit plan that expressly allows such a practice. Waiver of the deductibles or copayments shall be made only with the full knowledge and consent of the plan purchaser, payer, and third-party administrator. Documentation of the consent shall be made available to the board upon request.

(2) For professional services rendered to any other person authorized to practice pursuant to this chapter, to the extent allowed by this chapter and rules adopted by the board.

(O) Under the board's investigative duties described in this section and subject to division (F) of this section, the board shall develop and implement a quality intervention program designed to improve through remedial education the clinical and communication skills of individuals authorized under this chapter to practice medicine and surgery, osteopathic medicine and surgery, and podiatric medicine and surgery. In developing and implementing the quality intervention program, the board may do all of the following:

(1) Offer in appropriate cases as determined by the board an educational and assessment program pursuant to an investigation the board conducts under this section;

(2) Select providers of educational and assessment services, including a quality intervention program panel of case reviewers;

(3) Make referrals to educational and assessment service providers and approve individual educational programs recommended by those providers. The board shall monitor the progress of each individual undertaking a recommended individual educational program.

(4) Determine what constitutes successful completion of an individual educational program

and require further monitoring of the individual who completed the program or other action that the board determines to be appropriate;

(5) Adopt rules in accordance with Chapter 119. of the Revised Code to further implement the quality intervention program.

An individual who participates in an individual educational program pursuant to this division shall pay the financial obligations arising from that educational program.

Sec. 5103.11. There is hereby created the foster care and adoption initiatives fund. The fund shall be in the custody of the treasurer of state, but shall not be part of the state treasury. The fund shall consist of moneys collected under section 2919.1912 of the Revised Code. All interest earned on the fund shall be credited to the fund. The purpose of the fund is to provide funding for foster care and adoption services and initiatives. The department of job and family services shall allocate moneys from the fund according to the following distribution:

(A) Fifty per cent of the moneys in the fund shall be used for foster care services and initiatives.

(B) Fifty per cent of the moneys in the fund shall be used for adoption services and initiatives.

SECTION 2. That existing sections 2317.56, 2919.171, 2919.19, 2919.191, 2919.192, 2919.193, and 4731.22 of the Revised Code are hereby repealed.

SECTION 3. The General Assembly hereby declares that it finds, according to contemporary medical research, all of the following:

(A) As many as thirty per cent of natural pregnancies end in spontaneous miscarriage.

(B) Less than five per cent of all natural pregnancies end in spontaneous miscarriage after detection of fetal cardiac activity.

(C) Over ninety per cent of in vitro pregnancies survive the first trimester if cardiac activity is detected in the gestational sac.

(D) Nearly ninety per cent of in vitro pregnancies do not survive the first trimester where cardiac activity is not detected in the gestational sac.

(E) Fetal heartbeat, therefore, has become a key medical predictor that an unborn human individual will reach live birth.

(F) Cardiac activity begins at a biologically identifiable moment in time, normally when the fetal heart is formed in the gestational sac.

(G) The State of Ohio has a valid interest in protecting the health of the woman. The State of Ohio has a compelling interest in protecting the life of an unborn human individual who may be born.

(H) In order to make an informed choice about whether to continue her pregnancy, the pregnant woman has a valid interest in knowing the likelihood of the fetus surviving to full-term birth based upon the presence of cardiac activity.

(I) The State of Ohio finds that the detection of a fetal heartbeat can be accomplished through standard medical practices.

(J) At fertilization, a human being emerges as a whole, genetically distinct, living human organism and needs only the proper environment to fully develop into a human.

(K) Cardiac activity shows that tissues have come together to form organs and the developing central nervous system signals the heart to autonomically beat.

(L) When a heartbeat is visualized at seven weeks or less, ninety-one and one-half per cent will survive the first trimester and ninety-five per cent of those will deliver live- born infants.

(M) After the detection of a fetal heartbeat there is a ninety-five to ninety-eight per cent certainty that the new life will develop full term.

(N) A human being at an embryonic age and a human being at an adult age are naturally the same, with the only biological differences being due to the differences in maturity.


SECTION 4. If any provisions of a section as amended or enacted by this act, or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.


SECTION 5. Section 4731.22 of the Revised Code is presented in this act as a composite of the section as amended by both Am. Sub. H.B. 111 and Sub. H.B. 156 of the 132nd General Assembly. The General Assembly, applying the principle stated in division (B) of section 1.52 of the Revised Code that amendments are to be harmonized if reasonably capable of simultaneous operation, finds that the composite is the resulting version of the section in effect prior to the effective date of the section as presented in this act.

_____

*Speaker* _____ *of the House of Representatives.*

_____

*President* _____ *of the Senate.*

Passed _____, 20____

Approved _____, 20____

_____

*Governor.*

The section numbering of law of a general and permanent nature is complete and in conformity with the Revised Code.

_____

*Director, Legislative Service Commission.*

Filed in the office of the Secretary of State at Columbus, Ohio, on the ____ day of _____, A. D. 20____.

_____

*Secretary of State.*

File No. _____        Effective Date _____

# EXHIBIT B


**RE: Director's Order for the Management of Non-essential Surgeries and Procedures throughout Ohio**

I, Amy Acton, MD, MPH, Director of the Ohio Department of Health (ODH), pursuant to the authority granted to me in R.C. 3701.13 to "make special orders…for preventing the spread of contagious or infectious diseases" and for the purposes of preserving personal protective equipment (PPE) and critical hospital capacity and resources within Ohio, **ORDER** the following:

1. Effective 5:00 p.m. Wednesday March 18, 2020, all non-essential or elective surgeries and procedures that utilized PPE should not be conducted.

2. A non-essential surgery is a procedure that can be delayed without undue risk to the current or future health of a patient.   Examples of criteria to consider include:

   a. Threat to the patient's life if surgery or procedure is not performed;
   b. Threat of permanent dysfunction of an extremity or organ system;
   c. Risk of metastasis or progression of staging; or
   d. Risk of rapidly worsening to severe symptoms (time sensitive)

3. Eliminate non-essential individuals from surgery/procedure rooms and patient care areas to preserve PPE.  Only individuals essential to conducting the surgery or procedure shall be in the surgery or procedure suite or other patient care areas where PPE is required.

4. Each hospital and outpatient surgery or procedure provider, whether public, private, or nonprofit, shall establish an internal governance structure to ensure the principles outlined above are followed.

5. This action is taken to protect our healthcare workforce during this unprecedented event.  This Order shall remain in full force and effect until the State of Emergency declared by the Governor no longer exists, or the Director of the Ohio Department of Health rescinds or modifies this Order.

This Order takes into consideration and is consistent with the Ohio Hospital Association's *Implementing Guidelines for the Management of Non-Essential Surgeries and Procedures Throughout Ohio* dated March 16, 2020.

COVID-19 is a respiratory disease that can result in serious illness or death, is caused by the SARS-CoV-2 virus, which is a new strain of coronavirus that had not been previously identified in humans and can easily spread from person to person.  The virus is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person

246 North High Street          614 I 466-3543
Columbus, Ohio 43215  U.S.A.     www.odh.ohio.gov

The State of Ohio is an Equal Opportunity Employer and Provider of ADA Services.

Exhibit B

coughs or sneezes. It may be possible that individuals can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose or eyes.

On January 23, 2020, the Ohio Department of Health issued a Director's Journal Entry making COVID-19 a Class A reportable disease in Ohio.

On January 28, 2020, the Ohio Department of Health hosted the first statewide call with local health departments and healthcare providers regarding COVID-19.

On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the outbreak of COVID-19 a public health emergency of international concern.

On January 31, 2020, Health and Human Services Secretary, Alex M. Azar II, declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19.

On February 1, 2020, the Ohio Department of Health issued a statewide Health Alert Network to provide local health departments and healthcare providers with updated guidance for COVID-19 and revised Person Under Investigation (PUI) criteria.

On February 3, 2020, the Ohio Department of Health trained over 140 personnel to staff a call center for COVID-19, in the event it was needed.

On February 5, 2020, the Ohio Department of Health began updating and notifying the media of the number of PUIs in Ohio every Tuesday and Thursday.

On February 6, 2020, the Ohio Department of Health updated all agency assistant directors and chiefs of staff on COVID-19 preparedness and status during the Governor's cabinet meeting.

On February 7, 2020, the Ohio Department of Health and the Ohio Emergency Management Agency met to conduct advance planning for COVID-19.

On February 13, 2020, the Ohio Department of Health conducted a Pandemic Tabletop Exercise with State agencies to review responsive actions should there be a pandemic in Ohio.

On February 14, 2020, the Ohio Department of Health held a conference call with health professionals across the state. The purpose of the call was to inform and engage the healthcare community in Ohio. Presentations were provided by the Department of Health, Hamilton County Public Health, and the Ohio State University.

On February 27, 2020, the Ohio Department of Health and the Ohio Emergency Management Agency briefed the directors of State agencies during the Governor's cabinet meeting regarding preparedness and the potential activation of the Emergency Operations Center.

On February 28, 2020, the "Governor DeWine, Health Director Update COVID-19 Prevention and Preparedness Plan" was sent to a broad range of associations representing healthcare, dental, long-term

care, K-12 schools, colleges and universities, business, public transit, faith-based organizations, non-profit organizations, and local governments.

On March 2, 2020, the Ohio Department of Health activated a Joint Information Center to coordinate COVID-19 communications.

On March 5, 2020, the Ohio Department of Health hosted the Governor's Summit on COVID-19 Preparedness, a meeting with the Governor, cabinet agency directors, local health department commissioners, and their staff.

On March 6, 2020, the Ohio Department of Health opened a call center to answer questions from the public regarding COVID-19.

On March 9, 2020, testing by the Department of Health confirmed that three (3) patients were positive for COVID-19 in the State of Ohio. This confirms the presence of a potentially dangerous condition which may affect the health, safety and welfare of citizens of Ohio.

On March 9, 2020, the Ohio Emergency Management Agency activated the Emergency Operations Center.

On March 9, 2020, the Governor Declared a State of Emergency in Executive Order 2020-01D.

On March 11, 2020, the head of the World Health Organization declared COVID-19 a pandemic.

On March 11, 2020, testing by the Ohio Department of Health confirmed that one (1) more patient was positive for COVID-19 in the State of Ohio.

On March 11, 2020, the Ohio Departments of Health and Veterans Services issued a Joint Directors' Order to limit access to Ohio nursing homes and similar facilities.

On March 15, 2020, the Ohio Department of Health issued a Director's Order to limit access to Ohio's jails and detention facilities.

On March 15, 2020, the Ohio Department of Health issued a Director's Order to limit the sale of food and beverages, liquor, beer and wine to carry-out and delivery only.

On March 15, 2020, the CDC issued Interim Guidance for mass gatherings or large community events, stating that such events that consist of 50 or more people should be cancelled or postponed.

On March 15, 2020, the Ohio Department of Health issued a Director's Order closing polling stations.

Multiple areas of the United States are experiencing "community spread" of the virus that causes COVID-19. Community spread, defined as the transmission of an illness for which the source is unknown, means that isolation of known areas of infection is no longer enough to control spread.

The CDC reports that people are most contagious when they are most symptomatic (the sickest) however some spread might be possible before people show symptoms although that is not the main way the virus spreads.

Mass gatherings (50 or more persons) increase the risk of community transmission of the virus COVID-19.

Accordingly, upon guidance from the U.S. Surgeon General, American College of Surgeons and numerous other public health experts, I hereby **ORDER,** beginning at 5:00 p.m. Wednesday, March 18, 2020 all non-essential surgeries and procedures are cancelled. A non-essential surgery is a procedure that can be delayed without undue risk to the current or future health of a patient. Examples of criteria to consider include: threat to the patient's life if surgery or procedure is not performed; Threat of permanent dysfunction of an extremity or organ system; risk of metastasis or progression of staging; or risk of rapidly worsening to severe symptoms (time sensitive). Eliminate non-essential individuals from surgery/procedure rooms and patient care areas to preserve PPE. Only individuals essential to conducting the surgery or procedure shall be in the surgery or procedure suite or other patient care areas where PPE is required. Each hospital and outpatient surgery or procedure provider shall establish an internal governance structure to ensure the principles outlined above are followed. The Order is issued for the purposes of preserving personal protective equipment (PPE) and critical hospital capacity and resources within Ohio. This action is taken to protect our healthcare workforce during this unprecedented event. This Order shall remain in full force and effect until the State of Emergency declared by the Governor no longer exists, or the Director of the Ohio Department of Health rescinds or modifies this Order.

_____ MD MPH                    March 17, 2020
Amy Acton, MD, MPH
Director of Health

# EXHIBIT C

# DAVE YOST
## OHIO ATTORNEY GENERAL

Media > News Releases > March 2020 > Statement from AG Yost regarding Enforcement of Ohio Department of Health's Order to Preserve Person

# News Releases

Search News Releases: [            ]  **Search** ›

### Statement from AG Yost regarding Enforcement of Ohio Department of Health's Order to Preserve Personal Protective Equipment During a Pandemic Emergency

3/25/2020



(COLUMBUS, Ohio) — The following statement may be attributed to Ohio Attorney General Dave Yost:

"Establishing roles in a crisis is critical. In the current COVID-19 crisis, the Attorney General's office plays a specific role. We are the prosecutor and the Ohio Department of Health is the police officer. My office will take quick enforcement action once an investigation is completed by the Department of Health, when facts to support a violation are determined, and a case is forwarded to my office. That is the standard protocol.

In Ohio, the Attorney General's office lacks the extensive and explicit investigatory authority to independently take action with regard to this order. That authority lies with the Department of Health as the regulatory agency under Ohio Rev. Code 3701.04 and Ohio Admin. Code 3701-83-06. If the Department of Health determines through an investigation that Dr. Acton's order was violated by any surgical facility in Ohio, my office stands ready to play our role and pursue legal action on behalf of the Ohio Department of Health.

Complaints regarding possible violations of Dr. Acton's order should be filed with the Ohio Department of Health, as the department serves as the investigatory arm. In this instance, the attorney general plays the role of the prosecutor, not the cop."

MEDIA CONTACT:
Bethany McCorkle: 614-466-1339

–30–

**Bookmark** SHARE

---

**Individuals & Families**

Consumers
Military & Veterans
Seniors
Tipster
Victims

**Business & Economic Development**

Background Check
Services for Bingo
Collections
Professional Solicitors & Fundraisers
Services for Charities
Services for Business

**Law Enforcement**

BCI
Concealed Carry
Missing Persons
Ohio Law Enforcement Gateway
OOCIC
OPOTA
Unsolved Homicides

**Legal Community**

Antitrust
Ballot Initiatives
Outside Counsel
Prosecution
Sunshine Laws

**State & Local Government**

Formal Opinions
Ohio School Threat Assessment Training
Services for Schools

**About AG**

Dave Yost
Administration
Public Records Access
Regional Offices
Service Divisions

**Services**

Webcheck Locations
File a Consumer Complaint
File a Charitable Complaint
Charitable Registration
Tobacco Enforcement

**Training & Education**

Nonprofit Board Governance Webinars
Ohio's Charitable Registration System Webinars
OPOTA Courses
Victim Service Provider Training

**Media**

Events
News Releases
Newsletters
Reports
Videos

**Career & Employee Resources**

AG Employee Portal
AG Application Portal
myOhio.gov
Diversity & Inclusion
Job Opportunities

Exhibit G