# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **PRETERM-CLEVELAND, INC.,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 1:19-cv-00360** |
| **v.** | : | |
| | : | |
| **DAVID YOST,** *et al*., | : | **Judge Barrett** |
| | : | |
| **Defendants.** | : | |

## MOTION FOR AND BRIEF IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Preterm-Cleveland ("Preterm"), Planned Parenthood Southwest Ohio Region ("PPSWO"), Sharon Liner, M.D., Planned Parenthood of Greater Ohio ("PPGOH"), Women's Med Group Professional Corporation ("WMGPC"), and Northeast Ohio Women's Center ("NEOWC") ("Plaintiffs") move for a temporary restraining order, followed by a preliminary injunction, to enjoin Defendants from enforcing the Ohio Department of Health ("ODH") Director's Order for the Management of Non-essential Surgeries and Procedures Throughout Ohio ("Director's Order") (attached as Ex. B to Proposed Suppl. Complaint ("Suppl. Compl.")) in a way that would  ban surgical abortion.[1]

As the American College of Obstetricians and Gynecologists ("ACOG") has recognized, abortion care is essential because it cannot be delayed without risking the health and safety of the patient.[2] Accordingly, Plaintiffs' provision of this care is entirely consistent with the Director's

---

[1] ODH, *RE: Director's Order for the Management of Non-essential Surgeries and Procedures throughout Ohio* (Mar. 17, 2020), https://tinyurl.com/woxkyhw.

[2] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

Order, under which a "non-essential" surgery or procedure is a "procedure that can be delayed without undue risk to the current or future health of a patient." Director's Order at 4. Consistent with the plain language of this Order, Plaintiffs—like all healthcare providers—are doing their part to reduce the spread of COVID-19 and preserve personal protective equipment ("PPE"), such as gloves and masks, by stopping all non-essential procedures and reducing the use of PPE as much as possible during surgical abortions and other essential medical procedures that they continue to provide.

Despite Plaintiffs' compliance with the Order and in response to unidentified complainants,[3] on March 20 and 21, 2020, Attorney General Dave Yost sent letters to PPSWO, Preterm, and Women's Med Center Dayton ("WMCD") (a licensed ambulatory surgical facility ("ASF") owned by WMGPC) ordering the clinics "to immediately stop performing non-essential and elective surgical abortions" or ODH "will take all appropriate measures." Declaration of Sharon Liner, M.D. ("Liner Decl."), Ex. F; Declaration of Chrisse France ("France Decl."), Ex. B; Declaration of W.M. Haskell, M.D. ("Haskell Decl."), Ex. B. At a press conference on March 26, ODH Director Dr. Amy Acton said that ODH had "listened to the AG" and began to investigate "violations [of the Order] across the state," including at abortion clinics.[4] At that same press conference, Governor Mike DeWine identified only life-saving abortions as falling within the

---

[3] Though ODH would not tell Plaintiffs the source of the complaints, evidence suggest they came from anti-abortion activists. Liner Decl. ¶ 17; France Decl. ¶ 17; Haskell Decl. ¶ 20.

[4] Gov. Mike DeWine Corona Virus Update March 26, 2020, *available at* https://www.ideastream.org/gov-mike-dewine-coronavirus-update-march-26-2020.

Order's parameters.[5] That same day, the Attorney General again threatened "quick enforcement action" against clinics that continue to provide surgical abortion care.[6]

On March 26 and 27, ODH sent inspectors to Preterm, WMCD, and PPSWO to investigate those clinics' compliance with the Director's Order. Liner Decl. ¶ 17; France Decl. ¶ 14; Haskell Decl. ¶¶ 20, 23. After two days of inspections, the inspectors left without telling the facilities whether they had found violations of the Director's Order or any other regulation—a distinct break with established ODH practice and procedure—and instead said their superiors would make that determination at an unspecified later date. Liner Decl. ¶ 20; France Decl. ¶ 20; Haskell Decl. ¶ 23.

Plaintiffs need urgent relief from this Court. Without any clear guidance from the ODH and in light of the statements of the Director, Governor, and Attorney General and the actions of ODH, Plaintiffs and their physicians credibly fear being immediately shut down and prosecuted if they continue to provide surgical abortions.[7] Liner Decl. ¶ 41; France Decl. ¶ 22; Haskell Decl. ¶ 24; Declaration of Adarsh Krishen ("Krishen Decl.") Decl. ¶ 20; Declaration of David Burkons, M.D. ("Burkons Decl.") ¶ 20. In the absence of an injunction, the enforcement of the Director's Order to ban surgical abortion—the only abortion method available for all patients who are over 10 weeks pregnant and the only method available to some patients at any point in pregnancy, Plaintiffs' patients would be denied their right to access safe and legal previability abortion, in

---

[5] *Id.* The Governor did not say if he believed surgical abortion would be allowed under other circumstance such as if continued pregnancy posed serious but not life-threatening risks to a patient's health.

[6] Attorney General Yost press release March 26, 2020, Liner Decl. Ex. G (General Yost is "the prosecutor" and ODH is the "police officer" and his office "stands ready to play our role and pursue legal action on behalf of [ODH].").

[7] Although only PPSWO, WMCD, and Preterm have received letters and been inspected at this time, PPGOH and NEOWC are also subject to the Director's Order, adopted policies identical to the ones in place at the clinics that received letters, and intend to perform surgical abortions in compliance with the Order, thus PPGOH and NEOWC also need relief.

violation of nearly five decades of Supreme Court precedent that categorically prohibits states from banning abortion before viability, and is, therefore, unconstitutional. Some of these patients will be forced to carry pregnancies to term against their will and at risk to their health amidst a health system overburdened by responding to COVID-19. Accordingly, Plaintiffs seek to restrain and preliminarily enjoin Defendants their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them from enforcing or complying with any interpretation of the Director's Order that would prohibit surgical abortion procedures.

## STATEMENT OF FACTS

### A. Director's Order

In March 2020, the United States and Ohio both declared a state of emergency related to the COVID-19 pandemic. *See* Director's Order at 3; Ohio Exec. Order 2020-01D;[8] Proclamation No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020). The virus has reached every State in the country, including approximately 1653 confirmed cases in Ohio and 29 deaths as of the time of filing.[9] Federal and state officials and medical professionals expect a surge of infections in the coming months that will test the limits of the health care system,[10] which is already facing a shortage of PPE, particularly N95 masks.[11]

---

[8] *Available at* https://tinyurl.com/ud789de.

[9] CDC, *Cases in U.S.* (last updated Mar. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html; ODH, *COVID-19*, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/ (last visited Mar. 30, 2020).

[10] *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States*, CDC (last updated Feb. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/guidance-hcf.html.

[11] Andrew Jacobs, Matt Richtel & Mike Baker, *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020), https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html.

In light of this new reality, on March 17, 2020, Director Acton issued an order barring all "non-essential surgeries and procedures" beginning at 5 p.m. on March 18, 2020. Director's Order at 4.[12] The Order states that its purpose is to "preserv[e] personal protective equipment (PPE) and critical hospital capacity and resources within Ohio." *Id.* Although the Order does not define PPE, Plaintiffs understand that term to refer, for example, to surgical masks, gloves, protective eyewear, gowns, and shoe covers, which are commonly used in surgical procedures, including surgical abortions. Liner Decl. ¶ 6; France Decl. ¶ 8; Krishen Decl. ¶ 10; Haskell Decl. ¶ 10; Burkons Decl. ¶ 10.

The Director's Order defines a "non-essential surgery" as "a procedure that can be delayed without undue risk to the current or future health of a patient," and lists "[e]xamples of criteria to consider," including whether there is a "threat to the patient's life if surgery or [the] procedure is not performed," a "[t]hreat of permanent dysfunction of an extremity or organ system," a "risk of metastasis or progression of staging," or a "risk of rapidly worsening to severe symptoms (time sensitive)." Director's Order at 4.

The Director's Order remains in effect until the state of emergency declared by the Ohio governor no longer exists or ODH rescinds or modifies the order. *Id.* Federal officials and medical professionals expect the pandemic to last for a year or eighteen months.[13] The current shortage of PPE is expected to continue for the next three or four months.[14] The Order requires that "[e]ach

---

[12] The Director's Order cites as its authority section 3701.13, which allows ODH to "make special or standing orders or rules for preventing the spread of contagious or infectious diseases." Ohio. Rev. Code § 3701.13.

[13] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times (Mar. 8, 2020), https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html.

[14] Ctrs. for Disease Control & Prevention, *Healthcare Supply of Personal Protective Equipment* (last updated Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/healthcare-supply-ppe.html.

hospital and outpatient surgery or procedure provider shall establish an internal governance structure to ensure" compliance with the Order, permitting individual medical institutions to use their medical judgment whether a particular procedure is essential. Director's Order at 4.[15] If a facility or physician fails to comply, ODH may petition for injunctive or other relief (Ohio Rev. Code § 3701.57), revoke the facility's ASF license (Ohio Rev. Code § 3702.32(D)), refer for criminal prosecution (Ohio Rev. Code §§ 3701.352 and 3701.99), and/or refer to the State Medical Board for discipline (Ohio Rev. Code § 4731.22(B)(12)).

### B. Abortion in Ohio

According to the latest data from ODH, 55.7% of Ohio abortions in 2018 occurred before nine weeks gestational age, while 44.3% occurred at or after nine weeks.[16] More than 56% of abortions in the state were surgical abortions.[17]

Clinical abortions are typically performed using one of two methods: medication abortion or surgical abortion. Liner Decl. ¶ 22. Both methods are equally effective in terminating a pregnancy. *Id*. Complications from both medication and surgical abortion are rare, and when they occur, they can usually be managed in an outpatient clinic setting, either at the time of the abortion or in a follow-up visit. *Id*. Major complications—defined as complications requiring hospital admission, surgery, or blood transfusion—occur in less than one-quarter of one percent (0.23%) of all abortion cases: in 0.31% of medication abortion cases, in 0.16% of first-trimester surgical

---

[15] Ohio State Postponing Elective Surgeries, Procedures, Beginning March 19, Ohio State News (March 17, 2020), available at https://news.osu.edu/ohio-state-postponing-elective-surgeries-procedures-beginning-march-19/

[16] John Paulson & Donna L. Smith, ODH, Induced Abortions in Ohio 24 (2019), https://tinyurl.com/ufxuqpw.

[17] *Id.* at 23.

abortion cases, and in 0.41% of surgical cases in the second trimester or later. *Id*. Abortion-related emergency room visits constitute just 0.01% of all emergency room visits in the United States. *Id*.

Medication abortion involves a combination of two pills: mifepristone and misoprostol. *Id.* at ¶ 23. The patient takes the first medication in the health center and then, typically twenty-four to forty-eight hours later, takes the second medication at a location of their choosing, most often at their home, after which they expel the contents of the pregnancy in a manner similar to a miscarriage. *Id*. Surgical abortion is not what is commonly understood to be "surgery"; it involves no incision. *Id.* at ¶ 26. Rather, surgical instruments and/or gentle suction are used to safely empty the contents of the uterus. *Id*. For some patients, medication abortion is contraindicated or other factors counsel in favor of a surgical abortion. *Id.* at ¶ 27. For example, patients may be allergic to the medications or have other medical conditions that makes surgical abortion more appropriate. *Id*. Consistent with Ohio law, Plaintiffs provide medication abortion up to ten weeks (through seventy days) after the patient's last menstrual period ("LMP") and surgical abortion up to fifteen weeks and six days, nineteen weeks and six days, or twenty-one weeks and six days LMP.[18] France Decl. ¶ 5; Liner Decl. ¶ 24; Krishen Decl. ¶ 6; Haskell Decl. ¶ 7; Burkons Decl. ¶ 6.

Surgical abortion requires minimal use of PPE. Liner Decl. ¶ 7. In a typical procedure, clinicians use gloves, a surgical mask, protective eyewear, disposable and/or washable gowns, and hair and shoe covers. *Id*. France Decl. ¶ 8; Krishen Decl. ¶ 10; Haskell Decl. ¶ 10; Burkons Decl.

---

[18] Although medication abortion is safe and effective through eleven weeks LMP, Ohio law restricts this method to the regimen listed on federally approved label, which is ten weeks LMP. Ohio Rev. Code § 2919.123; *see* FDA, *Mifeprex (mifepristone) Information* (last updated Feb. 5, 2018), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information. Ohio law prohibits abortions after twenty weeks "post-fertilization age," which is twenty-two weeks LMP. Ohio Rev. Code § 2919.201; *see* Liner Decl. ¶ 31 n.9.

¶ 10.[19] The masks that Plaintiffs use for abortions are not N95 masks, the PPE that appears to be in shortest supply in battling the COVID-19 pandemic in Ohio and around the country.[20] Liner Decl. ¶ 35; France Decl. ¶ 8; Krishen Decl. ¶ 11; Haskell Decl. ¶ 10; Burkons Decl. ¶ 11. During the COVID-19 crisis, Plaintiffs have taken additional steps to conserve PPE whenever appropriate and consistent with CDC guidance.[21] Even before ODH's Order, Plaintiffs were limiting the already small number of individuals present during a surgical abortion and postponing other non-essential visits that may require PPE. Liner Decl. ¶ 38; France Decl. ¶¶ 8, 11, 12; Krishen Decl. ¶¶ 13–14; Haskell Decl. ¶¶ 13–14; Burkons Decl. ¶ 13–14. Further, when a patient is eligible for both surgical and medication abortion, patients are provided a medication abortion, unless surgical abortion is the more appropriate method. Liner Decl. ¶ 16; France Decl. ¶ 15 Krishen Decl. ¶ 17; Haskell Decl. ¶ 18; Burkons Decl. ¶ 17. Medication abortion uses less PPE than surgical abortion as the process of handing patients a pill requires no PPE at all. Liner Decl. ¶ 7.

Individuals seek abortion for a multitude of personal and complex reasons; all of which might be compounded by the current pandemic. By way of example, some patients have abortions because they conclude that it is not the right time to become a parent or have additional children, they desire to pursue their education or career, or they lack the financial resources or level of partner or familial support or stability they would want before having a child or additional children. Liner Decl. ¶ 30. Other patients seek abortions because existing medical conditions put them at

---

[19] Gloves are needed for any ultrasound, laboratory exam, and cleaning. France Decl. ¶ 9; Liner Decl. ¶ 7; Krishen Decl. ¶ 10; Haskell Decl. ¶ 11; Burkons Decl. ¶ 10. Plaintiffs that provide care for patients for whom there is a concern for COVID19 or other respiratory disease provide masks to those patients in accordance with CDC guidance. Liner Decl. ¶ 7; Krishen Decl. ¶ 10.

[21] *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States*, CDC (last updated Feb. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/guidance-hcf.html.

greater than average risk of medical complications. *Id.* Indeed, while much is unknown about COVID-19, including whether it can pass to the pregnancy or complicate pregnancy, some pregnant patients may be exposed to additional health risks from the disease. ACOG has warned that "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as influenza and SARS-CoV. As such, pregnant women should be considered an at-risk population for COVID-19."[22]

The window during which a patient can obtain in abortion in Ohio is limited. Pregnancy is usually approximately forty weeks in duration, Liner Decl. ¶ 31, and Ohio prohibits abortion after twenty-two weeks LMP, Ohio Rev. Code § 2919.201. Although abortion is a very safe medical procedure, the health risks associated with it increase as pregnancy progresses. Liner Decl. ¶ 32.[23] As ACOG and other well-respected medical professional organizations have observed, abortion "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[24] For these reasons, abortion is *not* "a procedure that can be delayed without undue risk to the current or future health of a patient." Liner Decl. ¶ 11 (quoting Director's Order at 4). Indeed, delay increases the "risk of rapidly worsening to severe symptoms," making the procedure "time sensitive." *Id.* (quoting Director's Order at 4).

---

[22] ACOG, *Practice Advisory - Novel Coronavirus 2019 (COVID-19)* (last updated Mar. 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers: COVID-19 and Pregnant Women* (last updated Mar. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

[23] Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States 77–78, 162–63 (2018).

[24] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

Patients generally seek abortion as soon as they are able, but many face logistical obstacles that can delay access to abortion care. Liner Decl. ¶ 33. Patients need to schedule an appointment, gather the resources to pay for the abortion and related costs,[25] and arrange transportation to a clinic, time off of work, and possibly childcare during appointments. *Id.* Ohio legal restrictions further increase burdens on patients trying to obtain care by mandating that all patients make two in-person trips at least twenty-four hours apart to a health center in order to obtain abortion care and requiring minor patients to obtain written consent from a parent or a judicial order before they can receive care. Ohio Rev. Code §§ 2317.56, 2919.121; *cf. Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 799–800 (S.D. Ohio 2019) (Barrett, J.) (finding host of "logistical obstacles to obtaining abortion care"). During the COVID-19 pandemic, patients must navigate these barriers against the backdrop of job insecurity, minimal public transit availability, and limited childcare assistance due to mandatory social distancing and shelter in place orders.[26] Indeed, jobless claims

---

[25] Ohio prohibits public insurance, including Medicaid, and insurance purchased on the state health exchange from covering abortion services except in the very limited circumstances where a patient's life is at risk, or where the pregnancy is a result of rape or incest that has been reported to law enforcement. Ohio Rev. Code §§ 9.04, 3901.87; Ohio Admin. Code § 5160-17-01.

[26] ODH, *Director's Stay At Home Order* (Mar. 22, 2020), https://coronavirus.ohio.gov/static/DirectorsOrderStayAtHome.pdf; ODH, *Governor DeWine Announces School Closures* (Mar. 12, 2020), https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home/news-releases-news-you-can-use/governor-dewine-announces-school-closures; ODH, *Governor DeWine Orders Ohio Bars & Restaurants to Close* (Mar. 15, 2020), https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home/news-releases-news-you-can-use/governor-dewine-orders-ohio-bars-restaurants-to-close; ODH, *Governor DeWine Announces Additional Temporary Business Closures* (Mar. 18, 2020), https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home/news-releases-news-you-can-use/governor-dewine-announces-additional-temporary-business-closures; Ohio Exec. Order 2020-04D; *see also* White House, *The President's Coronavirus Guidelines for America* (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf; Rebecca Shabad, *Fauci Predicts Americans Will Likely Need to Stay Home for at Least Several More Weeks*, NBC News (Mar. 20, 2020) https://www.nbcnews.com/politics/donald-trump/fauci-predicts-americans-will-likely-need-stay-home-least-several-n1164701.

are soaring due to the virus.[27] All of these factors can result in delay in obtaining care which, in turn, results in higher financial and emotional costs to the patient.

### C. Plaintiffs' Implementation of the Director's Order

Plaintiffs promptly adopted policies to comply with the Director's Order.[28] Liner Decl. ¶ 8; France Decl. ¶ 13; Krishen Decl. ¶ 15; Haskell Decl. ¶ 15; Burkons Decl. ¶ 15. Each policy forbids the performance of "non-essential surgeries and procedures that utilize PPE" until the end of Ohio's declared emergency or the Director's Order is modified or rescinded. Liner Decl. ¶ 8 France Decl., Ex. C; Krishen Decl., Ex. B; Haskell Decl., Ex. C; Burkons Decl., Ex. B. In accordance with the determination of the governing body for each abortion facility, each Plaintiff determined that "surgical abortion constitutes an essential surgery and may continue to be provided under the terms of the [Director's] Order," because "a delay in a surgical abortion will negatively affect patient health and safety." Liner Decl. ¶ 11 France Decl., Ex. C; Krishen Decl., Ex. B; Haskell Decl., Ex. C; Burkons Decl., Ex. B. Each pointed to the plain terms of the Director's Order, which states that "a surgery is essential if it cannot 'be delayed without undue risk to the current or future health of a patient' and includes, as examples of criteria to consider, the risk to the patient of rapidly worsening to severe symptoms that make the surgery time sensitive, as well as a progression of staging." Liner Decl. ¶ 9; France Decl., Ex. C; Krishen Decl., Ex. B; Haskell Decl., Ex. C; Burkons Decl., Ex. B. Plaintiffs' policies recognize that because "[p]regnancy has a duration of approximately forty weeks [LMP] and abortions are banned in Ohio beginning at 22

---

[27] Scott Noll, *As Ohio Unemployment Soars, Some People Are Missing Out on Benefits*, News 5 Cleveland (Mar. 19, 2020), https://www.news5cleveland.com/news/local-news/as-ohio-unemployment-soars-some-people-are-missing-out-on-benefits.

[28] Plaintiff Dr. Liner did not adopt such a policy because she is an individual (and not a hospital or ASF); however, as medical director of Plaintiff PPSWO, she was responsible for adoption of its implementing policy.

weeks LMP, . . . the timeframe for a patient to obtain an abortion is limited," and that "while abortion is an extremely safe medical procedure, . . . it cannot be delayed without increasing the risk to the health of the patient." Liner Decl. ¶ 10(a); France Decl., Ex. C; Krishen Decl., Ex. B; Haskell Decl., Ex. C; Burkons Decl., Ex. B. After Preterm, WMCD and PPSWO received letters from the Attorney General's office threatening enforcement if they did not comply with the Director's Order, and after further communication with the Attorney General's office, Plaintiffs amended their policies to reflect that "physicians will determine on a case-by-case basis whether a surgical abortion or procedure constitutes an essential surgery or procedure that may continue to be provided under the terms of the Order" and that "physicians shall rely on the Director's Order" to make that case-by-case determination. Liner Decl. ¶ 13; France Decl. ¶ 15; Krishen Decl. ¶¶ 16–17; Haskell Decl. ¶ 17; Burkons Decl. ¶¶. 16–17. Because Plaintiffs always determine the appropriate course of care for any patient on a case-by-case basis, this amendment did not result in any change to Plaintiffs' provision of care. Liner Decl. ¶ 14; France Decl. ¶ 15; Krishen Decl. ¶¶ 16–17; Haskell Decl. ¶ 17; Burkons Decl. ¶ 16–17.

Plaintiffs' determination that abortion is an essential surgery is supported by ACOG, the American Board of Obstetrics & Gynecology, the American Association of Gynecologic Laparoscopists, the American Gynecological & Obstetrical Society, the American Society for Reproductive Medicine, the Society for Academic Specialists in General Obstetrics and Gynecology, the Society of Family Planning, and the Society for Maternal-Fetal Medicine. These trusted national medical organizations issued a joint statement on "Abortion Access During the COVID-19 Outbreak," which provides that "[t]o the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of

comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[29] Liner Decl. ¶ 10(b) & Ex. D; France Decl., Ex. C; Krishen Decl.,Ex. B; Haskell Decl., Ex. C; Burkons Decl., Ex. B.

Plaintiffs also relied on the Ambulatory Surgery Center Association's "COVID-19: Guidance for ASCs for Necessary Surgery," which concurred with the American College of Surgeons' recommendation that consideration of whether delay of a surgery during the pandemic is appropriate must account for risk to the patient of delay, "including the expectation that a delay of 6–8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent."[30] Liner Decl. ¶ 10(c) & Ex. E; France Decl., Exhibit C; Krishen Decl., Ex. B; Haskell Decl., Ex. C; Burkons Decl., Ex. B.

In addition, to complying with the Director's Order, Plaintiffs are committed to following all recommendations in an effort to "flatten the curve," protect patients and staff, and minimize the use of PPE. Liner Decl. ¶¶ 6, 39; France Decl. ¶ 10; Krishen Decl. ¶ 12; Haskell Decl. ¶ 12; Burkons Decl. ¶ 12. For example, Plaintiffs have reduced the number of people allowed in their facilities, as well as in procedure rooms and changed the flow of patients to ensure recommended social-distancing, and they screen patients and staff for COVID-19 symptoms. Liner Decl. ¶ 39; France Decl. ¶¶ 11–12; Krishen Decl. ¶¶ 13–14; Haskell Decl. ¶¶ 13–14; Burkons Decl. ¶¶ 13–14.

---

[29] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

[30] Ambulatory Surgery Ctr. Ass'n, *COVID-19: Guidance for ASCs on Necessary Surgeries* (last updated Mar. 19, 2020), https://www.ascassociation.org/asca/resourcecenter/latestnewsresourcecenter/covid-19/covid-19-guidance (quoting Am. Coll. of Surgeons, *COVID-19: Recommendations for Management of Elective Surgical Procedures* (Mar. 13, 2020), https://www.facs.org/about-acs/covid-19/information-for-surgeons/elective-surgery).

### D.  Banning Surgical Abortion Will Cause Irreparable Harm

As described above, without any clear guidance from the ODH and in light of the statements of the Director, Governor, and Attorney General and the actions of ODH, Plaintiffs and their physicians credibly fear being immediately shut down and prosecuted, *see supra* pgs. 2–3. Such enforcement will deprive Plaintiffs' patients of their constitutional right to terminate pregnancy and cause them constitutional, physical, and emotional harm, all of which are irreparable. *See* Liner Decl. ¶¶ 42, 45. Without access to Plaintiffs' services, patient care will be delayed and, in some cases, denied altogether. *See* Liner Decl. ¶ 46; France Decl. ¶ 22; Krishen Decl. ¶¶ 20–21; Haskell Decl. ¶ 24; Burkons Decl. ¶¶ 20–21. Moreover, because pregnant patients will remain users of the healthcare system as long as they are pregnant, banning surgical abortion will result in minimal, if any, conservation of PPE, Liner Decl. ¶ 37, and may, in fact, result in increased use of PPE, *see infra* pg. 20–21. The State has no justification for imposing these harms on Plaintiffs' patients, particularly absent an overriding benefit.

### ARGUMENT

Plaintiffs seek a temporary restraining order, and thereafter, a preliminary injunction, to prevent the Director's Order from inflicting harm on Plaintiffs' patients by banning them from accessing previability abortion in Ohio. In ruling on such a motion, the Court considers four factors, all of which weigh heavily in Plaintiffs' favor: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause a substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)).

As discussed below, Plaintiffs are entitled to injunctive relief because enforcing the Director's Order to ban abortion directly contravenes decades of binding Supreme Court precedent holding that a state may not ban abortion before the point of viability, and thus Plaintiffs will succeed on the merits. Additionally, enforcement of the Director's Order to ban surgical abortion will inflict severe and irreparable harm on Plaintiffs' patients; the balance of hardships weighs decisively in Plaintiffs' favor; and the public interest would be served by blocking the enforcement of the unconstitutional and harmful order with respect to abortions. This Court therefore should grant injunctive relief.

## I.   PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR SUBSTANTIVE DUE PROCESS CLAIM.

Plaintiffs are certain to succeed on the merits of their claim that applying the Director's Order to ban surgical abortion violates Plaintiffs' patients' liberty rights under the Fourteenth Amendment by banning abortion before viability. Nearly five decades ago, the Supreme Court struck down as unconstitutional a state criminal abortion statute proscribing all abortions except those performed to save the life of the pregnant person. *Roe v. Wade*, 410 U.S. 113, 166 (1973). Specifically, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects the right to choose abortion, *id.* at 153–54, and prior to viability, a state has *no interest* sufficient to justify a ban on abortion, *id.* at 163–65. Rather, a state may proscribe abortion only *after* viability, and even then, it must allow abortion where necessary to preserve the life or health of the patient. *Id.* at 163–64.

The Supreme Court has repeatedly adhered to this core holding. For example, more than twenty-five years ago, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Court reaffirmed *Roe*'s "central principle" that "[b]efore viability, the State's interests are not strong enough to support a prohibition on abortion." 505 U.S. 833, 846, 871 (1992); *id.* at 871 (asserting

that any state interest is "insufficient to justify a ban on abortions prior to viability even when it is subject to certain exceptions"). Although a plurality in *Casey* announced an "undue burden" standard, under which "a provision of law [restricting previability abortion] is invalid[] if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion," 505 U.S. at 878 (plurality opinion), it emphasized:

> Our adoption of the undue burden analysis does not disturb the central holding of *Roe v. Wade*, and we reaffirm that holding. Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.

*Id.* at 879; *see also id.* at 846 ("*Roe*'s essential holding . . . is a recognition of the right of the woman to choose to have an abortion before viability."). *Roe*'s central principle has been repeatedly reaffirmed by the Court, including as recently as 2016. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).

Unsurprisingly, attempts to ban abortion prior to viability have been uniformly rejected by the courts. *See, e.g.*, *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772–73 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 981 (2016) (ban on abortions after six weeks); *Edwards v. Beck*, 786 F.3d 1113, 1117–19 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 895 (2016) (ban on abortions after twelve weeks); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019) (ban on abortions starting at fifteen weeks); *Isaacson v. Horne*, 716 F.3d 1213, 1217, 1231 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 905 (2014) (ban on abortions starting at twenty weeks); *Jane L. v. Bangerter*, 102 F.3d 1112, 1117–18 (10th Cir. 1996), *cert. denied*, 520 U.S. 1274 (1997) (ban on abortions starting at twenty-two weeks); *Sojourner T. v. Edwards*, 974 F.2d 27, 29, 31 (5th Cir. 1992), *cert denied*, 507 U.S. 972 (1993) (ban on all abortions); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368–69, 1371–72 (9th Cir. 1992), *cert. denied*, 506 U.S. 1011 (1992) (ban on all abortions); *Bryant v. Woodall*, 363 F. Supp. 3d 611, 630–32 (M.D.N.C. 2019) (ban on abortions starting at

twenty weeks); *EMW Women's Surgical Ctr., P.S.C. v. Meier*, 373 F. Supp. 3d 807 (W.D. Ky. 2019) (ban on a second-trimester abortion method); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, No. 3:19-CV-178-DJH, 2019 WL 1233575, at *1 (W.D. Ky. Mar. 15, 2019) (ban on abortions after six weeks); *see also Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997) (striking down a ban on a second-trimester abortion method because it would "inhibit[] the vast majority of second trimester abortions" and "would clearly have the effect of placing a substantial obstacle in the path of a woman seeking a pre-viability abortion").

In 2019, several states passed previability abortion bans, and in each place where a ban restricted access to abortion, courts have blocked it from taking effect. *See, e.g.*, *Robinson v. Marshall*, 415 F. Supp. 3d 1053 (M.D. Ala. 2019) (ban on nearly all abortions); *SisterSong Women of Color Reprod. Justice Collective v. Kemp*, 410 F. Supp. 3d 1327 (N.D. Ga. 2019) (ban on abortions after six weeks); *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Parson*, 389 F. Supp. 3d 631 (W.D. Mo. 2019), *modified*, 408 F. Supp. 3d 1049 (W.D. Mo. 2019) (ban on abortions after various weeks); *Little Rock Family Planning Servs. v. Rutledge*, 397 F. Supp. 3d 1213 (E.D. Ark. 2019) (ban on abortions after eighteen weeks); *Jackson Women's Health Org. v. Dobbs*, 379 F. Supp. 3d 549 (S.D. Miss. 2019), *aff'd*, 951 F.3d 246 (5th Cir. 2020) (ban on abortions after six weeks); Order Granting Stipulated Preliminary Injunction as to State Defendants, *Planned Parenthood Ass'n of Utah v. Miner*, No. 2:19-cv-00238 (D. Utah Apr. 18, 2019), ECF No. 34 (ban on abortions after eighteen weeks).

Indeed, that includes a previous order in this case, where this Court preliminarily enjoined Ohio's 2019 ban on abortion after six weeks, *see Preterm-Cleveland*, 394 F. Supp. 3d at 796, and follows other cases in which this Court has enjoined recent attempts by the Ohio legislature to ban previability abortions. *Planned Parenthood Sw. Ohio Region v. Yost*, 375 F. Supp. 3d 848 (S.D.

Ohio 2019) (Barrett, J.) (partially preliminarily enjoining a ban on a second-trimester abortion method); *Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 748 (S.D. Ohio 2018) (Black, J.) (preliminarily enjoining Ohio's ban on abortion when one of the patient's reasons is an indication of Down syndrome, because "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability" (quoting *Casey*, 505 U.S. at 879)), *aff'd*, 940 F.3d 318 (6th Cir. 2019), *reh'g en banc granted, opinion vacated*, 944 F.3d 630 (6th Cir. 2019).

Defendants' actions, unless enjoined, threaten to ban all abortions in Ohio starting at ten weeks LMP and even earlier among patients for whom medication abortion is not appropriate. *Cf. Jackson Women's Health*, 945 F.3d at 271 (holding that challenged law was a previability *ban* on abortion and not a *regulation* on abortion because it "peg[ged] the availability of abortions to a specific gestational age that undisputedly prevents the abortions of some non-viable fetuses"). As such, it is a ban on previability abortions, which contravenes decades of Supreme Court precedent, including *Roe.*

Because Defendants' actions will operate as a previability abortion ban, this Court need not look further; however, even if the Court were to apply the undue-burden test from *Casey*, Plaintiffs would certainly succeed on the merits. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. A restriction that, "while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877). As the Supreme Court has held, "*Casey* requires courts to consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2298.

Here, the burdens could not be greater. Applying the Director's Order to ban surgical abortion would ban abortion entirely for patients with pregnancies beyond ten weeks LMP and those with earlier pregnancies for whom medication abortion is not appropriate. Thus, the Director's Order is not just a substantial obstacle to obtaining an abortion, it will operate as a *complete* one. The Order could remain in effect for months, which would push many patients past the legal limit for abortion in Ohio. Moreover, even if some patients affected by the Order are able to obtain an abortion after it is lifted, they will still suffer increased risk to their health as a result of the delay in access to care. Liner Decl. ¶ 43. Thus, the enforcement of the Director's Order in a way that bans surgical abortion undoubtedly harms individuals seeking abortion.[31]

These exceedingly harmful burdens cannot be outweighed by either of the two interests the State asserts here: preserving hospital capacity and PPE. Plaintiffs share those interests, but a ban on surgical abortions does not serve either one. As to the first interest, legal abortion is safe, and complications associated with abortion—including those requiring hospital care—are exceedingly rare. Liner Decl. ¶ 22; *see also Whole Woman's Health*, 136 S. Ct. at 2311–12, 2315. Nearly all abortions in Ohio are provided in outpatient facilities, such as Plaintiffs' ASFs, not hospitals.[32] Thus, Plaintiffs' provision of abortion would not deplete hospital capacity. As to preserving PPE, as described above, *see supra* 8, surgical abortion uses minimal PPE and providers are already

---

[31] Even before ten weeks, the burdens that the Director's Order places on patients for whom surgical abortion is medically indicated or the only appropriate option are severe. *Cf. Planned Parenthood Cincinnati Region v. Taft,* 444 F.3d 502, 514 (6th Cir. 2006) (affirming preliminary injunction against abortion restriction on medication abortion that contained no health exception in light of evidence that medication abortion was relatively safer for some patients than surgical abortion).

[32] John Paulson & Donna L. Smith, ODH, Induced Abortions in Ohio 22 (2019) https://tinyurl.com/ufxuqpw (82 of over 20,000 abortions were performed in a hospital).

taking all appropriate steps to conserve PPE whenever possible. As such, banning surgical abortion does little to preserve PPE.

Notably, Plaintiffs could make further progress in preserving PPE and reduce overall contagion risks during the pandemic, but for the medically unnecessary abortion restrictions in Ohio law that limit Plaintiffs' ability to adapt to this crisis. For example, Ohio could eliminate its requirements that patients make an extra in person visit to the health center and physicians determine the presence fetal heart tone 24 hour prior to the abortion, or allow patients who can safely utilize medication abortion through eleven weeks to do so. Such changes could reduce the opportunity for the virus to spread and further minimize the need for PPE.

Indeed, far from being necessary to address the COVID-19 crisis, applying the Order to ban surgical abortion is unlikely to save any PPE and may well exacerbate the COVID-19 crisis. Patients who are prevented from obtaining abortion care must still seek medical care to maintain their health and well-being. Liner Decl. ¶ 37. Thus, pregnant patients will require care from providers using PPE whether the pregnancy is terminated or not. *Id.*[33] Moreover, given the vagueness of "elective" and "nonessential" in this context, patients who are facing serious health risks because of continued pregnancy may be delayed in accessing care because patients and providers are uncertain as to whether these risks rise to the level of making the abortion "essential." *See supra* 2–3 & n.5 (reflecting Governor Dewine's narrow interpretation of essential). Such patients could ultimately require *more* invasive care (with attendant use of PPE) or even hospital-based care.  at ¶ 46. Finally, in the event that this crisis continues for months—as it is expected to do—Defendants' actions will result in people being forced to give birth against their will. This

---

[33] Those patients who are able to obtain care out of state will face increased risk of exposure to the virus because of this travel and providers treating those patients will still be using PPE in any case.

will necessitate not just the use of PPE, but also the use of hospital beds, which are also in short supply during this crisis. *Id.*

The benefit of reducing the use of PPE in one segment of the healthcare system cannot possibly outweigh the burdens here, where abortion care is time-sensitive, where delay increases the risk to the patient's health, and where barring abortion (but not any other essential surgery or procedure) would have only a minimal negligible and temporary effect on the availability of PPE, if any, and have no effect on the PPE in shortest supply (the N95 mask). Plaintiffs therefore have established that they are likely to succeed on the merits of their claim that the Director's Order, as applied to ban surgical abortion, violates the substantive due process rights of their patients.

## II. PLAINTIFFS' PATIENTS WILL SUFFER IRREPARABLE HARM IF THE BAN IS ENFORCED.

Plaintiffs' patients will suffer serious and irreparable harm in the absence of a temporary restraining order and preliminary injunction. Unless enjoined, Defendants' actions will prevent Ohioans from exercising their fundamental constitutional right to terminate a pregnancy. The Sixth Circuit has long made clear that if "a constitutional right is being threatened or impaired, *a finding of irreparable injury is mandated*." *Am. Civil Liberties Union of Ky. v. McCreary Cty.*, 354 F.3d 438, 455 (6th Cir. 2003) (emphasis added) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *accord Mich. State A. Phillip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed." (internal citations omitted)); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (same); *see also Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) ("[T]he loss of constitutional rights for even a minimal amount of time constitutes irreparable harm."). Because Defendants' actions with respect to the Director's Order impair Plaintiffs' patients' rights guaranteed by the Fourteenth Amendment to the United States Constitution, they necessarily inflict irreparable harm and should

be enjoined. *See Preterm-Cleveland*, 394 F. Supp. 3d at 803 (determining that Ohio's six-week abortion ban "would, per se, inflict irreparable harm" if enforced).

Moreover, Plaintiffs' patients will be prohibited from obtaining a desired abortion, which can result in physical, emotional, and psychological harms, all of which are irreparable. Liner Decl. ¶ 42–46.[34] As many medical professional organizations, including ACOG, have concluded, abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[35] *See* Ohio Rev. Code § 2919.201 (prohibiting abortions after twenty-two weeks LMP). Forcing patients to forgo abortion care and remain pregnant against their will inflicts serious physical, emotional, and psychological consequences that alone constitute irreparable harm. *See e.g.*, *Elrod*, 427 U.S. at 373–74; *Planned Parenthood of Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013). Likewise, a delay in obtaining abortion care causes irreparable harm by "result[ing] in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 832 (7th Cir. 2018) (quoting *Van Hollen*, 738 F.3d at 796); *see also, e.g.*, *Planned Parenthood Sw. Ohio Region v. Hodges*, 138 F. Supp. 3d 948, 960 (S.D. Ohio 2015) (finding irreparable harm where "patients could face a delay" in obtaining abortion care); *Doe v. Barron*, 92 F. Supp. 2d 694, 696–97 (S.D. Ohio 1999) (same). This "disruption or denial of . . . patients' health care cannot be undone after a trial on the merits." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018) (internal

---

[34] *See also* ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak. (the "consequences of being unable to obtain an abortion profoundly impact a person's life, health, and well-being").

[35] *Id.*

quotation marks omitted), *cert. denied sub nom. Andersen v. Planned Parenthood of Kan. & Mid-Mo.*, 139 S. Ct. 638 (Mem.) (2018).

In sum, applying the Director's Order to ban surgical abortion will cause irreparable injury to Plaintiffs' patients and should therefore be enjoined while this litigation proceeds.

## III. THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT INJUNCTIVE RELIEF.

Plaintiffs' patients will suffer numerous irreparable harms without an injunction, and Plaintiffs' requested relief will simply preserve "the status quo that has been in place for more than 40 years since *Roe* was decided, and some 25 years since *Casey* followed." *Preterm-Cleveland*, 394 F. Supp. 3d at 803. In addition, given the indeterminate length of the Director's Order, some of Plaintiffs' patients will be forced to forgo an abortion entirely and carry an unwanted pregnancy to term. As the Sixth Circuit has made clear, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Am. Civil Liberties Union Fund of Mich.*, 796 F.3d at 649 (alternations in original) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)); *accord Mich. State*, 833 F.3d at 669 (same); *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012) ("[T]he public interest is promoted by the robust enforcement of constitutional rights . . . ."); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (same).

Moreover, as set forth more fully above, the benefits of a negligible potential reduction in the use of some PPE (and not the most limited PPE), if any, by abortion providers does not, ultimately, result in any net saving of PPE and—more importantly—is outweighed by the harm of eliminating abortion access. This is especially true here, where Defendants are attempting to ban abortion in the midst of a pandemic that may increase the risks of continuing a pregnancy and thus

may ultimately further tax the already overburdened health care system. Particularly where, as here, Plaintiffs are already taking steps—in line with those required of other medical professionals who continue to provide essential health care and CDC guidance—to preserve PPE as much as possible, *see supra* 8, injunctive relief is supported by the balance of harms and the public interest.

## IV.    A BOND IS NOT NECESSARY IN THIS CASE.

This Court should waive the Federal Rule of Civil Procedure 65(c) bond requirement. The Sixth Circuit has long held "that the district court possesses discretion over whether to require the posting of security." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Insurance Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (emphasis omitted) (quoting *Molton Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995)); *see also Molton Co.*, 55 F.3d at 1176 (affirming district court decision to require no bond because of "the strength of [the plaintiff's] case and the strong public interest involved"); *Preterm-Cleveland*, 394 F. Supp. 3d at 804 (waiving bond). This Court should use its discretion to waive the bond requirement here, where the relief sought will result in no monetary loss to Defendants.

### CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion for a temporary restraining order and/or preliminary injunction to enjoin Defendants from applying the Director's Order to prohibit surgical abortions.


Dated: March 30, 2020


Respectfully Submitted,

/s/ B. Jessie Hill
B. Jessie Hill #0074770
*Trial Attorney for Plaintiffs*
Cooperating Counsel for the American Civil

Liberties Union of Ohio Foundation
American Civil Liberties Union of Ohio
4506 Chester Ave.
Cleveland, OH 44103
(216) 368-0553
(216) 368-2086 (fax)
bjh11@cwru.edu
*Counsel for Plaintiff Preterm-Cleveland and
Northeast Ohio Women's Center*

Elizabeth Watson*
Rachel Reeves*
Brigitte Amiri*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
(212) 549-2650 (fax)
ewatson@aclu.org
rreeves@aclu.org
bamiri@aclu.org
*Counsel for Plaintiff Preterm-Cleveland and
Northeast Ohio Women's Center*

Carrie Y. Flaxman**
Richard Muniz*
Planned Parenthood Federation of America
1110 Vermont Ave NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)
carrie.flaxman@ppfa.org
richard.muniz@ppfa.org
*Counsel for Plaintiffs Planned Parenthood
Southwest Ohio Region, Planned Parenthood
of Greater Ohio, and Sharon Liner, M.D.*

Hana Bajramovic**
Planned Parenthood Federation of America
123 William Street, Floor 9

New York, NY 10038
(212) 541-7800
(212) 247-6811 (fax)
hana.bajramovic@ppfa.org
*Counsel for Plaintiffs Planned Parenthood*
*Southwest Ohio Region, Planned Parenthood*
*of Greater Ohio, and Sharon Liner, M.D*

Jennifer L. Branch # 0038893
Alphonse A. Gerhardstein # 0032053
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100
(513) 345-5543 (fax)
jbranch@gbfirm.com
agerhardstein@gbfirm.com
*Counsel for Plaintiffs Planned Parenthood*
*Southwest Ohio Region, Planned*
*Parenthood of Greater Ohio, Sharon Liner,*
*M.D., Women's Med Group Professional*
*Corporation and Capital Care Network of*
*Toledo*

Freda J. Levenson #0045916
American Civil Liberties Union of Ohio
Foundation
4506 Chester Avenue
Cleveland, OH 44103
(614) 586-1972 x 125
(216) 472-2210 (fax)
flevenson@acluohio.org
*Counsel for Plaintiff Preterm-Cleveland and*
*Northeast Ohio Women's Center*

*\* Admitted pro hac vice*
*\*\* Pro hac vice forthcoming*

**Certificate of Compliance with SDOH Local Rule 65.1**

Trial Attorney for Plaintiffs has served Counsel for Defendants with a copy of the Motion to Supplement the Complaint, Proposed Supplemental Complaint, Motion for Preliminary Injunction and/or Temporary Restraining Order, along with the attached Declarations via email of this Motion and that service has been accomplished.