# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| PRETERM-CLEVELAND, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | Case No: 1:19-cv-360 |
| | : | |
| v. | : | |
| | : | Honorable Michael Barrett |
| OHIO ATTORNEY GENERAL DAVE YOST, et al., | : | |
| | : | |
| Defendants, | : | |
| | : | |

---

**BRIEF OF AMICI CURIAE CITIZENS FOR COMMUNITY VALUES ON BEHALF OF NAMED INDIVIDUAL DOCTORS, NURSES, AND MEDICAL PROFESSIONAL ASSOCIATIONS OPPOSING PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION**

---

Philip D. Williamson (0097174)
Taft Stettinius & Hollister LLP
425 Walnut Street
Cincinnati, OH 43202
Telephone: 513-357-9417
pwilliamson@taftlaw.com
*Trial Attorney, Amici Curiae*


Rachel R. Citak (0099253)
Citizens for Community Values
P.O. Box 2945
Columbus, Ohio 43216
Telephone: 513-733-5775
rachelcitak@ccv.org
*Pro Hac Vice Pending*

## CORPORATE DISCLOSURE STATEMENT

Amici Citizens for Community Values, on behalf of named individual doctors, nurses, health professionals, and professional medical associations, does not have any parent corporations. No publicly held corporation owns ten percent or more of Amici stock.

# TABLE OF CONTENTS

PAGE(S)

CORPORATE DISCLOSURE STATEMENT ............................................... ii

I.     INTEREST OF AMICI ................................................... 1

II.    BACKGROUND ........................................................ 1-2

III.   INTRODUCTION & SUMMARY OF ARGUMENT ............... 2-4

IV.   ARGUMENT: THE COURT SHOULD RULE IN FAVOR OF THE
DEFENDANTS

    1.  Continued surgical abortions are contributing to the national and statewide
shortage of personal protection equipment (PPE), patient resources, and
hospital beds ............................................................... 5-9

    2.  Unequal enforcement of this order has and will continue to have
detrimental, unfair effects upon patients, health professionals, and the
medical field ............................................................... 9-14

    3.  Continued surgical abortions increase the risk of exposure to a
potentially deadly disease for women, healthcare workers, and the public
............................................................................... 14-16

V.    CONCLUSION .......................................................... 16

VI.   LIST OF AMICI ........................................................ 17-22

VII.  CERTIFICATE OF SERVICE ....................................... 23

# TABLE OF AUTHORITIES

**STATUTES**                                                             **PAGE(S)**

133rd Ohio General Assembly, Substitute Senate Bill Number 23, "Human

Heartbeat Protection Act" ........................................................................... 2

Ohio Civil Rule 65(A) ............................................................................. 2

**OTHER AUTHORITIES**

Executive Order 2020-01D, "Declaring a State of Emergency" ................. 1

Ohio Department of Health Order "Director's Order for the Management of
Non-essential Surgeries and Procedures throughout Ohio"
.......................................................... 1-4, 6, 8, 10, 12, 13-14, 16

Ohio Department of Health Order ........................................................... 14

iv

## I.     INTEREST OF AMICI

Amici curiae ("Amici") are a group of 132 doctors, nurses, health professionals, and medical professional associations (represented here by Citizens for Community Values). Amicus curiae *American College of Pediatricians* (ACP) is a national medical professional association of nearly 600 pediatric physicians and health professionals seeking to ensure that all children reach their optimal physical and emotional health and well-being. Amicus curiae *American Association of Pro-Life Obstetricians & Gynecologists* (AAPLOG) is a national medical professional association of nearly 4,800 obstetrician-gynecologist members and associates. AAPLOG seeks to provide the general public with a realistic appreciation and understanding of abortion-related health risks. Amici are individually named in *List of Amici*.

Amici have a keen interest in maximizing the healthcare resources available to combat the COVID-19 pandemic. Specifically, Amici will provide the Court with additional information related to the impact on medical professionals and public health. Amici argue there will be irreparable injury if the Plaintiff's motion for Preliminary Injunction is granted because Ohio Department of Health (ODH) orders issued in response to COVID-19 will not be fully implemented and enforced.

## II.     BACKGROUND

On March 9, 2020, Governor DeWine declared a State of Emergency by Executive Order 2020-01D, due to the rising coronavirus pandemic. The next week, on March 17, Ohio Department of Health (ODH) Director Dr. Amy Acton issued "RE: Director's Order for the Management of Non-essential Surgeries and Procedures throughout Ohio" ("Elective Procedures Ban"). This order demanded a cease of all elective surgeries and postponement of nonessential surgeries that "can be delayed without undue risk to the current or future health of a patient." The given purposes of these

restrictions were to minimize the spread of COVID-19 and conserve personal protection equipment (PPE) and "critical hospital capacity and resources within Ohio."

Soon after, Ohio citizens filed complaints that abortion providers were continuing to perform surgical abortions. Ohio Attorney General Dave Yost then sent two letters to Plaintiffs, ordering them to immediately stop performing non-essential and elective surgical abortions. Plaintiffs then filed a request for a Temporary Restraining Order (TRO) with the Southern District of Ohio against the Elective Procedures Ban. Plaintiffs attached their request to ongoing litigation concerning Ohio Senate Bill 23, "The Heartbeat Protection Act," which bans abortion once a fetal heartbeat can be detected.[1] The district court granted the TRO as well as Plaintiffs' request to file a supplemental complaint. The Sixth Circuit Court dismissed Defendants' request for a stay. Plaintiffs then filed a motion for preliminary injunction in order to prevent the enforcement of ODH orders.

## III. INTRODUCTION & SUMMARY OF ARGUMENT

Now, Amici come with the purpose of informing the Court on medical and public health matters and concerns. Amici argue that the balance of harm weighs in favor of the grave public need for PPE and minimizing exposure to COVID-19. Granting the Plaintiffs' preliminary injunction would both fail to serve the public interest and prove great risk of harm to 3rd parties, making the balance of harms greater the State. Denial of the preliminary injunction would allow Ohio officials to enforce ODH orders that abortion providers cease performing surgical abortions so as to preserve the crucial medical supplies needed for the broader public at this time.

Amici's interests lie primarily in the risk of harm to others and whether the public interest would be served by enforcement of the "Elective Procedures Ban." COVID-19 threatens every

---

[1] Ohio 133rd General Assembly, Enacted

citizen of Ohio. From the beginning of this crisis, experts have warned that hospitals may be overwhelmed by the influx of COVID-19 patients, leading to shortages of space, equipment, and personnel. The state government, healthcare providers, and citizens from all walks of life have worked tirelessly to combat that threat. During this crisis, space and medical equipment have become scarce, and every single hospital bed, item of PPE, or pint of blood is critical.

Exempting surgical abortion providers from enforcement of the Elective Procedures Ban increases the risk of harm to the State and the medical professionals that the State intended to protect. Surgical abortion—which is almost always an elective, nonessential procedure— exacerbates Ohio's public health crisis in three key ways. First, surgical abortions consume PPE, which is already in short supply throughout the State. Second, surgical abortions create the unnecessary risk that a woman will need emergency or follow-up care, further straining the healthcare system. Third, surgical abortions increase the risk of exposure to COVID-19 for women, healthcare providers, and the public.

Everyone in Ohio has sacrificed in order to combat the spread and effects of COVID-19. Patients have agreed to delay necessary treatments, or even forego important—but not essential— medical procedures. Many physicians have put their entire livelihoods on hold.[2] Hospitals and their employees have taken on extraordinary measures, from finding new ways to sterilize and reuse formerly disposable equipment, to turning convention centers and dorm rooms into hospital extensions. Manufacturers have retooled factories to produce necessary medical equipment. Ohio citizens from all walks of life have given up their daily freedoms—things like school, travel, religious services, and even spending time with loved ones and greeting their neighbors. Ohio's

---

[2] Most specialties within the practice of medicine do not solely perform lifesaving treatment. Instead, the livelihood of most medical professionals depends in whole or in part upon providing nonessential—but important—care and procedures. See *Table A: Elective Procedures Denied as Reported by Amici* for further review of the impact to specialty practices.

abortion providers demand a special exemption from the sacrifices everyone else has made to combat this public health crisis.

In order to rule in favor of the Plaintiffs, the Court would have to find—with respect to time, equipment, personnel, and space—public interest favors abortion providers over the thousands of COVID-19 patients in Ohio, as well as the thousands of healthcare providers working to address COVID-19 crisis.[3] On top of the everyday emergencies that confront the healthcare system, COVID-19 is a crisis in and of itself. The time Ohio remains under the Elective Procedures Ban may not impact many women's abilities to later obtain a surgical abortion in Ohio, but timing is critical in the greater battle against COVID-19.

The Court should rule in favor of the Defendants for the following reasons explained within this brief:

(1) Continued surgical abortions are contributing to the national and statewide shortage of personal protection equipment (PPE), patient resources, and hospital beds;

(2) Unequal enforcement of the Elective Procedures Ban has and will have detrimental, unfair effects upon patients, health professionals, and the medical field; and

(3) Continued surgical abortions increase the risk of exposure to a potentially deadly disease for women, healthcare workers, and the public.

---

[3] *See COVID-19*, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home (last visited Apr 7, 2020), where as of April 8, 2020, Ohio has reported 5,148 confirmed cases of COVID-19, resulting in 1,495 hospitalizations and 417 ICU admissions. COVID-19 has killed 193 Ohioans.

## IV.    ARGUMENT

**1. Continued surgical abortions are contributing to the national and statewide shortage of personal protection equipment (PPE), patient resources, and hospital beds.**

Every mask counts, every ventilator matters, and every decision makes a difference. To that end, the State and healthcare providers have taken drastic measures with the ultimate goal of protecting every single health professional working to save lives and "flatten the curve." So while Plaintiffs argue that the amount of PPE and supplies providers have on hand is not significant enough to justify stopping surgical abortions, they are missing the point: Every mask matters.

Ohio has even worked to ensure that every mask counts as long as possible. On March 29, 2020, Governor DeWine asked the U.S. Food & Drug Administration (FDA) to approve an "emergency use permit" for Battelle's mask sterilization system to address the massive shortage in personal protective equipment.[4] This request was quickly granted unrestricted approval,[5] meaning Ohio can re-sterilize 160,000 total masks per day at current optimum capacity.[6]

Ohio has sought to maximize its available resources. Just a few days after the FDA approved a mask sterilization system, Ohio received hundreds of thousands of PPE materials from the federal Strategic National Stockpile. This shipment included: "271,450 N95 masks, 672,100 surgical masks, 131,808 face shields, 107,670 gowns, 483,575 pairs of gloves and 552 coveralls." ODH Director Dr. Amy Acton responded, "The supplies we received, and the State's

---

[4] Halperin, Eric. *Battelle Cleared to Sterilize N95 Masks at Max Capacity, Operate in Other States to Fight Coronavirus PPE Shortage*. NBC4 WCMH-TV, 29 Mar. 2020, www.nbc4i.com/video/battelle-cleared-to-sanitize-n95-masks-at-max-capacity-operate-in-other-states-to-help-offset-coronavirus-ppe-shortage/4438664/.
[5] Hinton, RADM Denise M. U.S. Food & Drug Administration, www.fda.gov/media/136529/download.
[6] Supra, Halperin.

reserve will not meet the immediate or future needs of Ohio's healthcare providers and first responders."[7]

The federal government is likewise seeking to increase the supply of medical resources. On April 2, 2020, President Trump issued the "Memorandum on Order Under the Defense Production Act Regarding 3M Company," invoking the Defense Protection Act.[8] He called on manufacturing plants to produce "the number of N-95 respirators that the Administrator [of the Federal Emergency Management Agency] determines to be appropriate." Yet our state and nation still face a severe shortage.

PPE is not the only medical resource we are lacking. Joint Task Force 37 of the National Guard has deployed "approximately 500 Ohio National Guard and Ohio Military Reserve members" in Ohio to aid relief efforts.[9] On April 4, 2020, Governor DeWine stated,"The Ohio National Guard is working with other state agencies to assess sites like dormitories, hotels, convention centers, and unused buildings that might serve as alternate sites to care for patients."[10] And yet, it's not enough.

It is clear in the current state of emergency that we must conserve PPE and medical resources. The Elective Procedures Ban is one of the State's efforts to do so. It is not clear, however, why abortion providers insist that surgical abortions be exempted from those efforts—much less why they insist the Constitution *requires* the State and healthcare providers to privilege elective surgical abortions over all other medical procedures.

---

[7] "Coronavirus: Federal Shipment of Personal Protective Equipment Doesn't Meet Ohio's Need, Dr. Amy Acton Says." *Columbus Dispatch*, 31 Mar. 2020, https://www.dispatch.com/news/20200331/coronavirus-federal-shipment-of-personal-protective-equipment-doesnrsquot-meet-ohiorsquos-need-dr-amy-acton-says.

[8] https://www.cnn.com/2020/04/02/politics/defense-production-act-ventilator-supplies/index.html

[9] Ohio National Guard. "COVID-19." The Ohio Adjutant *General's Department*, Ohio National Guard, www.ong.ohio.gov/stories/covid19/index.html.

[10] Jim Provance & Brooks Sutherland, DeWine extends stay-at-home order through May 1, *Toledo Blade* (2020), https://www.toledoblade.com/local/Coronavirus/2020/04/02/ohio-governor-mike-dewine-extends-stay-at-home-order/stories/20200402113 (last visited Apr 6, 2020).

Surgical abortions necessarily involve blood, bodily fluids, injections, insertions, ultrasounds, speculums, and in-person exams. Throughout Plaintiffs' facilities, there are valuable PPE and cleaning supplies necessary to maintain operation and fulfil required sanitization standards. In order to provide surgical abortions in the current environment, abortion providers across the state must hoard sufficient PPE for pre-operative, operative, and post-operative patient care. As ODH Director Dr. Acton instructed, those who have PPE to spare should be making it available to those who serve patients whose lives are on the line and to those hospital systems preparing for the inundation of COVID-19 patients.[11] Abortion providers instead choose to increase the strain on health professionals performing truly essential surgeries and procedures.

The reality is, even the best laid plans can go awry. Surgical abortions are not without risk of complication to the women. Amici recognize that, though rare, surgical abortions can have serious and life-threatening complications. Hemorrhaging, cervical laceration, uterus perforation, and hematometra[12] are some of the most commonly reported abortion complications according to the ODH "2018 Induced Abortions in Ohio" Vital Statistics Report. Within obstetrics and gynecology (OB/GYN) practice, treating hemorrhage is a central component of care and treatment. However, in the context of surgical abortion, there are several potential causes of hemorrhage influenced by error and/or patient risk factors.

Abortion providers may or may not use ultrasound to guide the surgical abortion procedure, especially in early pregnancies. This can increase the risk of error. When performing "blind," it is possible that a surgical tool may perforate the vaginal wall or cervix while traveling to the uterus. Once the surgical tools reach the uterus, it is possible to perforate the uterus. If

---

[11] "Ohio Gov. Mike DeWine Orders End of Dine-in Options at Restaurants, Bars." *WCPO*, Scripps Local Media, 15 Mar. 2020, www.wcpo.com/news/national/coronavirus/live-ohio-gov-mike-dewine-announces-latest-covid-19-containment-measures.
[12] Hematometra occurs when blood fills the uterus.

severe, this may cause hematometra, or blood filling the uterus. One of the worst-case scenarios is when a surgical tool perforates and passes through the uterus, potentially lacerating another organ. Additionally, not all abortion providers do an ultrasound after surgical abortion to make sure there are no retained products.[13] Even with an ultrasound, it is still possible to err and miss tissue that remains. When the body recognizes foreign tissue in the uterus that fails to expel, infection sets in.

Besides the possibility of error, there are patient risk factors that can further complicate the surgical abortion. As gestation progresses, the uterus increases in size and blood flow, making hemorrhage more likely. Another condition, called *atony*, occurs when the uterus exhibits a lack of muscle tone. This becomes an issue once the uterus is emptied by suction during abortion, because the uterine muscles may fail to contract and reduce blood flow if the uterus is lacerated by a surgical tool.

In the case of a serious abortion complication like hemorrhage, the patient will require transport and transfer to an emergency hospital care as far as three miles away from the abortion facility. A patient suffering from blood loss may then require a blood transfusion. This is not a rapid process, due to risks of negative transfusion reactions. Instead, the patient is placed on a ventilator and then gradually given blood. If the uterus is infected due to retained products, the uterus is much more likely to bleed during a follow up dilation and cutterage (D&C), which may involve sharp surgical tools. Lastly, transportation to the hospital exposes the women to an increased chance of contracting and spreading COVID-19.

Though the risks of emergency complications during pregnancy are statistically rare, these risks become significant during this state health crisis. Hospital time, space, resources, and

---

[13] Fetal tissue accidentally left in the uterus after an abortion.

labor are at a premium. There simply is no room for Emergency Room staff, resources, rooms, and doctors to take on the additional burden of emergencies related to elective surgical abortions.

Preserving these resources, labor, and rooms in the medical field today will save lives tomorrow. That's why our nation is making such unprecedented sacrifices at this time. We are all out of room for undue privilege, entitlement, exceptions, and excuses. It's time for all hands on deck.

**2. Unequal enforcement of the Elective Procedures Ban has and will continue to have detrimental, unfair effects upon patients, health professionals, and the medical field.**

As ODH Director Dr. Amy Acton has stated, "Timing is everything, and every day matters…This is not a drill. This is a once-in-a-lifetime pandemic, and everything each of us does matters."[14] Since everyone's actions are so pivotal at this time, it seems reasonable that health professionals should take every precaution, which includes eliminating unnecessary depletion of PPE, minimizing exposure of patients to office areas and staff, as well as preserving hospital beds. This is accomplished by stopping non-essential procedures and discouraging unnecessary risks.

It was noted in the district and circuit court opinions that abortion access has traditionally been granted special considerations by our federal courts. However, the current pandemic presents unprecedented restrictions for all Ohio citizens, and the medical professional community has not been immune. As state officials seek to "flatten the curve," time is of the essence and unified cooperation is critical. Surgical abortion should be no exception.

Everyone in Ohio, from citizens, to religious organizations, to business owners to medical practices, have had to sacrifice in some way. No operations have been able to simply continue "business as usual." Many operations that affect patients' quality of life, wellbeing, mobility, and

---

[14] "Ohio Gov. Mike DeWine Orders End of Dine-in Options at Restaurants, Bars." *WCPO*, Scripps Local Media, 15 Mar. 2020, www.wcpo.com/news/national/coronavirus/live-ohio-gov-mike-dewine-announces-latest-covid-19-containment-measures.

occupations have been put on hold as nonessential or elective. Sacrificing comfort, convenience, and freedoms has all been for the greater purpose of saving lives.

Medical professionals and patients have had to make especially difficult sacrifices. Amici have first-hand experience:

(1) One OB/GYN amicus had a patient with irregular vaginal bleeding. Her ultrasound showed irregular uterus lining. The doctor tried in vain to retrieve a biopsy of the tissue. In order to retrieve the tissue for testing, the doctor realized she would need to perform a dilation and cutterage (D&C)—effectively, the same procedure used to retrieve fetal tissue during a surgical abortion. Due to the patient's age and symptoms, there was a small, but real, possibility of uterine cancer. This surgery scheduling was denied, and the patient was forced to postpone and endure the uncertainty of irregular bleeding and the possibility of cancer.

(2) One amicus is a physician at a small gastrointestinal (GI) practice serving a large metropolitan area. The main source of income for the practice is elective, nonessential exams and procedures that have been shut down by the Elective Procedures Ban. This means nearly all endoscopies have come to a halt, including patients being seen for liver biopsies, rectal bleeding, retrieval of tissue for testing, r-endoscopy for bleeding, stomach ulcers, or trouble swallowing, as well as preventative scheduled colonoscopies. Gastroenterologists are at the forefront of detecting colon cancer at its earliest stages, which can be one of the most deadly forms of cancer. Colon cancer metastasizes quickly, spreading to attack other healthy organs. Routine screenings are the best way to catch it early. GI patients who show elevated liver enzymes are often referred to hepatologists for specialty care, but hepatology offices have taken the

ODH orders very seriously and are only scheduling appointments that can be done via telemedicine.

(3) OSU's plastic surgery department has placed a hold on any new hires due to the financial uncertainty in an entirely elective area of practice. Various doctors as part of the Amici have reported high numbers of furloughs and layoffs in practices and hospitals, especially for staff. This makes the job even harder and requires even longer hours for the essential healthcare professionals and staff that remain. However, this means postponement of important work in their department for patients who are suffering, such as breast reconstruction or breast mastectomies. Mastectomies can alleviate anxiety for women who have a high risk of breast cancer and view their breasts as "ticking time bombs" due to genes or heredity. Many women awaiting breast reconstruction surgery are suffering from loss of self-esteem, struggles with feeling like they no longer "feel feminine," and even depression. Reconstructive surgery is scientifically proven to improve on women's mental and social health, but all plastic surgery procedures have been put on hold.

Every single specialty of medicine has had to make sacrifices and deviate from the status quo. This is further illustrated by the procedures in *Table A*, which lists many important—though elective—procedures that Amici report having to cancel or postpone. Health has suffered, quality of life has suffered, and routine prevention has been obstructed. Doctors, nurses, and health professionals across Ohio have taken ODH orders seriously in fear of infecting themselves or others, or even being penalized. Yet abortion providers are the only ones who seem to have escaped from sharing in this burden.

*Table A: Elective Procedures Denied as Reported by Amici*

(1) Radiology/Primary care:

    a.  **Mammograms*. Women receive regularly scheduled mammogram to detect any abnormal of cancerous developments in breast tissue.

    b.  **Colonoscopy screenings*. These regular examinations can detect signs of colon cancer, the deadliest form of cancer.

    c.  **Lung cancer screening*. These have been postponed under the Elective Procedures unless serious or acute symptoms are present.

    d.  **Joint MRIs*. These have been postponed unless there is a concern for infection or malignancy.

    e.  **Thyroid fine needle aspirations*. This test checks for Thyroid cancer.

    f.  **Cancer follow-up imaging*. Many patients who are on 6 or 12 month follow up interval schedule have been required to postpone.

(2) Orthopedics/Neurology/Neurosurgery/Psychiatry

    a.  *Arthroscopy*. This uses a camera to examine joint health.

    b.  *Spinal Cord Fusion*. Eliminate movement and joint pain by fusing the bones together.

    c.  *Pain injection procedures*. E.g. cortisone injections for carpal tunnel, degenerated discs and other nerve and/or joint pain

    d.  *Joint replacements*. Hip replacements and knee replacements are often needed to restore mobility, quality of life, weight loss efforts, and occupational functions.

    e.  *Neurosurgery*. Often needed for severe spinal stenosis causing bilateral loss of sensation and poorly controlled pain, even with pain management efforts.

    f.  *Electroconvulsive therapy*. This is still used in controlled settings to treat those hospitalized severe major depressive disorder.

(3) Cardiology:

    a.  *Cardiac stress tests*. These regular tests help prevent heart attacks

    b.  *Heart valve replacements or repairs*. This surgery can be a solution to chronic conditions like carotid artery disease, blocked valve, deformed valve, heart murmur, valve leakage, shortness of breath, chest pain, passing out.

    c.  *Repeat percutaneous coronary intervention*. This is a nonsurgical procedure to help with coronary heart disease and narrowed arteries by inserting stents.

(4) Obstetrics/Gynecology (OB/GYN)

    a.  *Pre-pregnancy abdominal cerclages*. These are done to prevent 2nd-trimester pregnancy loss, and if not done before pregnancy, will be done during pregnancy, presenting a much greater risk to the woman and the baby.

    b.  *Prolapse surgeries*. These are surgeries performed on women of any age whose uterus is falling into the vagina due to weak pelvic floor muscles & ligaments.

    c.  *Diagnostic/treatment laparoscopies*. This is done to diagnose and determine the best treatment for chronic issues including pain and masses.

    d.  **Hysterectomies*. These are often performed on women suffering from pain, bleeding, masses, or fibroids—large noncancerous tumors that can grow to 20 lb. or more.

e. **D&Cs and hysteroscopies.** These are useful for determining the source of abnormal bleeding issues and are used to biopsy and test for possible cancers.

(5) General Surgery/ENT

    a. *Tonsillectomy.* Tonsils are often removed from children and adults suffering from recurrent strep throat.

    b. *Myringotomy.* This procedure inserts ear tubes for children suffering from poor drainage and resulting ear infections.

    c. *Gallbladder removal. Often performed when patients experience symptoms such as stomach pain or gallstones.*

(6) Plastic Surgery/Dermatology

    a. *Ruptured implants removal.* Ruptured silicone breast implants can only be detected with an MRI. Saline implants rupture and leak into the body, causing a rapid change in breast size and shape.

    b. *Flap repair, reconstructive breast implants, and breast augmentation.* Women often experience sadness, low self-esteem, and even depression after a mastectomy, finding themselves dissatisfied with their appearance. Flap repair uses tissue, muscle, and skin from other areas of the body to recreate breast tissue. Implants are an additional option.

    c. *Pilonidal cyst excision.* Pilonidal cysts begin with an ingrown hair and usually appear at the end of the tailbone, near the top of the buttocks crease. They can be recurring, cause severe discomfort, affect daily activities, and become infected.

    d. *Hernia repair.* This operation corrects weakness in a wall (e.g. abdominal wall) that is allowing internal organs or tissues to bulge through.

    e. *Ostomy takedowns.* This is a surgery to remove an ostomy bag so the patient may resume normal bowel functioning. Patients with colorectal issues (i.e. colon cancer, Crohn's disease) may have an ostomy bag attached while healing from surgery. This system diverts bowels and/or urine into a bag that must be periodically emptied.

*\*\* Cancer-related treatments are exempt from the Elective Procedures Ban. However, due to the unavailability of medical equipment, PPE, time, and space, Amici have reported requesting permission for biopsies or routine procedures related to testing for these conditions, and then receiving a denial, requested reconsideration.*

No matter their stances on abortion, Amici have been brought together by a common goal of providing medical care to the sick. Pregnancy is not a disease nor an injury; it is a physical state in which the woman can be perfectly healthy. If pregnancy is a serious threat to her life or physical health, the Elective Procedures Ban has made an exemption in that instance. Chemical abortion is still permitted under the Elective Procedures; it requires no PPE. But there is no pill for a chemical knee surgery. No telemedicine hip replacement. No planning for a cancer-positive colon screening.

Meanwhile, surgical abortion is actually an election *within* an election. A pregnant woman may make the decision to end her pregnancy, and then may decide whether to have a chemical or surgical abortion for various reasons—including how far along she is in the pregnancy. Chemical abortion is usually not prescribed in cases where the pregnancy is beyond 11 weeks. For women beyond 11 weeks, surgical abortion should no longer be an option during this time of scarce PPE and high risks of spreading COVID-19. In such a time of crisis and state emergency, everyone is having to take more consideration and concern for their future planning than usual. Clients of abortion providers are no exception.

### 3. Continued surgical abortions increase the risk of exposure to a potentially deadly disease for women, healthcare workers, and the public.

In the midst of the COVID-19 crisis, Planned Parenthood has released a statement that "Planned Parenthood's top priority is ensuring every person can continue accessing essential healthcare, including abortion."[15] The website for Planned Parenthood of Greater Ohio says that "…the threat of infection for most individuals in the general U.S. population remains low but varies by location."[16] There is no further discussion here of the ODH warning that this disease is easily spread.[17]

Surgical abortions usually require at least three points of contact for the client and staff:

(1) Pre-operation: The pregnant client seeking abortion undergoes intake and registration, requiring exposure to administrative staff. This is also when the client would come

---

[15] J. Edward Moreno, Ohio halts procedures at abortion clinics amid COVID-19 outbreak The Hill (2020), https://thehill.com/homenews/state-watch/488842-ohio-halts-all-procedures-at-abortion-clinics-amid-covid-19-outbreak (last visited Apr 6, 2020).

[16] Planned Parenthood of Greater Ohio, Planned Parenthood of Greater Ohio, https://www.plannedparenthood.org/planned-parenthood-greater-ohio (last visited Apr 6, 2020).

[17] See Director's Order from the office of the Ohio Department of Health:
In Re: Order to Limit and/or Prohibit Mass Gatherings in the State of Ohio, where "COVID-19 is a respiratory disease that can result in serious illness or death, is caused by the SARS-CoV2virus, which is a new strain of coronavirus that had not been previously identified in humans and can easily spread from person to person."

into hands-on contact with the doctor and nursing staff. The client is examined to ensure she is physically fit for the surgery. Pre-op counseling takes place to answer any of the patient's questions. An ultrasound determines the stage of pregnancy, and laminaria may be inserted to help dilate the uterus beforehand. These actions make social distancing impossible.

(2) Operation: At this stage, social distancing is completely unfeasible. The doctor will have at least one additional staff member or nurse present. The client may receive medicine to relax or be completely sedated. She will receive medicine to dilate the cervix. The doctor uses a speculum to examine the vaginal canal. Abortions for later pregnancies may require administering an injection through the stomach beforehand. Once the suction tube is inserted, the doctor will empty the uterus using suction. The doctor then may then examine the uterus and use a curette to remove leftover tissue. The patient is then brought into a recovery room for up to an hour.

(3) Post-operation and Follow Up: For follow-up care, many clients may not return to the facility where the abortion was performed. They may call, make an appointment with their OB/GYN office, or, in cases involving serious complications, be admitted to a hospital.

Plaintiffs' staff, doctors, and patients are not only exposed to each other, but then go on to interact with other patients and travel through different areas of the facility. They travel in cars and go home to families that may be exposed. Daily life and essential needs like gas and groceries may require them to enter public places where others can be exposed.

The extent of harm due to client, staff, and public exposure quickly becomes exponential. In-person examinations and surgical procedures should be limited to life-saving measures and

15

imminent harm to life, limb, or health. Allowing surgical abortions to continue is putting the life

and health of women, staff, and doctors at risk.

V.      **CONCLUSION**

In this growing public health crisis, every mask, gown, bed, and pint of blood counts.

Patients and healthcare providers have put their lives and livelihoods on hold to combat COVID-

19. Abortion providers should not be privileged above everyone else in this fight.

For the reasons stated above, we ask the Court to rule in favor of the Defendants and allow

proper enforcement of the ODH Elective Procedures Ban limiting surgical abortions.

Respectfully submitted,

*/s/ Philip D. Williamson* (0097174)
Philip D. Williamson
Taft Stettinius & Hollister, LLP
425 Walnut Street
Cincinnati, OH 43202
Telephone: 513-357-9417
pwilliamson@taftlaw.com
*Amici Trial Attorney*

*/s/ Rachel R. Citak* (0099253)
Rachel R. Citak
Citizens for Community Values
P.O. Box 2945
Columbus, Ohio 43216
Telephone: 513-733-5775
rachelcitak@ccv.org
*Amici Legal Counsel, Pro Hac Vice Pending*

## LIST OF AMICI

*Medical Professional Organizations*
1. American Association of Pro-Life Obstetricians & Gynecologists (AAPLOG)
2. American College of Pediatricians (ACP)

*Individual Medical Health Professionals*

1. Mrs. Deborah Achtyes
   Nurse
   Defiance, Ohio

2. Mrs. Deb Anderson, RN
   Dayton, Ohio

3. Mrs. Barbara Assad
   Nurse
   Akron, Ohio

4. Dr. John J. Astrino, MD
   Pediatrician (Retired)
   Stow, Ohio

5. Mr. Philip Badenhop
   MRI/X-ray Technologist
   Wauseon, Ohio

6. Mr. William Baker
   Nurse
   Zanesville, Ohio

7. Dr. Michael Baria
   Physician
   Columbus, Ohio

8. Mrs. Elizabeth Barrett
   Medical Transcriptionist
   Cincinnati, Ohio

9. Dr. Alfred Barrow
   Psychologist
   Bonita Springs, Florida

10. Stephanie Bedwell, RN
    Cincinnati, Ohio

11. Ms. Florine Bittner, RN
    Retired (Ohio)

12. Mrs. Brenda Bixler
    Nurse
    Columbus, Ohio

13. Mrs. Mary Ellen Blake
    Licensed Professional Clinical
    Counselor
    Retired (Ohio)

14. Mrs. Judith Bottles
    PTA (physical therapist asst.)
    Retired (Ohio)

15. Dr. Kerri Brackney
    Physician and Maternal Fetal Medicine
    Fellow
    Cleveland, Ohio

16. Mrs. Christa Brown
    Nurse
    Columbus, Ohio

17. Mrs. Michelle Bundenthal
    Certified Registered Nurse Anesthetist
    (CRNA)
    Orlando, Florida

18. Dr. Robert Burger
    Physician
    Cincinnati, Ohio

19. Mrs. Eileen Burhanna, RN
    Bellefontaine, Ohio

20. Dr. Brian Burkey
    Physician
    Gates Mills, Ohio

21. Mr. Joshua Cernetic
    CEO Healthcare Facility
    Xenia, Ohio

22. Dr. Matthew Chetta
    Physician
    Columbus, Ohio

23. Mrs. Andrea Chipps
    Certified Nurse-Midwife (CNM)
    Cincinnati, Ohio

24. Dr. Mike Citak
    Chief Medical Officer & General
    Surgeon
    Somerset, Kentucky

25. Mrs. Robin Citak
    Nurse, Obstetrics/Gynocology
    (OB/GYN)
    Somerset, Kentucky

26. Dr. Merrilee Cox
    Pediatric Hospitalist
    Dayton, Ohio

27. Dr. Michelle Cretella
    Physician
    Gainesville, Florida

28. Dr. Elizabeth Crickard
    Physician
    Dublin, Ohio

29. Mrs. Karen Culler, RN
    Toledo, Ohio

30. Dr. Tom Davidson
    Dentist
    Retired (Ohio)

31. Miss Lurisa Davis, RN
    Salem, Ohio

32. Mrs. Diane Detmer
    Nurse
    Cincinnati, Ohio

33. Mrs. Abby Devore
    Nurse
    Belle Center, Ohio

34. Dr. Kirk Doerger
    Physician
    Cincinnati, Ohio

35. Mrs. Margaret Dorr, RN
    Cincinnati, Ohio

36. Dr. LaDonna Dulemba
    Nurse Practitioner
    Richmond, Indiana

37. Dr. Michael Durbin, MD
    Willowick, Ohio

38. Dr. Sara Eapen
    Physician
    Cleveland, Ohio

39. Dr. Alexandra Einhorn
    Physician
    Columbus, Ohio

40. Mr. Keith Enix
    Nurse
    Middletown, Ohio

41. Dr. Ashley Fernandes
    Physician
    Columbus, Ohio

42. Dr. Whitney Fernandez
    Chiropractor
    Troy, Ohio

43. Mr. Fred Fox, RN
    Cincinnati, Ohio

44. Dr. Paul Fredette
    Surgeon
    Bellingham, Washington

45. Dr. Gregory Ganser
    Dentist
    Canton, Ohio

46. Mr. Matthew Geise
    Occupational Therapist
    Chillicothe, Ohio

47. Mrs. Jennifer Giroux, RN
    Cincinnati, Ohio

48. Mrs. Joanna Goettemoeller
    Nurse
    Troy, Ohio

49. Ms. Carrie Gould, RN
    Parkersburg, West Virginia

50. Mrs. Debbie Graham, RN
    Cincinnati, Ohio

51. Mrs. Debbie Graham, RN
    Cincinnati, Ohio

52. Mrs. Jennifer Gross
    Nurse Practitioner
    West Chester, Ohio

53. Mrs. Loretta Hackle
    Licensed Practical Nurse (LPN)
    Cincinnati, Ohio

54. Dr. Matt Hale
    Physician
    Ohio

55. Joyce Hammer
    Nurse
    Toledo, Ohio

56. Rev. Mark J. Hammond
    Catholic Priest & RN
    Columbus, Ohio

57. Miss Elly Hancsak
    Nurse
    Parma, Ohio

58. Mrs. Rebecca Harju, RN
    (Currently Unemployed)
    Ohio

59. Dr. Murrell Henderson
    Physician
    Deerfield, Ohio

60. Mrs. Marie Henderson, RN
    Deerfield, Ohio

61. Dr. David Hess
    Physician
    Cincinnati, Ohio

62. Dr. Roger Hesselbrock
    Physician
    Dayton, Ohio

63. Mrs. Dawn Hollingsworth
    Pathology Medical Transcriptionist
    West Carrollton, Ohio

64. Ms. Emilee Hollis, RN
    Cincinnati, Ohio

65. Mrs. Sandra Hopler, RN
    Columbus, Ohio

66. Dr. Lauren Hruszkewycz,
    Physician
    Mason, Ohio

67. Dr. Angela Jackson Lopez
    Physician
    Springfield, Ohio

68. Dr. Michael Jacobson,
    Physician
    West Chester, Ohio

69. Dr. Joshua Jacobson
    Physician
    Fayetteville, North Carolina

70. Mrs. Alivia Janowiecki
    Expanded Function Dental Auxiliary
    (EFDA)
    Vandalia, Ohio

71. Mr. David Jerome
    ASRT radiographer
    Grove City, Ohio

72. Mrs. Marlene Jerome, RN
    Grove City, Ohio

73. Mrs. Jane Johannsen
    Nurse Practitioner
    Retired (Ohio)

74. Mrs. Robin Jones, RN
    Cincinnati, Ohio

75. Dr. Michael Joyce
    Surgeon
    Cleveland, Ohio

76. Rohn Kennington
    Physician
    Springfield, Ohio

77. J. Kick
    RN, Bachelor of Science in Nursing
    (BSN)
    Ashland, Ohio

78. Mrs. Marcine Klopfenstein, RN
    Wauseon, Ohio

79. Dr. Justin Krueger
    Physician

80. Dr. Allen Lewis
    Pediatrician
    Columbus, Ohio

81.  Dr. Timothy Lichter
    Physician
    West Chester, Ohio

82. Dr. Thomas Lieser
    Physician
    Cincinnati, Ohio

83. Mrs. Dana Magoto
    Dental Hygienist
    Troy, Ohio

84. Mrs. Tara Malek
    Nurse (currently unemployed)
    Michigan

85. Dr. Michael Manhart, PhD
(Microbiology)
    Cincinnati, Ohio

86. Dr. James Matheson
    Physician
    Lorain, Ohio

87. Dr. Mary Matias Akhtar
    Physician
    Liberty Twp., Ohio

88. Dr. Brooke Mazza
    Pharmacist (PharmD)
    Galloway, Ohio

89. Mrs. Kathleen McGuire, RN
    Dayton, Ohio

90. Dr. Lindsey Miller
    Physician
    Marysville, Ohio

91. Dr. Ann Moell
    Physician
    Dayton, Ohio

92. Mr. James Mumaw
    EMT & Volunteer Firefighter
    Wadsworth, Ohio

93. Dr. David Mungo
    Orthopedic Surgeon
    Alliance, Ohio

94. Dr. Alan Murnane
    Physician
    Westerville, Ohio

95. Mrs. Cathy Neville, RN
    Lisbon, Ohio

96. Mr. Daniel Newman, RN
    Cincinnati, Ohio

97. Lawrence Nichta
    Psychologist
    Cleveland, Ohio

98. Dr. Mitchell Nutt
    Physician
    Saint Marys, Ohio

99. Mrs. Ann Peacock, RN
    Lebanon, Ohio

100. Ms. Sue Polaski, RN
     Retired (Ohio)

101. Ms. Kari Pooler
     Advanced EMT
     Kenton, Ohio

102. Dr. Harvey Popovich
     Physician
     Waterville, Ohio

103. Dr. Gerald Price
     Physician
     Batavia, Ohio

104. Dr. Lindsay Rerko
     Physician
     Westerville, Ohio

105. Dr. Scott Ricciardi
     Chiropractor
     Calcutta, Ohio

106. Mrs. Virginia Riepenhoff
     Nurse
     Ottawa, Ohio

107. Rev. Ernest Robillard, RN
     S. Kingstown, Rhode Island

108. Lisa Rohrig
     Nurse
     Columbus, Ohio

109. Ms. Barbara Rowlett
     Military Nurse
     Retired (Ohio)

110. Dr. Ryan Schmucker
Physician
University, Ohio

111. Mrs. Barbara Schwendenmann
Pharmacist
Cincinnati, Ohio

112. Dr. Paul Shaniuk
Physician
Cleveland, Ohio

113. Ms. Sandra Soresso
Certified Occupational Therapy Asst.
Cleveland, Ohio

114. Ms. Kathy Speer
Disabled Nurse
Hartville, Ohio

115. Mrs. Colleen Spinks
Nurse
Cleveland, Ohio

116. Mrs. Patricia Stockman, RN
Retired
Huber Heights, Ohio

117. Dr. Raymond Stolarski
Physician
Cincinnati, Ohio

118. Marsha Strominger, RN
Cincinnati, Ohio

119. Dr. Dennis Sullivan
Physician
Beaver Creek, Ohio

120. Dr. Dennis Sullivan
Physician
Beaver Creek. Ohio

121. Dr. Louis Tartaglia
Physician
Beavercreek, Ohio

122. Dr. Alicia Thompson
Physician
Chillicothe, Ohio

123. Dr. Leroy Travers, BA, MD, FRCP(C)
Physician
Retired (Ohio)

124. Dr. Kimberly Vacca
Physician
Sandusky, Ohio

125. Larry Venable
Medical Imaging Service Engineer
Eaton, Ohio

126. Dr. Elmer Wahl
Physician
Mason, Ohio

127. Dr. Gregory Warrell
Medical Physicist
Munster, Indiana

128. Mrs. Sharon Weinsheimer, RN
Akron, Ohio

129. Dr. Dennis Wells
Physician-Surgeon
Cincinnati, Ohio

130. Dr. Thomas Willke
Physician
Cincinnati, Ohio

131. Mrs. Sally Zehnal
Medical Technologist (ASCP)
Hudson, Ohio

132. Mrs. Patricia Zenner, RN
Perrysburg, Ohio

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 16, 2020, a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties registered to receive electronic notice.

*/s/ Philip D. Williamson* (0097174)
Philip D. Williamson

*/s/ Rachel R. Citak* (0099253)
Rachel R. Citak