## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

PRETERM-CLEVELAND, et al.,      :

                                 :

        Plaintiffs,         :     Case No:  1:19-cv-360

                                 :

        v.                        :

                                 :     Hon. Michael Barrett

ATTORNEY GENERAL OF OHIO, et al.,    :

                                 :

        Defendants.       :

---

## BRIEF OF AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN MEDICAL ASSOCIATION, AND OTHER NATIONWIDE ORGANIZATIONS OF MEDICAL PROFESSIONALS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

NICOLE A. SAHARSKY
*Mayer Brown LLP*
1999 K Street, NW
Washington, DC 20006
nsaharsky@mayerbrown.com

CLELAND B. WELTON II
*Mayer Brown Mexico, S.C.*
Goldsmith 53, Polanco
Ciudad de Mexico, 11560
cwelton@mayerbrown.com

KATHLEEN S. MESSINGER
*Mayer Brown LLP*
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
kmessinger@mayerbrown.com

MATTHEW D. BESSER
*Bolek Besser Glesius LLC*
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, OH 44124
(216) 464-3004
mbesser@bolekbesser.com

SKYE L. PERRYMAN
*American College of Obstetricians
  and Gynecologists*
409 12th Street, SW
Washington, DC 20024
sperryman@acog.org

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* certify that no *amicus* is a publicly held corporation, that no *amicus* has a parent company, and that no publicly held corporation owns 10% or more of any *amicus*'s stock.

Dated:  April 16, 2020                    /s/ *Matthew D. Besser*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ............................................................. iii

INTEREST OF *AMICI CURIAE* ....................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

ARGUMENT ........................................................................................ 5

I.     ABORTION IS ESSENTIAL, TIME-SENSITIVE, AND SAFE
HEALTH CARE ........................................................................ 5

II.    ODH'S ORDER WILL MAKE SAFE, LEGAL ABORTION LARGELY
INACCESSIBLE IN OHIO ........................................................ 8

III.   THERE IS NO MEDICAL JUSTIFICATION FOR ODH'S ORDER,
AND IT WILL SEVERELY HARM WOMEN AND MEDICAL
PROFESSIONALS .................................................................. 12

     A.    The COVID-19 Pandemic Does Not Justify Restricting Or
Prohibiting Abortion Care In Ohio ...................................... 12

     B.    The Order Will Harm Women And Pose A Serious Threat To
Medical Professionals In Ohio ............................................ 15

CONCLUSION ................................................................................... 18

APPENDIX .......................................................................................1a

CERTIFICATE OF SERVICE ...........................................................1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*June Medical Services LLC v. Kliebert,*
    250 F. Supp. 3d 27 (M.D. La. 2017) ........................................................................ 8

*Planned Parenthood Center for Choice v. Abbott,*
    No. A-20-CV-323-LY, 2020 WL 1815587 (W.D. Tex. Apr. 9, 2020) ............... 13, 14

*Whole Woman's Health v. Hellerstedt,*
    136 S. Ct. 2292 (2016) ......................................................................................... 7, 8

**Statutes**

Ohio Rev. Code § 2919.123 ..................................................................................... 2, 9

Ohio Rev. Code § 2919.201 ..................................................................................... 3, 9

Ohio Rev. Code § 2929.24(A)(2) .................................................................................. 3

Ohio Rev. Code § 2929.28(A)(2)(a)(ii) ......................................................................... 3

Ohio Rev. Code § 3701.99(C) ....................................................................................... 3

Ohio Rev. Code § 3701.352 ........................................................................................... 3

Ohio Rev. Code § 3702.32(D) ....................................................................................... 3

Ohio Rev. Code § 4731.22(B)(12) ................................................................................. 3

**Other Authorities**

ACOG & Soc'y for Family Planning, *Practice Bulletin Number 143:*
    *Medical Management of First Trimester Abortion* (Mar. 2014) ......................... 7, 8

ACOG, Comm. on Health Care for Underserved Women, *Opinion*
    *Number 613: Increasing Access to Abortion*, 124 Obstetrics &
    Gynecology 1060 (2014) ................................................................................... 11, 16

ACOG, *Guidelines for Women's Health Care: A Resource Manual*
    (4th ed. 2014) ................................................................................................... 6

ACOG, *Induced Abortion: What Complications Can Occur with an*
    *Abortion?* (2015) ............................................................................................... 6

ACOG, *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020) ........................................................................ 4, 5, 9, 12

ACOG, *Statement of Policy, Abortion* (reaffirmed 2017) ........................................ 5, 9

Am. Coll. of Surgeons, *COVID-19 Guidelines for Triage of Gynecology Patients* (Mar. 24, 2020) .............................................................. 4, 5, 9, 12

Am. Med. Ass'n, *AMA Statement on Government Interference in Reproductive Health Care* (Mar. 30, 2020) .................................................. 4, 5, 9, 12

Michelle J. Bayefsky et al., *Abortion During the Covid-19 Pandemic – Ensuring Access to an Essential Health Service*, New Eng. J. Med (Apr. 9, 2020) ........................................................................... 12, 14

Jonathan Bearak et al., *COVID-19 Abortion Bans Would Greatly Increase Driving Distances for Those Seeking Care,* Guttmacher Institute (updated Apr. 8, 2020) ........................................................... 8, 10

M. Antonia Biggs et al., *Women's Mental Health and Well-Being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study*, 74 JAMA Psychiatry 169 (2017) .............................. 12

Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19) – Travel in the US* ............................................................... 14

Gov. Mike DeWine, *COVID-19 Update* (Mar. 26, 2020) ............................................ 2, 17

Editors of the *New England Journal of Medicine* et al., *The Dangerous Threat to* Roe v. Wade, 381 New Eng. J. Med. 979 (2019) ............................ 5

Liza Fuentes et al., *Texas Women's Decisions and Experiences Regarding Self-Managed Abortion*, BMC Women's Health (2020) ........................ 11

Daniel Grossman et al., *Knowledge, Opinion and Experience Related to Abortion Self-Induction in Texas*, Tex. Policy Evaluation Project, Research Brief (2015) ................................................................... 11

Guttmacher Inst., *Counseling and Waiting Periods for Abortion* (2020) ................. 10

Guttmacher Inst., *State Facts About Abortion: Ohio* (2020) ..................................... 6

Lisa H. Harris & Daniel Grossman, *Complications of Unsafe and Self-Managed Abortion*, 382 New Eng. J. Med. 1029 (2020) .......................... 11

Tara C. Jatlaoui et al., *Abortion Surveillance – United States 2015*, 67 Morbidity & Mortality Weekly Rep. 1 (2018) ...................................... 7, 13

iv

Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 Perspectives on Sexual & Reprod. Health 17 (2017) .............................................................................. 7, 13

Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 Am. J. Pub. Health 1904 (2017) ............................................................... 6

Rachel K. Jones & Kathryn Kooistra, *Abortion Incidence and Access to Services in the United States, 2008*, 43 Perspectives on Sexual & Reprod. Health 41 (2011) ................................................................... 6, 13

Rachel K. Jones et al., *Abortion Incidence and Service Availability in the United States, 2017* (2019) ....................................................... 5, 7, 16

Theodore Joyce, *The Supply-Side Economics of Abortion*, 365 New Eng. J. Med. 1466 (2011) ........................................................................... 6, 13

Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (updated Apr. 7, 2020) ............................................ 14

National Academies of Sciences, Engineering, & Medicine, *The Safety and Quality of Abortion Care in the United States* (2018) .............................. 6, 7, 9

Ohio Dep't of Health, *Order for the Management of Non-Essential Surgeries and Procedures Throughout Ohio* (Mar. 17, 2020) ................ 2, 3, 12, 16

Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (2012) ......................................................... 6

Elizabeth G. Raymond et al., *Mortality of Induced Abortion, Other Outpatient Surgical Procedures and Common Activities in the United States*, 90 Contraception 476 (2014) ........................................................ 11

Sarah C.M. Roberts et al., *Association of Facility Type with Procedural-Related Morbidities and Adverse Events Among Patients Undergoing Induced Abortions*, 319 JAMA 2497 (2018) ....................................... 7

Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175 (2015) .................................................................................................. 6

Ushma D. Upadhyay et al., *Incidence of Post-Abortion Complications and Emergency Department Visits Among Nearly 55,000 Abortions Covered by the California Medi-Cal Program* (Jan. 28, 2014) .............................. 13

v

Kari White et al., *Complications from First Trimester Aspiration Abortion: A Systematic Review of the Literature*, 92 Contraception 422 (2015) ............................................................................................... 6, 7

Kari White et al., *The Potential Impacts of Texas' Executive Order on Patients' Access to Abortion Care*, Tex. Policy Evaluation Project, Research Brief (2020) ........................................................................................ 10

## INTEREST OF *AMICI CURIAE*

*Amici* are nationwide, non-partisan organizations of leading medical professionals and experts in the United States. They represent the doctors and nurses who are on the front lines caring for patients and fighting the COVID-19 pandemic, at great personal cost. *Amici*'s members are directly affected by the COVID-19 crisis and the attendant shortages of hospital resources and personal protective equipment (PPE). A full list of *amici* is provided in the appendix to this brief.[1]

*Amici* submit this brief to provide the medical community's perspective on the March 17, 2020, order from the Ohio Department of Health (ODH). That order significantly limits access to abortion care in the state during the COVID-19 pandemic. It is the consensus of the nation's medical experts that the COVID-19 pandemic does not justify restricting or prohibiting abortion care. In fact, ODH's order will increase, rather than decrease, use of hospital resources and PPE. And it will not help stop the spread of COVID-19. At the same time, the order poses a severe threat to the health and well-being of women in Ohio. In sum, the order is contrary to the considered judgment of the medical community.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The ODH's order broadly restricts abortion in Ohio during the COVID-19 pandemic. *Amici* are leading societies of medical professionals, whose policies represent the considered judgment of many health care professionals in this country. *Amici*

---

[1] No counsel for a party authored this brief in whole or in part, and no entity or person, other than *amici curiae*, their members, and their counsel, made a monetary contribution to the preparation or submission of this brief.

recognize that reproductive health care is critical to a woman's overall health and that access to abortion is an important component of reproductive health care. *Amici's* position is that laws that regulate abortion should be supported by valid medical justifications. ODH's order lacks a valid medical justification. If allowed to go into effect, it will render abortion largely inaccessible in the state and will severely harm women. It also will severely chill doctors, by subjecting them to criminal penalties for providing necessary medical care. And rather than promote public health, the order will lead to increased use of hospital resources and PPE and the further spread of COVID-19.

On March 17, 2020, ODH issued an order prohibiting "all non-essential surgeries and procedures."[2] The Governor interpreted the order to ban all procedural abortions except in cases of emergency,[3] and the Attorney General has ordered Ohio abortion providers to immediately stop performing those abortions.[4] That is, according to Governor and Attorney General, the order permits medication abortions, which are available through the tenth week of a pregnancy,[5] but prohibits non-emergency abortions after that point. For women for whom medication abortion is medically inappropriate, the order operates as a complete ban on non-emergency abortions.[6] In the course of this litigation, state officials have suggested that a woman also may be

---

[2] Ohio Dep't of Health, *Order for the Management of Non-Essential Surgeries and Procedures Throughout Ohio* 4 (Mar. 17, 2020) (ODH Order), https://perma.cc/2NSS-HYPJ.

[3] *See* Gov. Mike DeWine, *COVID-19 Update* (Mar. 26, 2020) (*COVID-19 Update*), https://perma.cc/CC6S-64M6.

[4] Liner Decl. Ex. F, Dkt. No. 42-1 (Mar. 30, 2020); France Decl. Ex. B, Dkt. No. 42-2 (Mar. 30, 2020); Haskell Decl. Ex. B, Dkt. No. 42-4 (Mar. 30, 2020).

[5] *See* Ohio Rev. Code § 2919.123.

[6] *See* Liner Decl. ¶ 27, Dkt. No. 42-1 (Mar. 30, 2020).

allowed to have an abortion if she is about to reach 20 weeks – the point at which she would no longer be able to obtain a non-emergency abortion under Ohio law.[7]

Thus, ODH's order (as newly interpreted in the state officials' brief) appears to ban all non-emergency abortions between the tenth week of a pregnancy and approximately the twentieth week. It also means that women in Ohio who are not appropriate candidates for medication abortion cannot obtain abortion until they approach 20 weeks' gestation. Suffice it to say, ODH's order significantly limits a woman's right to obtain abortion care during the COVID-19 pandemic.

The stated purpose of the order is to preserve hospital resources and PPE.[8] The order will remain in effect until the Governor lifts Ohio's state of emergency or the Director of ODH modifies or rescinds the order.[9]

Failure to comply with the order can have very serious consequences. Physicians and medical professionals who violate the order may be subject to criminal penalties, including up to a $750 fine and 90 days of imprisonment per violation.[10] Violators also are subject to discipline by the ODH and revocation of their professional and facility licenses.[11]

---

[7]    Resp. to Mot. for Preliminary Injunction 3, Dkt. No. 59 (Apr. 8, 2020) ("Abortion providers can perform surgical abortions necessary for a mother's health or life, and also surgical abortions that cannot be delayed without jeopardizing the patient's abortion rights."); *see* Ohio Rev. Code § 2919.201.
[8]    ODH Order 4 ("The Order is issued for the purposes of preserving personal protective equipment (PPE) and critical hospital capacity and resources within Ohio.")
[9]    *Id.*
[10]    *See* Ohio Rev. Code §§ 3701.352, 3701.99(C) (violation of ODH order is a second-degree misdemeanor); *id.* § 2929.24(A)(2) (second-degree misdemeanor punishable by jail term up to 90 days); *id.* § 2929.28(A)(2)(a)(ii) (second-degree misdemeanor punishable by $750 fine).
[11]    *See id.* § 3702.32(D) (facility found to violate ODH rule may face license revocation); *id.* § 4731.22(B)(12) (commission of misdemeanor subjects violator to license revocation).

3

The ODH's order is contrary to the considered judgment of the country's leading physician organizations, including guidance from the American Medical Association, the American College of Obstetricians and Gynecologists, and the American College of Surgeons.[12] The state's limitations on abortion are not supported by accepted medical practice or scientific evidence. There is a broad medical consensus that abortion is essential health care, accessed by at least one-quarter of women in the United States during their lifetimes. There is no evidence that prohibiting procedural abortion during the pandemic will mitigate PPE shortages or promote public health and safety.

The order will severely limit safe abortion in Ohio. Abortion care will be delayed or, in some cases, denied altogether. Some women will travel long distances to go out of state to obtain abortion care. And some women likely will resort to unsafe methods of abortion.

*Amici's* members are on the front lines caring for patients, at great personal risk. They understand that the COVID-19 pandemic is a public health crisis that requires the full attention and resources of our health care system. But the COVID-19 pandemic does not justify restricting abortion care in Ohio. Most abortions do not require use of any hospital resources and use only minimal PPE. Indeed, the order is likely to increase, rather than decrease, burdens on hospitals and use of PPE, as

---

[12] Am. Coll. of Obstetricians & Gynecologists (ACOG), *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18, 2020) (*ACOG Joint Statement*), https://perma.cc/52S9-LHUA; Am. Coll. of Surgeons, *COVID-19 Guidelines for Triage of Gynecology Patients* (Mar. 24, 2020) (*American College of Surgeons Statement*), https://perma.cc/4KXE-24KY; Am. Med. Ass'n, *AMA Statement on Government Interference in Reproductive Health Care* (Mar. 30, 2020) (*AMA Statement*), https://perma.cc/2YZR-2UXT.

well as increase interstate travel.  At the same time, the order will severely impair essential health care for women, while placing doctors, nurses, and other medical professionals in an untenable position by criminalizing necessary medical care.

The Court should grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

## I.  ABORTION IS ESSENTIAL, TIME-SENSITIVE, AND SAFE HEALTH CARE

Abortion is an essential component of comprehensive health care.  Like all medical matters, decisions regarding abortion should be made by patients in consultation with their physicians and health care professionals and without undue interference from outside parties.[13]  The medical community recognizes that "[a]ccess to legal and safe pregnancy termination . . . is essential to the public health of women everywhere."[14]

Abortion also is a common medical procedure.  In 2017, medical professionals performed over 860,000 abortions nationwide,[15] including approximately 20,630 in

---

[13]  ACOG, *Statement of Policy, Abortion* (reaffirmed 2017) (*ACOG Abortion Policy*), https://perma.cc/73RA-RMUK.

[14]  Editors of the *New England Journal of Medicine* et al., *The Dangerous Threat to* Roe v. Wade, 381 New Eng. J. Med. 979, 979 (2019) (stating the view of the editors, along with several key organizations in obstetrics, gynecology, and maternal-fetal medicine, including the American Board of Obstetrics and Gynecology); *see ACOG Joint Statement*; *American College of Surgeons Statement; AMA Statement.*

[15]  Rachel K. Jones et al., *Abortion Incidence and Service Availability in the United States*, 2017, at 7 (2019) (Abortion Incidence 2017).

Ohio.[16]  Approximately one-quarter of American women will have an abortion before the age of 45.[17]

Abortion is one of the safest medical procedures performed in the United States, and the vast majority (95%) of abortions are performed in clinics or doctor's offices, not in hospitals.[18]  Complication rates from abortion are extremely low – even lower than other common medical procedures.[19]  Most complications are relatively minor and can be easily treated at a clinic and/or with antibiotics.[20]

Major complications from abortion are exceptionally rare, occurring in just 0.23 to 0.50 percent of cases, depending on the method used.[21]  The risk of death from abortion is even rarer.  Nationally, fewer than one in 100,000 patients die from abortion-related complications.[22]  The risk of death associated with childbirth is approximately fourteen times higher than the risk associated with abortion.[23]

---

[16]  Guttmacher Inst., *State Facts About Abortion: Ohio* (2020), https://perma.cc/L9JP-4Z65.

[17]  Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 Am. J. Pub. Health 1904, 1908 (2017).

[18]  *See, e.g.*, Rachel K. Jones & Kathryn Kooistra, *Abortion Incidence and Access to Services in the United States, 2008*, 43 Perspectives on Sexual & Reprod. Health 41, 42 (2011) (*Abortion Incidence 2008*); Theodore Joyce, *The Supply-Side Economics of Abortion*, 365 New Eng. J. Med. 1466, 1467 (2011) (Joyce); National Academies of Sciences, Engineering, & Medicine, *The Safety and Quality of Abortion Care in the United States* 10 (2018) (*Safety and Quality of Abortion Care*).

[19]  *Safety and Quality of Abortion Care* 10, 36 ("legal abortions in the United States . . . are safe and effective," and "[s]erious complications are rare," affecting fewer than 1% of patients); *see id.* at 51-68.

[20]  *See* Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 181 (2015); *Safety and Quality of Abortion Care* 60, 116; ACOG, *Induced Abortion: What Complications Can Occur with an Abortion?* (2015), https://perma.cc/DFU5-WL5D.

[21]  Kari White et al., *Complications from First Trimester Aspiration Abortion: A Systematic Review of the Literature*, 92 Contraception 422, 434, 435 tbl. 7 (2015) (White).

[22]  Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216 (2012) (Raymond & Grimes); *see* ACOG, *Guidelines for Women's Health Care: A Resource Manual* 719 (4th ed. 2014).

[23]  Raymond & Grimes 216.

State officials have interpreted ODH's order to permit medication abortion. Medication abortion is a safe and effective option for most women up through the tenth week of pregnancy.[24]  For medication abortions, patients typically take the medication to complete the procedure at home.[25]  For some women, medication abortion is not medically appropriate because of underlying health conditions or other factors.[26]

After ten weeks, patients receive procedural abortions, which commonly are performed in clinics or doctor's offices, as opposed to hospitals.[27]  The safety of abortions performed in office settings is equivalent to those performed in hospital settings.[28]  (ODH's order now bans those abortions in Ohio, except in very limited circumstances.)

The overwhelming weight of medical evidence conclusively demonstrates that abortion is an extremely safe, common medical procedure.  The Supreme Court made just that point in *Whole Woman's Health v. Hellerstedt*, when it noted that "[t]he great weight of evidence demonstrates that," before Texas enacted certain regulations,

---

[24]  *See Safety and Quality of Abortion Care* 10, 51-55.

[25]  Tara C. Jatlaoui et al., *Abortion Surveillance – United States 2015*, 67 Morbidity & Mortality Weekly Rep. 1, 33 tbl. 11 (2018) (Jatlaoui); Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 Perspectives on Sexual & Reprod. Health 17, 24 tbl. 5 (2017) (*Abortion Incidence 2014*).

[26]  *See* ACOG & Soc'y of Family Planning, *Practice Bulletin No. 143: Medical Management of First-Trimester Abortion* 6 (Mar. 2014) (*ACOG Practice Bulletin 143*), https://perma.cc/5B6K-2HY3; *see also* Liner Decl. ¶ 27, Dkt. No. 42-1 (Mar. 30, 2020).

[27]  *Abortion Incidence 2017*.

[28]  Sarah C.M. Roberts et al., *Association of Facility Type with Procedural-Related Morbidities and Adverse Events Among Patients Undergoing Induced Abortions*, 319 JAMA 2497, 2505 (2018); White 440; *see Safety and Quality of Abortion Care* 10, 73, 79.

7

"abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure."[29]

While abortion is a safe and common medical procedure, it is also a time-sensitive one for which a delay may increase the risks or potentially make it completely inaccessible. The consequences of being unable to obtain an abortion profoundly impact a person's life, health, and well-being.

## II. ODH'S ORDER WILL MAKE SAFE, LEGAL ABORTION LARGELY INACCESSIBLE IN OHIO

ODH's order will lead to abortion care being delayed or denied. As of 2017, there were only nine abortion clinics in the entire state of Ohio, serving some 2.2 million women of reproductive age.[30] If Ohio doctors and medical professionals must forgo all non-emergency procedural abortions, many patients will not be able to obtain appropriate abortion care. According to the state officials, any woman who is ineligible for medication abortion – either because she is not a good candidate for medication abortion under accepted clinical guidance,[31] or because she is more than

---

[29]  136 S. Ct. 2292, 2302 (2016) (quoting district court's order); *see June Medical Services LLC v. Kliebert*, 250 F. Supp. 3d 27, 61 (M.D. La. 2017) ("Abortion is one of the safest medical procedures in the United States."), *rev'd*, 905 F.3d 787 (5th Cir. 2018), *cert. granted*, 140 S. Ct. 35 (2019) (No. 18-1323) (argued Mar. 4, 2020).

[30]  *See* Jonathan Bearak et al., *COVID-19 Abortion Bans Would Greatly Increase Driving Distances for Those Seeking Care,* Guttmacher Institute (Apr. 2, 2020) (Bearak), https://perma.cc/Z2UA-NTP7.

[31]  Contraindications for medication abortion include confirmed or suspected ectopic pregnancy, intrauterine device (IUD) in place, current long-term systemic corticosteroid therapy, chronic adrenal failure, known coagulopathy or anticoagulant therapy, and intolerance or allergy to mifepristone. Most clinical trials also have excluded women with severe liver, renal, or respiratory disease or uncontrolled hypertension or cardiovascular disease (angina, valvular disease, arrhythmia, or cardiac failure). Women also are not good candidates for medical abortion if they are unable or unwilling to adhere to care instructions, desire quick completion of the abortion process, are not available for follow-up contact or evaluation, or cannot understand the instructions because of language or comprehension barriers. *ACOG Practice Bulletin 143*, at 6.

ten weeks pregnant[32] – cannot obtain an abortion, unless she waits until she is approaching the 20-week mark and manages to obtain an abortion from one of the few providers before she passes that mark.[33]

Delays in obtaining abortion care can compromise patients' health. Abortion should be performed as early as possible because, although abortion procedures are among the safest medical procedures, the associated rate of complications increases as the pregnancy progresses.[34] It is relatively safer for a woman to obtain abortion care earlier in pregnancy than later. This is one of the reasons the nation's leading medical experts oppose orders (like the one here) that delay abortion care during the COVID-19 pandemic.[35] The state officials' position that women should wait until they are as close as possible to the point at which they can no longer obtain an abortion in Ohio (20 weeks), and then rush to obtain an abortion, makes no sense and actually increases the risks to the patients.

Further, many women face resource constraints, work schedules, and family demands that make it difficult or impossible to plan to seek abortion care during a narrow window of time. For women who face barriers to access due to lack of resources, requiring that an abortion procedure be delayed until she is approaching 20 weeks of pregnancy could mean, as a practical matter, that the woman will not be able to obtain abortion care. ODH's order harms these women by conditioning their access to abortion based on their ability to obtain care within arbitrary time periods.

---

[32] *See* Ohio Rev. Code § 2919.123.
[33] *See* Ohio Rev. Code § 2919.201.
[34] *Safety and Quality of Abortion Care* 75; *see ACOG Abortion Policy*.
[35] *See ACOG Joint Statement*; *American College of Surgeons Statement*; *AMA Statement*.

9

As a result of the order, some women will travel out of state in order to attempt to obtain abortion care.  One recent study concluded that if Ohio were to shut down legal abortion care (as ODH's order does in most cases after ten weeks), "[t]he average (median) one-way driving distance to an abortion clinic for a woman of reproductive age in Ohio would increase from 15 miles to 120 miles (or 700% longer)."[36]  While the out-of-state travel itself poses an undue burden on women seeking abortion care, each of Ohio's five neighboring states also imposes a waiting period of 18 hours or more.[37]  Two of those states (Indiana and Kentucky) also require a mandatory in-person consultation visit, necessitating two separate visits to the same facility.[38]

For many women, especially low-income women, "[i]t is often difficult . . . to make the necessary arrangements to travel to a clinic, especially one that is far away.  Finding child care, taking time off work and covering the cost of gas increase patients' out-of-pocket expenses and are logistically challenging to arrange."[39]  And out-of-state travel may be particularly challenging as a result of COVID-19 because of "economic uncertainty from lost wages and need to care for children who are at home."[40]

ODH's order will also likely cause some women to resort to unsafe methods of care.  Studies have found that women are more likely to self-induce abortions when

---

[36]  Bearak.

[37]  *See* Guttmacher Inst., *Counseling and Waiting Periods for Abortion* (2020), https://perma.cc/TW5C-ZNBJ.

[38]  *See id.*

[39]  *See* Kari White et al., *The Potential Impacts of Texas' Executive Order on Patients' Access to Abortion Care*, Tex. Policy Evaluation Project, Research Brief 3 (2020), https://perma.cc/5V3F-25UK.

[40]  *Id.*

they face barriers to reproductive services.[41]  For example, from 2011 to 2013, Texas severely curtailed the ability to obtain abortion care, leading to sharp declines in abortions performed in that state.[42]  A study that surveyed Texas women seeking abortions in 2013 concluded that "self-managed abortion may become more common if clinic-based abortion care becomes more difficult to access," especially "among poor women – who make up more than half of all abortion patients."[43]

In Ohio, many women will not have the means to travel out of state for abortion care, which increases the likelihood that they will attempt to self-induce abortion or seek an illegal abortion.[44]  Methods of self-induction may rely on harmful tactics such as herbal or homeopathic remedies, getting punched in the abdomen, using alcohol or illicit drugs, or taking hormonal pills.[45]

Finally, evidence suggests that women are more likely to experience short-term psychological issues when denied an abortion.  For example, women denied

---

[41] *See, e.g.*, Lisa H. Harris & Daniel Grossman, *Complications of Unsafe and Self-Managed Abortion*, 382 New Eng. J. Med. 1029, 1029 (2020).

[42] Liza Fuentes et al., *Texas Women's Decisions and Experiences Regarding Self-Managed Abortion*, BMC Women's Health 2 (2020).

[43] *Id.* at 11.

[44] *See* ACOG, Comm. on Health Care for Underserved Women, *Opinion Number 613: Increasing Access to Abortion*, 124 Obstetrics & Gynecology 1060, 1061-62 (2014) (*ACOG Opinion 613*); Elizabeth G. Raymond et al., *Mortality of Induced Abortion, Other Outpatient Surgical Procedures and Common Activities in the United States*, 90 Contraception 476, 478 (2014).

[45] Daniel Grossman et al., *Knowledge, Opinion and Experience Related to Abortion Self-Induction in Texas*, Tex. Policy Evaluation Project, Research Brief 3 (2015).

abortions because of gestational age bans are more likely to report short-term symptoms of anxiety than those women who received an abortion.[46]  Accordingly, restrictions on abortion, such as those at issue here, are detrimental to women's physical and psychological health and well-being.

## III.    THERE IS NO MEDICAL JUSTIFICATION FOR ODH'S ORDER, AND IT WILL SEVERELY HARM WOMEN AND MEDICAL PROFESSIONALS

### A.    The COVID-19 Pandemic Does Not Justify Restricting Or Prohibiting Abortion Care In Ohio

It is the consensus of the nation's medical experts that the COVID-19 pandemic does not justify restricting or prohibiting abortion care.[47]  The state officials have sought to justify the order's restrictions on abortion by claiming that they will reduce demands on hospital resources and preserve PPE.[48]  The order will not further those goals; instead, it will make the problem worse.[49]

Permitting abortion care – which is essential, time-sensitive health care – will not substantially increase the burdens hospitals face as a result of the COVID-19

---

[46]   M. Antonia Biggs et al., *Women's Mental Health and Well-Being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study*, 74 JAMA Psychiatry 169, 172 (2017).

[47]   *ACOG Joint Statement* (ACOG and several other medical organizations "do not support COVID-19 responses that cancel or delay abortion procedures."); *American College of Surgeons Statement* (listing "[p]regnancy termination (for medical indication or patient request)" as a "[s]urger[y] that if significantly delayed could cause significant harm"); *AMA Statement* (In response to states issuing orders "ban[ning] or dramatically limit[ing] women's reproductive health care," the AMA's view is that "physicians – not politicians – should be the ones deciding which procedures are urgent-emergent and need to be performed, and which ones can wait, in partnership with our patients.").

[48]   *See* ODH Order 4.

[49]   *See, e.g.*, Michelle J. Bayefsky et al., *Abortion During the Covid-19 Pandemic – Ensuring Access to an Essential Health Service*, New Eng. J. Med (Apr. 9, 2020) (Bayefsky), https://perma.cc/X88X-UYHG.

pandemic. The vast majority of abortions are performed in non-hospital settings.[50] And very, very few abortions result in complications that require hospitalization.[51] Because most abortion care is delivered in outpatient settings, providing abortion care almost never requires hospital resources, including hospital PPE.

In particular, procedural abortions rarely use hospital resources and require only minimal PPE. They typically are performed in outpatient settings, and typically only use gloves, a surgical mask (not an N95 face mask), reusable eyewear, and disposable and/or washable outerwear.[52] Absent unusual circumstances (such as a patient suspected of having contracted COVID-19), procedural abortion does not require use of the PPE most needed to fight the COVID-19 pandemic, such as N95 face masks.[53]

ODH's order thus does not further its stated goals. And in fact, it does the opposite. Effectively banning abortion will increase reliance on the health care system and use of PPE. Pregnant women remain in the health care system. They often visit hospitals (including emergency rooms) for evaluation, thus using hospital bed space and resources. Most women also give birth in hospitals, and some births even require surgery. Each of these events will require hospital resources, including PPE.

---

[50]   Jatlaoui 33 tbl. 11; Joyce 1467; *see Abortion Incidence 2014*, at 24 tbl. 5; *Abortion Incidence 2008*, at 42.

[51]   Ushma D. Upadhyay et al., *Incidence of Post-Abortion Complications and Emergency Department Visits Among Nearly 55,000 Abortions Covered by the California Medi-Cal Program* slide 28 (Jan. 28, 2014), https://perma.cc/Y4NJ-WM7Q.

[52]   *See* Liner Decl. ¶ 7, Dkt. No. 42-1 (Mar. 30, 2020); France Decl. ¶ 8, Dkt. No. 42-2 (Mar. 30, 2020); Krishen Decl. ¶ 10, Dkt. No. 42-3 (Mar. 30, 2020); Haskell Decl. ¶ 10, Dkt. No. 42-4 (Mar. 30, 2020); Burkons Decl. ¶ 10, Dkt. No. 42-5 (Mar. 30, 2020).

[53]   *See, e.g.*, *Planned Parenthood Center for Choice v. Abbott*, No. A-20-CV-323-LY, 2020 WL 1815587, at *4 (W.D. Tex. Apr. 9, 2020) ("Abortion providers generally do not use N95 masks").

As one district court recently explained, "[p]regnant women prevented from accessing abortion will still require medical care," and "delaying access to abortion will not conserve PPE" or "hospital resources."[54]

Forcing patients to wait until later gestational ages to have an abortion also will not further the state's stated goals. While abortion is incredibly safe, the relative risk of complications increases as pregnancy progresses. Accordingly, the state's decision to ban abortion in earlier stages of pregnancy (from 10 to 20 weeks) but then permit it at the end of the gestational age range for which abortion is legal in Ohio will do nothing to reduce reliance on the health care system or reduce the possibility of complications requiring intervention.

Further, women who attempt unsafe, unmanaged abortions may require emergency hospitalization. That could use significant hospital resources, including PPE. And for the few women who may have the resources to travel to another state to obtain an abortion, there is no evidence that abortions in other states would utilize less medical equipment than abortions in Ohio. Further, travel is a factor that contributes to the spread of COVID-19.[55] Many Governors have issued "shelter-in-place" orders that prevent people from even leaving their homes, except in certain narrow circumstances, to reduce the spread of COVID-19.[56]

---

[54] *Planned Parenthood*, 2020 WL 1815587, at *4; *see* Bayefsky (pregnancy "could lead to much more contact with clinicians and greater need for PPE, thereby increasing risks to both patients and staff").

[55] Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19) – Travel in the US* (last reviewed Mar. 30, 2020), https://perma.cc/2QA7-TL9M; *see Planned Parenthood*, 2020 WL 1815587, at *5 ("long-distance travel" to obtain abortion "increases an individual's risk of contracting COVID-19").

[56] *See, e.g.*, Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (updated Apr. 7, 2020), https://perma.cc/V58G-67GK.

The state officials concede that this abortion ban "will increase the need for hospital treatment in the long run," but insist that it is justified by short-term benefits.[57] That is wrong. Many women will continue using healthcare resources in the short-term if they are denied abortion care: They will either attempt to self-induce abortion (risking injury and hospitalization), or they will travel out of state (risking intercommunity transmission and still using abortion services), or they will remain pregnant and require prenatal care. Each of those alternatives to timely, local, and professional abortion care will increase the demand for PPE and other hospital resources.

*Amici* are on the front lines of the COVID-19 pandemic. Their members are caring for patients every day in trying circumstances and in cases where they have not been provided adequate PPE or testing. *Amici* recognize the importance of conserving hospital and PPE resources during this critical time. But banning procedural abortion, or forcing women to delay care until later gestational ages, will not preserve or mitigate shortages of hospital resources and PPE that the nation's medical professionals need to care for people during the pandemic. There is simply no evidence or logic under which that would be the case.

**B.  The Order Will Harm Women And Pose A Serious Threat To Medical Professionals In Ohio**

ODH's order essentially bans non-emergency procedural abortions in the state, which will increase the likelihood that women will delay the procedure or will not be

---

[57]  Resp. to Mot. for Preliminary Injunction 21, 23, Dkt. No. 59 (Apr. 8, 2020) (internal quotation marks omitted).

able to obtain the procedure at all. As discussed, the order means women may travel outside the state to obtain abortions, attempt to self-induce abortions through potentially harmful methods, or ultimately be unable to obtain abortions at all, forcing them to carry an unwanted pregnancy to term.[58] Each of these outcomes increases the likelihood of negative consequences to a woman's physical and psychological health that could be avoided if abortion services were available.[59] Being forced to carry a pregnancy to term could profoundly affect a person's life, health, and well-being.

The order also poses serious threats to physicians and medical professionals. Now, in addition to fighting the COVID-19 pandemic, doctors and medical professionals must try to figure out how they can continue providing care without violating the order and worry about the state criminally prosecuting them for doing their jobs. Under the order, doctors, nurses, and other medical professionals who perform abortion care that is constitutionally protected and medically necessary could lose their licenses and even be subject to criminal penalties. Those are draconian sanctions to place on individuals who are only attempting to offer the best possible care to their patients.

Finally, ODH's order further burdens women and medical professionals for an additional reason: It is far too vague and uncertain. The order on its face prohibits only "non-essential surgeries and procedures."[60] The Governor and Attorney General

---

[58] *See, e.g., Abortion Incidence 2017*, at 3, 8.
[59] *See, e.g., ACOG Opinion 613*.
[60] ODH Order 4.

16

has interpreted it to prohibit all non-medication (procedural) abortions, meaning all abortions after ten weeks, except in cases of emergency.[61]  In their most recent brief to this Court, the state officials have attempted to qualify the order's reach by suggestion that a woman could obtain an abortion after 10 weeks if the abortion "cannot be delayed without jeopardizing the patient's abortion rights."[62]  This appears to mean that a woman may obtain an abortion if she is nearing the 20-week point.

The state officials' new qualification raises more questions than it answers:  Is this an authoritative constructive of state law, or merely a convenient litigating position?  How could it be enforced?  At what point in the 10- to 20-week "ban" period is does a woman get close enough to 20 weeks that she may obtain an abortion?  May a doctor perform a procedure at 20 weeks minus three days?  At 19 weeks?  At 18 weeks?  What if the patient is at 16 weeks, and the doctor expects the COVID-19 emergency to last at least another 4 weeks?  Doctors and their patients should not be forced to make these judgment calls, under threat of criminal punishment if they guess wrong about how ODH's order will be enforced.

* * * * *

Abortion is essential health care for women, protected by the Constitution.  No valid medical justification supports ODH's order.  *Amici* urge this Court to grant Plaintiffs' motion for a preliminary injunction.

---

[61]  *See COVID-19 Update*; Liner Decl. Ex. F, Dkt. No. 42-1 (Mar. 30, 2020); France Decl. Ex. B, Dkt. No. 42-2 (Mar. 30, 2020); Haskell Decl. Ex. B, Dkt. No. 42-4 (Mar. 30, 2020),.
[62]  Resp. to Mot. for Preliminary Injunction 3, Dkt. No. 59 (Apr. 8, 2020).

## CONCLUSION

The motion for a preliminary injunction should be granted.

Respectfully submitted,

/s/ Matthew D. Besser

NICOLE A. SAHARSKY
*Mayer Brown LLP*
1999 K Street, NW
Washington, DC 20006
nsaharsky@mayerbrown.com

CLELAND B. WELTON II
*Mayer Brown Mexico, S.C.*
Goldsmith 53, Polanco
Ciudad de Mexico, 11560
cwelton@mayerbrown.com

KATHLEEN S. MESSINGER
*Mayer Brown LLP*
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
kmessinger@mayerbrown.com

MATTHEW D. BESSER
*Bolek Besser Glesius LLC*
Monarch Centre, Suite 302
5885 Landerbrook Drive
Cleveland, OH 44124
(216) 464-3004
mbesser@bolekbesser.com

SKYE L. PERRYMAN
*American College of Obstetricians*
  *and Gynecologists*
409 12th Street, SW
Washington, DC 20024
sperryman@acog.org

## APPENDIX

## LIST OF *AMICI CURIAE*

1.    The **American College of Obstetricians and Gynecologists** (ACOG) is the nation's leading group of physicians providing health care for women. With more than 60,000 members – representing more than 90 percent of all obstetricians-gynecologists in the United States – ACOG advocates for quality health care for women, maintains the highest standards of clinical practice and continuing education of its members, promotes patient education, and increases awareness among its members and the public of the changing issues facing women's health care. ACOG is committed to ensuring access to the full spectrum of evidence-based quality reproductive health care, including abortion care, for all women. ACOG opposes medically unnecessary laws or restrictions that serve to delay or prevent care. ACOG has previously appeared as *amicus curiae* in various courts throughout the country. ACOG's briefs and guidelines have been cited by numerous courts as providing authoritative medical data regarding childbirth and abortion.

2.    The **American Medical Association** (AMA) is the largest professional association of physicians, residents, and medical students in the United States. Additionally, through state and specialty medical societies and other physician groups seated in the AMA's House of Delegates, substantially all U.S. physicians, residents, and medical students are represented in the AMA's policymaking process. The objectives of the AMA are to promote the science and art of medicine and the betterment of public health. AMA members practice in all fields of medical specialization and in

every state.  The federal courts have cited the AMA's publications and *amicus curiae* briefs in cases implicating a variety of medical questions.

3.    The **American Academy of Family Physicians** (AAFP) is the national medical specialty society representing family physicians.  Founded in 1947 as a not-for-profit corporation, its 134,600 members are physicians and medical students from all 50 states, the District of Columbia, Guam, Puerto Rico, the Virgin Islands, and the Uniformed Services of the United States.  AAFP seeks to improve the health of patients, families, and communities by advocating for the health of the public and serving the needs of its members with professionalism and creativity.

4.    The **American Academy of Nursing** (Academy) serves the public by advancing health policy through the generation, synthesis, and dissemination of nursing knowledge.  Academy Fellows are inducted into the organization for their extraordinary contributions to improve health locally and globally.  With more than 2,800 Fellows, the Academy represents nursing's most accomplished leaders in policy, research, administration, practice, and academia.

5.    The **American Academy of Pediatrics** (AAP) is a non-profit professional organization founded in 1930 dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults.  Its membership is comprised of 67,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists.  AAP has become a powerful voice for child and adolescent health through education, research, advocacy, and the provision of expert advice.  AAP has worked with the federal and state governments, health care providers, and parents

2a

on behalf of America's families to ensure the availability of safe and effective reproductive health services.

6.　　The **American College of Osteopathic Obstetricians and Gynecologists** (ACOOG) is a non-profit, non-partisan organization committed to excellence in women's health representing over 2,500 providers. ACOOG educates and supports osteopathic physicians to improve the quality of life for women by promoting programs that are innovative, visionary, inclusive, and socially relevant. ACOOG is likewise committed to the physical, emotional, and spiritual health of women.

7.　　The **American Osteopathic Association** (AOA) represents more than 151,000 osteopathic physicians (DOs) and osteopathic medical students; promotes public health; encourages scientific research; serves as the primary certifying body for DOs; and is the accrediting agency for osteopathic medical schools. As the primary certifying body for DOs and the accrediting agency for all osteopathic medical schools, the AOA works to accentuate the distinctiveness of osteopathic principles and the diversity of the profession.

8.　　The **American Psychiatric Association** (APA) is a non-profit organization representing over 38,800 physicians who specialize in the practice of psychiatry. APA members engage in research into and education about diagnosis and treatment of mental health and substance use disorders, and are front-line physicians treating patients who experience mental health and/or substance use disorders.

9. The **American Society for Reproductive Medicine** (ASRM) is a multidisciplinary not-for-profit organization dedicated to the advancement of the science and practice of reproductive medicine. Its members include approximately 8,000 professionals. ASRM accomplishes its mission through the pursuit of excellence in education and research and through advocacy on behalf of patients, physicians, and affiliated health care providers.

10. The **American Urogynecologic Society** (AUGS) is the premier non-profit organization representing professionals dedicated to treating female pelvic floor disorders. Founded in 1979, AUGS represents more than 1,900 members, including practicing physicians, nurse practitioners, physical therapists, nurses and health care professionals, and researchers from many disciplines.

11. The **North American Society for Pediatric and Adolescent Gynecology** (NASPAG) is dedicated to providing multidisciplinary leadership in education, research, and gynecologic care to improve the reproductive health of youth. NASPAG conducts and encourages multidisciplinary and inter-professional programs of medical education and research in the field and advocates for the reproductive well-being of children and adolescents and the provision of unrestricted, unbiased, and evidence-based medical practice.

12. The **National Association of Nurse Practitioners in Women's Health** (NPWH) is a national non-profit educational and professional organization that works to ensure the provision of quality primary and specialty health care to women of all ages by women's health and women's health focused nurse practitioners.

Its mission includes protecting and promoting a woman's right to make her own choices regarding her health within the context of her personal, religious, cultural, and family beliefs. Since its inception in 1980, NPWH has been a trusted source of information on nurse practitioner education, practice, and women's health issues. In keeping with its mission, NPWH is committed to ensuring the availability of the full spectrum of evidence-based reproductive health care for women and opposes unnecessary restrictions on access that serve to delay or prevent care.

13.    The **Society for Adolescent Health and Medicine** (SAHM), founded in 1968, is a non-profit multidisciplinary professional society committed to the promotion of health, well-being, and equity for all adolescents and young adults by supporting adolescent health and medicine professionals through the advancement of clinical practice, care delivery, research, advocacy, and professional development. It strives to empower its 1,200 members who are professionals and trainees in medicine, nursing, research, psychology, public health, social work, nutrition, education, and law from a variety of settings. Through education, research, clinical services and advocacy activities, SAHM enhances public and professional awareness of adolescent health issues among families, educators, policy makers, youth-serving organizations, students in the field as well as other health professionals around the world. SAHM continues to advocate on behalf of all adolescents and young adults both on federal and state government levels for the availability of safe and effective reproductive health services.

14. The **Society for Maternal-Fetal Medicine** (SMFM), founded in 1977, is the medical professional society for obstetricians who have additional training in the area of high-risk, complicated pregnancies. Representing over 4,000 members, SMFM supports the clinical practice of maternal-fetal medicine by providing education, promoting research, and engaging in advocacy to reduce disparities and optimize the health of high-risk pregnant women and their babies. SMFM and its members are dedicated to ensuring that medically appropriate treatment options are available for high-risk women.

15. The **Society of Family Planning** (SFP) is the source for science on abortion and contraception. SFP represents approximately 800 scholars and academic clinicians united by a shared interest in advancing the science and clinical care of family planning. The pillars of its strategic plan are (1) building and supporting a multidisciplinary community of scholars and partners who have a shared focused on the science and clinical care of family planning; (2) supporting the production of research primed for impact; (3) advancing the delivery of clinical care based on the best available evidence; and (4) driving the uptake of family planning evidence into policy and practice.

16. The mission of the **Society of Gynecologic Surgeons** is to promote excellence in gynecologic surgery through acquisition of knowledge and improvement of skills, advancement of basic and clinical research, and professional and public education.

17.    The **Society of OB/GYN Hospitalists** (SOGH) is a rapidly growing group of physicians, midwives, nurses and other individuals in the health care field who support the OB/GYN Hospitalist model.  SOGH is dedicated to improving outcomes for hospitalist women and supporting those who share this mission.  SOGH's vision is to shape the future of OB/GYN by establishing the hospitalist model as the care standard and the Society values excellence, collaboration, leadership, quality and community.

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2020, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.


Dated:  April 17, 2020                              */s/ Matthew D. Besser*