## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Preterm-Cleveland, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 1:19-cv-00360 |
| | : | |
| vs. | : | Judge Michael R. Barrett |
| | : | |
| Attorney General of Ohio, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. (Doc. 42). Defendants filed a Response in Opposition (Doc. 59) and Plaintiffs filed a Reply (Doc. 68).[1]

### I.  BACKGROUND

#### a.  The Pending Lawsuit and COVID-19

Plaintiffs are Preterm-Cleveland, Planned Parenthood Southwest Ohio Region ("PPSOR"), Sharon Liner, M.D., Planned Parenthood of Greater Ohio, Women's Med Group Professional Corporation ("WMGPC"), Capital Care Network of Toledo, and Northeast Ohio Women's Center (collectively, "Plaintiffs"). Plaintiffs are a collection of reproductive healthcare clinics and physicians providing abortion care throughout Ohio.[2]

---

[1] The parties' Notices of Supplemental Authority are also before the Court. (Docs. 47, 49, 56, 75, 76, 77). Additionally, the Court permitted amici curiae to file briefs. (Doc. 73) (in support of Plaintiffs); (Docs. 44-1, 69) (in support of Defendants).

[2] While clinics and physicians do not possess a constitutional right to perform abortions, they have standing to assert constitutional challenges on behalf of their patients in the abortion context. *See Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019).

Defendants are the Attorney General of Ohio, David Yost, the Director of the Ohio Department of Health ("ODH"), Amy Acton, M.D., M.P.H., the Secretary of the State Medical Board of Ohio, Kim Rothermel, M.D., and the Supervising Member of the State Medical Board of Ohio, Bruce Saferin, D.P.M. (collectively, "State Defendants" or "Defendants"). The remaining Defendants are the Ohio Prosecuting Attorneys for Cuyahoga County, Hamilton County, Franklin County, Richland County, Mahoning County, Montgomery County, Lucas County, and Summit County (collectively, "County Defendants"). Plaintiffs filed their Initial Complaint in this matter in May 2019. (Doc. 1).

On March 9, 2020, the Governor of Ohio, Mike DeWine, declared a State of Emergency via Executive Order in light of COVID-19. (Doc. 59-1, PageID 1098). "COVID-19 is a respiratory disease that can result in serious illness or death, is caused by the SARS-CoV-2 virus, which is a new strain of coronavirus that had not been previously identified in humans and can easily spread person to person." (*Id.*, PageID 1096). "The virus is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person coughs or sneezes." (*Id.*, PageID 1096-97).

COVID-19 has created a crisis for Ohio's healthcare system and, as part of this crisis, there is a shortage of personal protective equipment ("PPE") in the State. (Doc. 59-3, Mark Hurst Decl. ¶¶ 4, 6); (Doc. 59-4, Benjamin Robison Decl. ¶ 3). Generally, "PPE includes items such as masks, gloves, surgical gowns, and other supplies that protect both healthcare workers and patients." (Doc. 59, PageID 1061). There is an international shortage of PPE and thus Ohio is competing with other states, the federal government, and other countries to obtain sufficient amounts. (*Id.*, ¶ 4). To mitigate the shortage, Ohio

must decrease the use of PPE during the crisis. (Doc. 59-3, Hurst Decl. ¶ 9). All measures taken now to conserve PPE allow more PPE to be available to healthcare workers as the number of COVID-19 infections increases and time for production and manufacturing of new PPE. (Doc. 59-4, Robison Decl. ¶ 6); (Doc. 59-5, Brian Fowler Decl. ¶ 5).

Further, it is unlikely that the Ohio healthcare system can adequately respond to the disease and other healthcare needs if a projected surge of the virus occurs in the coming weeks. (Doc. 59-3, Hurst Decl. ¶ 9); (Doc. 59-4, Robison Decl. ¶ 3). If such a surge occurs, it could overwhelm the capacity of Ohio's healthcare system. (Doc. 59-3, Hurst Decl. ¶ 6). It is critical that all healthcare personnel have adequate PPE due to symptomatic and asymptomatic patients, as personnel without adequate PPE could unknowingly transmit COVID-19 to other healthy individuals before becoming symptomatic or contract the disease from others that are not showing symptoms. (*Id.*, ¶ 7).

On March 13, 2020, President Donald J. Trump declared a National Emergency in light of COVID-19's presence in the United States. Proclamation No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020). President Trump explained that "[t]he Federal Government, along with State and local governments, has taken preventive and proactive measures to slow the spread of the virus and treat those affected, including by" "releasing policies to accelerate the acquisition of [PPE]." *Id.* President Trump emphasized, still, that "[t]he spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems." *Id.*

On March 17, 2020, Defendant Acton issued an order titled "RE: Director's Order for the Management of Non-essential Surgeries and Procedures throughout Ohio" ("Director's Order"). (Doc. 59-1, PageID 1096-99). She ordered the following:

1. Effective 5:00 p.m. Wednesday March 18, 2020, all non-essential or elective surgeries and procedures that utilized PPE should not be conducted.

2. A non-essential surgery is a procedure that can be delayed without undue risk to the current or future health of a patient. Examples of criteria to consider include:

 a. Threat to the patient's life if surgery or procedure is not performed;
 b. Threat of permanent dysfunction of an extremity or organ system;
 c. Risk of metastasis or progression of staging;[3] or
 d. Risk of rapidly worsening to severe symptoms (time sensitive).

3. Eliminate non-essential individuals from surgery/procedure rooms and patient care areas to preserve PPE. Only individuals essential to conducting the surgery or procedure shall be in the surgery or procedure suite or other patient care areas where PPE is required.

4. Each hospital and outpatient surgery or procedure provider, whether public, private, or nonprofit, shall establish an internal governance structure to ensure the principles outlined above are followed.

5. . . . This Order shall remain in full force and effect until the State of Emergency Declared by the Governor no longer exists, or the Director of the Ohio Department of Health rescinds or modifies this Order.

(*Id.*, PageID 1096).

Defendant Acton issued the order to preserve PPE and critical hospital capacity and resources in Ohio. *Id.*; (Doc. 59-3, Hurst Decl. ¶ 12); (Doc. 59-4, Robison Decl. ¶ 5); (Doc. 59-5, Fowler Decl. ¶ 5). A violation of the Director's Order is a second-degree misdemeanor. *See* Ohio Rev. Code. §§ 3701.99(C), 3701.352. The penalty for a second-degree misdemeanor in Ohio is a fine of no more than $750, or up to ninety-days

---

[3] "Staging" is "the determination of distinct phases or periods in the course of a disease, the life history of an organism, or any biological process." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1760 (32d ed. 2012).

imprisonment, or both. *See id.* § 2929.24(A)(2). In addition to criminal penalties, if found to have violated the order, a healthcare facility faces the loss of its ambulatory surgical facility license[4] and its physicians and other medical professionals face the loss of their medical licenses. (Doc. 48, ¶¶ 11-17).[5]

The Director's Order went into effect on March 18, 2020 at 5:00 p.m. (Doc. 59-1, PageID 1096). That same day, Plaintiffs developed, approved, and implemented internal policies to ensure that the principles of the Order are followed at their clinics. (Doc. 42-1, Sharon Liner, M.D., Decl. ¶ 8) (PPSOR); (Doc. 42-2, Chrisse France Decl. ¶ 13, Ex. C) (Preterm-Cleveland); (Doc. 42-3 Adarsh Krishen, M.D., Decl. ¶ 15, Ex. B) (Planned Parenthood of Greater Ohio); (Doc. 42-4, W.M. Martin Haskell, M.D., Decl. ¶ 15, Ex. C) (WMGPC); (Doc. 42-5, David Burkons, M.D., Decl. ¶ 15, Ex. B) (Northeast Ohio Women's Center). Each policy determined that "surgical abortion constitutes an essential surgery and may continue to be provided under the terms of the [Director's] Order," because "a delay in a surgical abortion will negatively affect patient health and safety." (Doc. 42-1, Liner, Decl. ¶ 11); (Doc. 42-2, France Decl., Ex. C); (Doc. 42-3 Krishen Decl., Ex. B); (Doc. 42-4, Haskell Decl., Ex. C); (Doc. 42-5, Burkons Decl., Ex. B).

On March 20, 2020 and March 21, 2020, Defendant Yost e-mailed letters to Plaintiffs PPSOR, Preterm-Cleveland, and WMGPC stating that "[t]he Ohio Department

---

[4] Ambulatory surgical facilities are free-standing facilities in which outpatient surgery is routinely performed." *Women's Medical Prof'l Corp. v. Baird*, 438 F.3d 595, 599 n.1 (6th Cir. 2006) (citing Ohio Rev. Code § 3702.30(A)(1)). Ambulatory surgical facilities "include facilities providing medical care and services in areas including, but not limited to, cosmetic and laser surgery, plastic surgery, abortion, dermatology, digestive endoscopy, gastroenterology, lithotripsy, urology, and orthopedics." *Id.* Ambulatory surgical facilities in Ohio must be licensed. Ohio Rev. Code § 3702.30(E)(1).

[5] Defendants Yost, Acton, Rothermel, and Saferin are responsible for enforcing the civil penalties of the Director's Order. Defendant Yost may also refer possible violations to the County Defendants for criminal prosecution. (Doc. 48 ¶¶ 19-30).

of Health has received a complaint that your facility has been performing or continues to offer to perform surgical abortions, which necessarily involve the use of PPE." (Doc. 42-1, Liner Decl. ¶ 13, Ex. F); (Doc. 42-2, France Decl. ¶ 14, Ex. B); (Doc. 42-4, Haskell Decl. ¶ 16, Ex. B). Defendant Yost ordered Plaintiffs "to immediately stop performing non-essential and elective surgical abortions" and warned that, "[i]f you or your facility do not immediately stop performing non-essential or elective surgical abortions in compliance with the [Director's O]rder, the Department of Health will take all appropriate measures." *Id.*

On March 21, 2020, Plaintiffs responded to Defendant Yost confirming their compliance with the Director's Order and revised their internal policies to clarify that their physicians will determine, on a case-by-case basis, whether a surgical abortion or other procedure constitutes an essential surgery or procedure.[6] (Doc. 42-1, Liner Decl. ¶ 14, Ex. B); (Doc. 42-2, France Decl. ¶ 15, Ex. C); (Doc. 42-3, Krishen Decl. ¶ 16, Ex. B); (Doc. 42-4, Haskell Decl. ¶ 17, Ex. C); (Doc. 42-5, Burkons Decl. ¶ 16, Ex. B). The revised policies state that the clinics' "physicians shall rely on the Director's Order" in making those determinations. *Id.* The policies also forbid the performance of non-essential surgeries and procedures that use PPE until the Director's Order is rescinded or the State of Emergency in Ohio is declared over and require staff to make every effort to preserve PPE during essential surgeries, *e.g.*, limiting the number of people present. *Id.*

---

[6] "If a physician determines a surgical abortion or other procedure is essential, the physician documents that determination in the patient's chart." (Doc. 42-1, Liner Decl. ¶ 14).

On March 22, 2020, Defendant Acton issued the "Director's Stay at Home Order."

https://coronavirus.ohio.gov/static/DirectorsOrderStayAtHome.pdf (last visited Apr. 23,

2020).[7] She ordered, inter alia, that:

> all individuals currently living within the State of Ohio are ordered to stay at
> home or at their place of residence except as allowed in this Order. To the
> extent individuals are using shared or outdoor spaces when outside their
> residence, they must at all times and as much as reasonably possible,
> maintain social distancing of at least six feet from any other person, with the
> exception of family or household members, consistent with the Social
> Distancing Requirements set forth in this Order. All persons may leave their
> homes or place of residence only for Essential Activities, Essential
> Governmental Functions, or to participate in Essential Businesses and
> Operations, all as defined below.

(*Id.*, ¶ 1). Defendant Acton then defined what she deemed to be "Essential Businesses

and Operations" and included "Religious Entities," "Media," and "First amendment

protected speech." (*Id.*, ¶ 12 (e), (f), (g)).

On March 25, 2020, Defendant Yost issued a Statement regarding the Director's

Order explaining that

> [e]stablishing roles in a crisis is critical. In the current COVID-19 crisis, the
> Attorney General's office plays a specific role. We are the prosecutor and
> the Ohio Department of Health is the police officer. My office will take quick
> enforcement action once an investigation is completed by the Department
> of Health, when facts to support a violation are determined, and a case is
> forwarded to my office. That is the standard protocol.

(Doc. 42-1, Liner Decl., Ex. G). Defendant Yost noted that his "office stands ready to play

our role and pursue legal action on behalf of the Ohio Department of Health." *Id.*

The next day, two inspectors from the ODH arrived at Plaintiffs PPSOR, Preterm-

Cleveland, and WMGPC for unannounced inspections and seeking information about the

---

[7] The copy of the Director's March 22, 2020 Order, found on the ODH's website, is self-authenticating under
Fed. R. Evid. 902, and the Court may take judicial notice of it. *See e.g.*, *Oak Ridge Envtl. Peace All. v.
Perry*, 412 F. Supp. 3d 786, 810 (E.D. Tenn. 2019) (citing *Demis v. Sniezek*, 558 F.3d 508, 513 n. 2 (6th
Cir. 2009) (taking notice of government website)).

clinics' compliance with the Director's Order. (Doc. 42-1, Liner Decl. ¶ 17); (Doc. 42-2, France Decl. ¶ 17); (Doc. 42-4, Haskell Decl. ¶ 20). Plaintiffs cooperated with the inspectors. *Id.* That same day, during their daily televised Coronavirus Update, Defendant Acton and Governor DeWine acknowledged that the ODH was investigating complaints of violations of her March 17, 2020 Order against certain abortion clinics. https://www.ideastream.org/ohio-could-see-up-to-8000-covid-19-cases-per-day-at-peak-coronavirus-update-march-26-2020 (last visited Apr. 23, 2020).[8]

On March 27, 2020, the ODH inspectors returned for a second day of inspections. (Doc. 42-1, Liner Decl. ¶ 20); (Doc. 42-2, France Decl. ¶ 20); (Doc. 42-4, Haskell Decl. ¶ 23). The inspectors did not inform the clinics whether they had found violations of the Director's Order, an apparent break with the ODH's practice of informing these Plaintiffs of inspection results before leaving an inspection. *Id.* The results of those inspections remain unknown as of the date of this Order. (Doc. 68-2, Liner Supp. Decl. ¶ 15); (Doc. 68-1, France Supp. Decl. ¶ 5); (Doc. 68-4, Haskell Supp. Decl. ¶ 5).

On March 30, 2020—due to the combination of the lack of response from Defendants as to what procedures Plaintiffs could legally perform and the civil and criminal penalties of a violation of the Director's Order—Plaintiffs filed a Motion to File a Supplemental Complaint and Motion for a TRO and/or Preliminary Injunction. (Docs. 41, 42). The proposed Supplemental Complaint sought to add a constitutional challenge to the Director's Order as applied to surgical abortion procedures. (Doc. 41-1). The Motion for a TRO and/or Preliminary Injunction requests that the Court temporarily restrain, and

---

[8] The Court may consider these statements. *See* FED. R. EVID. 801(d)(2) (an opposing party's statement, made by the party in a representative capacity, offered against an opposing party is not hearsay).

then preliminarily enjoin, Defendants from enforcing the Director's Order in a way that would ban surgical abortion in Ohio. (Doc. 42).

Pursuant to S.D. Ohio Civ. R. 65.1, the Court held two informal telephone conferences with the parties on March 30, 2020. The Court invited Defendants to clarify the State's interpretation of the Director's Order during those conferences. Defendants informed the Court that they would offer no such clarification.

The Court granted Plaintiffs' Motion to Supplement the Complaint and issued a TRO on March 30, 2020. (Doc. 43). The Court highlighted the novel intersection between the United States Supreme Court ("Supreme Court") precedent on the Fourteenth Amendment's guarantee of the right to reproductive freedom and the State's interest in protecting its citizens during the evolving COVID-19 pandemic. *Id.* After finding that Plaintiffs satisfied their burden, the Court ordered that Plaintiffs are to determine if a surgical abortion procedure can be safely postponed during the pre-viability stage to conserve PPE and, if so, to postpone. *Id.* The Court further ordered that, if one of Plaintiffs' healthcare providers determines, on a case-by-case basis, that the surgical abortion procedure is medically indicated and cannot be delayed—based on the timing of pre-viability or other medical conditions—said procedure is deemed legally essential to preserve a woman's right to constitutionally protected access to abortion. *Id.*

Defendants filed an interlocutory appeal of the TRO to the U.S. Court of Appeals for the Sixth Circuit ("Sixth Circuit") the next day and requested that this Court stay the TRO pending that appeal. (Doc. 50). This Court denied Defendants' request. (Doc. 52). In so denying, the Court felt obligated to clarify its TRO, as Defendants' opening brief on appeal contained questionable interpretations of the TRO. *See*, *e.g.*, (Sixth Circuit Docket

No. 20-03365, (Doc. 10, p.5)) (inaccurately suggesting that the TRO permits Plaintiffs to provide "the on-demand provision of elective abortions").[9] The Court clarified when surgical abortions are essential: when they are necessary on case-by-case determinations because of medical reasons (which implicate "undue risk to the current or future health of the patient" per the Director's Order) or because of timing vis-à-vis pre-viability (which the State, for the first time on appeal, conceded to be valid). (Doc. 52, PageID 1022).

On April 2, 2020, Defendant Acton amended her Stay at Home Order. https://coronavirus.ohio.gov/static/publicorders/Directors-Stay-At-Home-Order-Amended-04-02-20.pdf (last visited Apr. 23, 2020). "Religious Entities," "Media," and "First amendment protected speech" remained "Essential Businesses and Operations." *(Id.*, ¶ 12 (e), (f), (g)). She amended the exception for "Religious entities" to declare that weddings and funerals are not subject to her Stay at Home Order's prohibition of gathering of more than ten people. (*Id.*, ¶ 12(e)); *see* (*Id.*, ¶ 3). She also extended the Stay at Home Order through May 1, 2020. *Id.*

On April 6, 2020, the Sixth Circuit held that it lacked jurisdiction over the TRO and dismissed Defendants' appeal. (Doc. 57). The majority noted that:

> [t]he State argues that the intent of the Director's Order is to preserve PPEs in the immediate near-term, "[s]o the fact that the order might require (some) abortionists to use more PPEs weeks or months from now (in some cases) is really beside the point." But it is not beside the point to question whether the Director's Order deprives a woman of her right to an abortion during the optimal 15-week period during which the aspiration method can be performed. A prompt ruling by the district court on [Plaintiffs]' motion for preliminary injunction may she further light on this issue.

---

[9] The clarification appears to be of no avail as Defendants continued to erroneously suggest that the TRO allows Plaintiffs "to risk the public health in order to provide a surgical abortion to anyone who wants one whenever they want it" in their Reply brief. (Sixth Circuit Docket No. 20-03365, (Doc. 16, p.11)).

(*Id.*, PageID 1043). The judge who concurred in part and dissented in part emphasized that "[a] state may regulate certain abortion procedures or require women to undertake steps that may delay obtaining an abortion, so long as the state leaves open *reasonably available avenues* for obtaining a pre-viability abortion." (*Id.*, PageID 1045) (internal citations omitted) (emphasis added). He stressed that Plaintiffs have the burden to establish that the Director's Order is unconstitutional and "the State may be able to establish that is has left open sufficient channels such that the Order does not impose an undue burden on a women's right to obtain an abortion." (*Id.*, PageID 1045-46). Like the majority, he advised that this Court "should consider . . . the preference of many women for having the abortion while the aspiration method can be performed, rather than the dilation & evacuation procedure that is required for later abortions." (*Id.*, PageID 1047).

After the Sixth Circuit's ruling, a spokeswoman for Defendant Yost's Office stated that the ruling permits his office to enforce action against any of Plaintiffs' physicians who "perform[] a surgical abortion that could have been safely postponed or performed with medication."[10] Kate Smith, *Majority of Abortion Services in Ohio Can Continue, Judges Rule*, CBS News (Apr. 6, 2020), available at https://www.cbsnews.com/news/ohio-abortion-majority-services-judge-rules/ (last visited Apr. 23, 2020).

On April 8, 2020, and pursuant to the briefing scheduled agreed to by the parties, Defendants filed their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction. (Doc. 59). That same day, the ODH issued a "COVID-19 Checklist for Essential Versus Non-Essential Surgeries Responding to COVID-19" to help guide Ohio

---

[10] The Court may consider these statements. *See* FED. R. EVID. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: The statement is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.").

healthcare providers interpret the Director's Order. https://coronavirus.ohio.gov/wps/port al/gov/covid-19/checklists/english-checklists/essential-versus-non-essential-surgeries-covid-19-checklist (last visited Apr. 23, 2020). The ODH instructs providers to ask:

> 1. Does postponing the procedure threaten the patient's life?
>
> 2. Could postponing the procedure lead to permanent dysfunction of an extremity or organ system?
>
> 3. Is there a risk of metastasis or progression of staging?
>
> 4. Is there time sensitivity? Could the patient develop rapidly worsening or severe symptoms without the procedure?

*Id.* If the answer to any of those questions is yes, the ODH instructs that the procedure should go forward. *Id.* The ODH also notes, inter alia, that:

> • The health and age of each individual patient and the risk of severe outcomes — to both physical health and mental health — are among factors that should be considered.
>
> • For additional guidance, it is appropriate to reach out to professional societies and associations in specific specialty areas.
>
> • Decisions remain the responsibility of providers and local healthcare delivery systems.

*Id.*

On April 10, 2020, the Court, on a finding of good cause per Federal Rule of Civil Procedure 65(b)(2), extended the TRO in light of the fact that the Order was set to expire before the parties' agreed-upon filing deadline for Plaintiffs' Reply. (Doc. 63). Plaintiffs timely filed their Reply. (Doc. 68).

### b. Abortion in Ohio

"[A]bortion is a unique medical procedure under both Ohio and federal law because that procedure must be performed within twenty-two weeks (*i.e.*, pre-viability) per an Ohio

statute[11] and, under the federal constitution, without undue restrictions on the procedure." (Doc. 57, PageID 1045) (Bush, J., concurring in part and dissenting in part).

There are two main methods of abortion: medication abortion and surgical abortion. (Doc. 42-1, Liner Decl. ¶ 22). Medication abortion in Ohio must be preceded by an ultrasound at least twenty-four hours in advance. Ohio Rev. Code §§ 2919.193, 2919.194. Medication abortion involves the patient taking a combination of two pills. (Doc. 42-1, Liner Decl. ¶ 23). The patient takes the first medication, mifepristone, at the clinic and then, typically within one or two days and at home, takes the second medication, misoprostol. *Id.* After taking the misoprostol, the patient will expel the contents of the pregnancy in a manner similar to a miscarriage. *Id.* For some patients, medication abortion is contraindicated, *e.g.*, due to an allergy to either of the medications or other medical condition, like a bleeding disorder or low hemoglobin. (*Id.*, ¶ 27).

Surgical abortion does not involve an incision in the patient; rather, it involves the use of suction or instruments, depending on the length of gestation, to safely empty the contents of the uterus. (*Id.*, ¶ 26). There are two methods of surgical abortions: aspiration and dilation and evacuation ("D&E"). (*Id.*, ¶ 26). The aspiration method is used up to approximately 15 weeks LMP, uses dilation of the cervix and suction to empty the uterine contents, and usually takes five to ten minutes. *Id.* The D&E method is used after 15 weeks LMP, involves dilation of the cervix and instruments used to empty the uterine contents, and lasts longer than the aspiration method. *Id.* Moreover, beginning at approximately 15 through 17 weeks of gestation, D&E surgical abortions have to be

---

[11] Ohio Rev. Code § 2919.201. Gestational dates are measured from the first day of the patient's last menstrual period ("LMP"). (Doc. 68-7, Lisa Keder, M.D., M.P.H., Decl. ¶ 10, n.2). A full-term pregnancy is approximately 40 weeks LMP. (Doc. 42-1, Liner Decl. ¶ 31).

performed over two days due to the amount of time required for the patient to dilate. (Doc. 42-1, Liner Decl. ¶ 26); (Doc. 68-2, Liner Supp. Decl. ¶ 10); (Doc. 68-6, Alison Norris, M.D., PH.D., Decl. ¶ 27).

All Plaintiffs provide medication abortion up to ten weeks LMP. (Doc. 48, ¶ 62). Plaintiffs PPSOR, Preterm-Cleveland, Planned Parenthood of Greater Ohio, WMGPC, and Northeast Ohio Women's Center provide surgical abortion up to maximum gestations ranging from 15 weeks and six days LMP up to 21 weeks and 6 days LMP. (Doc. 42-1, Liner Decl. ¶ 4) (PPSOR: 21 weeks 6 days LMP); (Doc. 42-2, France Decl. ¶ 5) (Preterm-Cleveland: 21 weeks 6 days LMP); (Doc. 42-3, Krishen Decl. ¶ 6) (Planned Parenthood of Greater Ohio: 19 weeks 6 days LMP); (Doc. 42-4, Haskell Decl. ¶ 7) (WMGPC: 21 weeks 6 days LMP); (Doc. 42-5, Burkons Decl. ¶ 6) (Northeast Ohio Women's Center: 15 weeks 6 days LMP).[12]

There are certain logistical obstacles to obtaining an abortion. (*Id.* ¶ 33). The patient will need to schedule an appointment, make sure of payment,[13] and arrange for transportation, time off of work and possibly childcare[14] during appointments. *Id.* A minor patient, unless emancipated, also must obtain written parental consent or a court order. Ohio Rev. Code § 2919.121. And all patients, regardless of age, must make two in-person

---

[12] According to the latest data available from the ODH, in Ohio in 2018: 55.7% of abortions occurred before nine weeks LMP; 44.3% occurred thereafter; and 56% of abortions were surgical abortions. (Doc. 42-1, Liner Decl. ¶ 28).

[13] Ohio law prohibits public insurance, including Medicaid, and insurance purchased on the state exchange from covering abortion care except when a patient's physical health or life is at risk or when the pregnancy is the result of rape or incest and that rape or incest has been reported to law enforcement. Ohio Rev. Code §§ 9.04, 3901.87; Ohio Admin. Code § 5160-17-01.

[14] A majority (61%) of those patients having abortions already have at least one child. (Doc. 48 ¶ 67).

trips—at least 24 hours apart—to the clinic before they can obtain an abortion. *See id.* §
2317.56.

### c. **PPE**

The Director's Order does not define PPE. According to Defendants, treating
patients with COVID-19 requires face/eye protections, N95 masks and surgical masks,
gloves, and gowns. (Doc. 59-3, Hurst Decl. ¶ 6). Plaintiffs generally agree, but provide
more specifically that treating patients with COVID-19 requires face shields or goggles,
N95 masks (or face masks, but N95 masks are the preferred practice), non-sterile gloves,
and isolation gowns.[15] (Doc. 68-7, Keder Decl. ¶ 34, n.23).

Medication abortion requires the use of non-sterile gloves for the statutorily
required preceding ultra-sound, and the process of providing a patient the medications
does not involve any PPE. (Doc. 42-1, Liner Decl. ¶ 7); (Doc. 42-2, France Decl. ¶ 9);
(Doc. 42-3, Krishen Decl. ¶ 10); (Doc. 42-4, Haskell Decl. ¶ 11); (Doc. 42-5, Burkons Decl.
¶ 10).

The use of PPE for surgical abortion varies slightly by Plaintiff. PPSOR uses
protective eyewear that can be reused according to CDC guidelines, a surgical mask,
non-sterile gloves, and washable[16] gowns. (Doc. 42-1, Liner Decl. ¶ 7). Preterm-
Cleveland uses reusable protective eyewear, surgical masks, gloves, and hair and shoe
coverings. (Doc. 42-2, France Decl. ¶ 8). Planned Parenthood of Greater Ohio uses
reusable protective eyewear, surgical masks, gloves, hair and shoe coverings, and

---

[15] Isolation gowns are not the same as surgical gowns, as isolation gowns provide greater protection by
covering larger critical zones. *Id.*

[16] Plaintiff PPSOR would only use disposable gowns if it was dealing with a patient who presented with
upper respiratory symptoms consistent with COVID-19. (*Id.*, ¶ 35).

typically reusable gowns. (Doc. 42-3, Krishen Decl. ¶ 10). WMGPC uses reusable protective eyewear, surgical masks, non-sterile gloves, washable gowns, and foot coverings. (Doc. 42-4, Haskell Decl. ¶ 10). Northeast Ohio Women's Center uses reusable protective eyewear, surgical masks, non-sterile gloves, and typically reusable gowns. (Doc. 42-5, Burkons Decl. ¶ 10).

Surgical abortion does not require the use of a N95 masks and all Plaintiffs, aside from WMGPC, do not use or have N95 masks. (Doc. 42-1, Liner Decl. ¶ 35); (Doc. 42-2, France Decl. ¶ 8); (Doc. 42-3, Krishen Decl. ¶ 11); (Doc. 42-4, Haskell Decl. ¶ 10); (Doc. 42-5, Burkons Decl. ¶ 11); (Doc. 68-6, Norris Decl. ¶ 19); (Doc. 68-7, Keder Decl. ¶ 35). WMGPC explains that it ordered one box of N95 masks before the Director's Order, but does not use them to provide surgical abortions. (Doc. 68-4, Haskell Supp. Decl. ¶ 7).

Surgical abortion does not require the use of isolation gowns and none of the Plaintiffs appear to use isolation gowns. (Doc. 68-2, Liner Supp. Decl. ¶ 16); (Doc. 68-3, Krishen Supp. Decl. ¶ 6); (Doc. 68-6, Norris Decl. ¶ 19); *see* (Doc. 42-2, France Decl. ¶ 8); (Doc. 42-4, Haskell Decl. ¶ 10); (Doc. 42-5, Burkons Decl. ¶ 10).

### d. Ohio's "Flattening of the Curve"

Defendant Acton's March 17, 2020 and Stay at Home Orders have slowed the infection rate and lowered the number of COVID-19 infections, *i.e.*, "flattened the curve," and conserved PPE in Ohio. (Doc. 59-5, Fowler Decl. ¶ 4); (Doc. 68-6, Norris Decl. ¶ 9). The goal behind flattening the curve is to reduce the speed with which new cases of the virus develop; the idea is that, although the same number of people may eventually be infected, the cases of infections will be spread out over time and Ohio's healthcare system will not be overwhelmed. (Doc. 68-6, Norris Decl. ¶ 9).

### e.  Changes at Plaintiffs' Clinics due to the Director's Order

In addition to Plaintiffs' creation of and changes to their policies discussed above, Plaintiffs have changed the flow of patient care by screening staff and patients for COVID-19 symptoms before they can enter the facility and requiring patients to wait in their cars until their appointment room is available or there is space in their waiting-rooms that complies with the social distancing mandate. (Doc. 42-1, Liner Decl. ¶ 39); (Doc. 42-2, France Decl. ¶ 12); (Doc. 42-4, Krishen Decl. ¶ 14); (Doc. 42-4, Haskell Decl. ¶ 14); (Doc. 42-5, Burkons Decl. ¶ 14). Plaintiffs have stopped allowing support people to accompany patients, unless the patient is a minor. (Doc. 42-1, Liner Decl. ¶ 14); (Doc. 42-2, France Decl. ¶ 11); (Doc. 42-4, Krishen Decl. ¶ 13); (Doc. 42-4, Haskell Decl. ¶ 13); (Doc. 42-5, Burkons Decl. ¶ 13). Plaintiffs have also provided a medication abortion when a patient is eligible for both a medication and surgical abortion, unless surgical abortion is contraindicated for the specific patient. (Doc. 42-1, Liner Decl. ¶ 16); (Doc. 42-2, France Decl. ¶ 15); (Doc. 42-4, Krishen Decl. ¶ 17); (Doc. 42-4, Haskell Decl. ¶ 18); (Doc. 42-5, Burkons Decl. ¶ 17).

Plaintiffs' changes have resulted in a significant drop, 33% to 72% depending on the clinic, in surgical abortions over the last three-weeks when compared to the immediately preceding three-weeks. (Doc. 68-1, France Supp. Decl. ¶ 6) (Preterm-Cleveland: **greater than 69% drop**); (Doc. 68-2, Liner Supp. Decl. ¶ 6) (PPSOR: **33% drop**); (Doc. 68-3, Krishen Supp. Decl. ¶ 5) (Planned Parenthood of Greater Ohio: **greater than 56% drop**); (Doc. 68-4, Haskell Supp. Decl. ¶ 6) (WMGPC: **72% drop**); (Doc. 68-5, Burkons Supp. Decl. ¶ 5) (Northeast Ohio Women's Center: **greater than 65% drop**).

### f. **Parties' Arguments**

The Court is compelled to address three concerns before turning to the merits of the parties' arguments. First, throughout their Response in Opposition, Defendants cite several newspaper articles. (Doc. 59). There is nothing generally concerning about citing newspaper articles, of course. However, the Court is troubled by Defendants' characterization of the contents of these articles. For example, Defendants assert that " . . . healthcare providers have deferred a wide variety of procedures, even life-saving transplants," after following advice to limit non-essential and elective surgeries to preserve PPE and other medical resources. (*Id.*, PageID 1070-71). Defendants cite a March 25, 2020 article from the Wall Street Journal headlined, "*Coronavirus Threat Forces Longer Waits for Some Organ-Transplant Patients*." (*Id.*, PageID 1071, n.27). But, a review of that article's content, rather than just the headline, reveals that physicians are not delaying kidney transplants solely to conserve PPE and other medical resources. Rather, physicians are delaying kidney transplants, on case-by-case bases, due to shortages of beds, equipment, and staff and, more immediately, due to an inability to test kidney donors and recipients to see if they are infected with COVID-19, the vulnerability of donors and recipients to infection during surgery and recovery, and because recipients must take immune suppressing drugs post-surgery that make them particularly vulnerable to infection. *Id.*

Second, Defendants inaccurately assert that Plaintiffs' Motion requests *carte blanche* to perform surgical abortions. (Doc. 59, PageID 1063) ("[T]he Court should reject Plaintiffs' motion for a preliminary injunction seeking a blanket exception for surgical abortions."); (*Id.*, PageID 1073) ("Plaintiffs thus argue that all surgical abortions are

18

essential and these procedures should be categorically exempt from the Director's Order."); (*Id.*, PageID 1075) ("The Sixth Circuit thus rejected Plaintiffs' argument that every surgical abortion is 'essential.'"); (*Id.*, PageID 1083) ("Far from supporting their claim for a blanket exception . . ."); (*Id.*, PageID 1085) ("A blanket exemption for all surgical abortions, as Plaintiffs seek . . ."); (*Id.*) ("An injunction mandating a blanket exemption for surgical abortions is not constitutionally sound."); (*Id.*, PageID 1089) (" . . . a far narrower demand than the blanket exemption for all surgical abortions that Plaintiffs seek."); (*Id.*, PageID 1090) ("Any blanket exception to the Director's Order that the Court agrees to . . . "). Plaintiffs do not, and have not, made such request to the Court and the constant inaccurate characterization of Plaintiffs' position is unnecessary and distracting.

Third, the Court notes the fluidity of Defendants' interpretation of the Director's Order as applied to Plaintiffs. Defendant Yost's March 20, 2020 and March 21, 2020 cease-and-desist letters were silent as to Plaintiffs' patients' pre-viability constitutional rights. *See* (Doc. 42-1, Liner Decl. ¶ 13, Ex. F); (Doc. 42-2, France Decl. ¶ 14, Ex. B); (Doc. 42-4, Haskell Decl. ¶ 16, Ex. B). Defendant Yost did not follow up with Plaintiffs' written responses to those letters. Instead, a week later, the ODH sent investigators to conduct unannounced two-day inspections and the ODH has withheld the results of those inspections for more than three weeks. *See* (Doc. 68-2, Liner Supp. Decl. ¶ 15); (Doc. 68-1, France Supp. Decl. ¶ 5); (Doc. 68-4, Haskell Supp. Decl. ¶ 5).

At the March 30, 2020 phone conferences with this Court, Defendants declined to state their interpretation of the Director's Order; rather they elected to reveal their interpretation in their opening appellate brief. (Sixth Circuit Docket No. 20-03365, (Doc. 10)). Defendants now concede, as legally they must, that the following are permitted

under the Director's Order, as applied to Plaintiffs: (1) if a patient is eligible for both medication abortion and surgical abortion, the provider must provide a medication abortion unless it is contraindicated for the patient; (2) if delaying the abortion would push the patient past the point of pre-viability, and thus become unable to obtain an abortion, the provider may perform surgical abortion; and (3) if delay may cause harm to the patient's life or health, the provider may perform the surgical abortion. (Doc. 59, PageID 1062, 1077-78, 1084-85, 1089). The Court is mindful of Plaintiffs' concern about how Defendants will interpret the Director's Order on any given day, particularly in light of Defendant Yost's statement that he is ready to pursue legal action on the ODH's behalf. (Doc. 42-1, Liner Decl., Ex. G).

Turning to the merits of the parties' arguments, Plaintiffs request a preliminary injunction preventing Defendants from enforcing and applying the Director's Order in a manner that bans their patients from exercising their constitutional right to pre-viability abortions. (Docs. 42, 68). They argue that the that burden the Director's Order places on some of their patients is undue and unconstitutional under the substantive-due-process analysis found in *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). (Docs. 42, 68).

Plaintiffs assert that—without clear and consistent guidance from Defendants or a Court order—they fear that their patients will lose their rights to pre-viability abortion access for an unknown length of time and Defendants will second-guess their case-by-case determinations that a surgical abortion was essential and, thus, fear losing their medical licenses, losing their facility licenses and ability to operate, and being prosecuted. (Doc. 42-1, Liner Decl. ¶ 41); (Doc. 42-2, France Decl. ¶¶ 21, 22); (Krishen Decl. ¶¶ 19,

20); (Doc. 42-4, Haskell Decl. ¶¶ 23, 24); (Doc. 42-5, Burkons Decl. ¶¶ 19, 20); (Doc. 68-1, France Supp. Decl. ¶ ¶ 4,5); (Doc. 68-2, Liner Supp. Decl. ¶ 15); (Doc. 68-3, Krishen Supp. Decl. ¶ 4); (Doc. 68-4, Haskell Supp. Decl. ¶ 5); (Doc. 68-5, Burkons Supp. Decl. ¶ 4).

Defendants respond that a preliminary injunction is improper, as the burden placed on Plaintiffs' patients is merely a "temporary delay of surgical abortion" and that burden is constitutionally permissible. (Doc. 59). Defendants urge the Court to utilize the legal framework regarding states' emergency powers found in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 23 (1905), rather than the substantive-due-process analysis that Plaintiffs request. *Id.*[17]

## II. __ANALYSIS__

The purpose of a preliminary injunction is to preserve the *status quo* prior to entry of the final order. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In considering a preliminary injunction, the court considers four elements: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc) (internal quotation marks omitted). "These

---

[17] To the extent that Defendants invite the Court to rely on *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on unrelated grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Sixth Circuit has never relied on that case to support an opinion and the Court declines the invitation to extend its holding beyond the context of that case's facts *i.e.*, when a curfew is imposed in response to a natural disaster. *See Robinson v. Marshall*, No. 2:19CV365-MHT, 2020 WL 1847128, at *12 (M.D. Ala. Apr. 12, 2020).

four considerations are factors to be balanced, not prerequisites that must be met."
*Kessler v. Hrivnak*, No. 3:11-cv-35, 2011 WL 2144599, at *3 (S. D. Ohio May 31, 2011).

### a. Likelihood of Success

The Director's Order explains that "[a] non-essential surgery is a procedure that can be delayed *without undue risk to the current or future health of a patient*" and that examples of criteria to consider include "[t]hreat to the patient's life if surgery or procedure is not performed, "[t]hreat of permanent dysfunction of an extremity or organ system," "[r]isk of metastasis or progression of staging," and "[r]isk of rapidly worsening to severe symptoms (time sensitive)." (Doc. 59-1, PageID 1096) (emphasis added). The ODH's checklist for implementing that Order states that "decisions remain the responsibility of providers and local healthcare delivery systems." A logical reading of the Director's Order and her department's checklist would indicate that a procedure is essential if a postponement results in irreversible conditions and individual physicians makes those determinations, on case-by-case bases, based on their medical training and judgment.[18]

The Court agrees that that non-essential surgeries should not be conducted in light of the shortage of PPE and risk of spreading COVID-19 in Ohio. The Court also agrees with Defendants' concessions that, under the Director's Order and as applied to Plaintiffs, (1) if a patient is eligible for both medication abortion and surgical abortion, the provider must provide a medication abortion unless it is contraindicated; (2) if delaying the abortion would push the patient past the point of pre-viability, the provider may perform surgical

---

[18] The TRO followed that logic. It held that Plaintiffs' physicians were to make case-by-case determinations and that surgical abortions are essential when they are necessary because of medical reasons (which implicate "undue risk to the current or future health of the patient" per the Director's Order) or because of the timing vis-à-vis pre-viability.

abortion; and (3) if delay may cause harm to the patient's life or health, the provider may perform the surgical abortion. (Doc. 59, PageID 1062, 1077-78, 1084-85, 1089).

The issues that remain, and why Plaintiffs argue a preliminary injunction is necessary, are what amount of harm to a patient's health justifies proceeding with a surgical abortion earlier than the legal limit, 21 weeks and 6 days LMP, and who gets to make that determination. The State's emergency powers analysis found in *Jacobson* and the substantive-due-process analysis found in *Roe* and *Casey* should be applied together in light of the COVID-19 pandemic, the subject-matter of this case, and the holdings of those cases. *See Adams & Boyle, P.C. v. Slatery,* No. 3:15-cv-00705, slip op. at 4-5 (M.D. Tenn. April 21, 2020); *Robinson*, 2020 WL 1847128, at *8-9. *But see In re Abbott*, No. 20-50296, 2020 WL 1911216, at *7 (5th Cir. Apr. 20, 2020); *In re Rutledge*, No. 20-1791, 2020 WL 1933122, at *4 (8th Cir. Apr. 22, 2020).

*Jacobson* involved the constitutionality of a 1902 Cambridge, Massachusetts regulation, adopted pursuant to state statute, that required the city's residents to undergo a free smallpox vaccination in an attempt to end a smallpox epidemic. 197 U.S. at 12. The Supreme Court held that the regulation did not violate the Fourteenth Amendment as applied to Mr. Jacobson—an adult who was fit for vaccination, refused to be vaccinated, but stayed in the community—as it was a lawful exercise of the State's police powers. *Id.* at 27. The Supreme Court held that, "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.*

Although "*Jacobson* urges deferential review in times of emergency," it also "demands that courts enforce the Constitution." *Robinson,* 2020 WL 1847128, at *8 (citing *Jacobson*, 197 U.S. at 28). In that regard, the *Jacobson* Court explains that,

> if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Jacobson*, 197 U.S. at 31 (emphasis omitted). *Accord Casey*, 505 U.S. at 857 ("[A] State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims.") (quoting *Jacobson*, 197 U.S. at 24-30). The *Jacobson* Court stated that

> we are not inclined to hold that the statute establishes the absolute rule that an adult must be vaccinated if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination, or that vaccination, by reason of his then condition, would seriously impair his health, or probably cause his death. No such case is here presented.

*Jacobson*, 197 U.S. at 39. "Under *Jacobson*, therefore, a State's emergency response can still be unlawful if it impinges on a fundamental right in a 'plain, palpable' way." *Robinson*, 2020 WL 1847128, at *9 (quoting *Jacobson*, 197 U.S. at 31). Access to abortion is a fundamental right. *Hellerstedt*, 136 S. Ct. at 2300; *Casey*, 505 U.S. at 876; *Roe*, 410 U.S. at 153-54; *Women's Med. Prof'l Corp.*, 353 F.3d at 443. "And so *Jacobson* asks courts to protect it, even in times of emergency." *Robinson*, 2020 WL 1847128, at *9.

The law is well-settled that women possess a fundamental constitutional right of access to abortions. *Roe*, 410 U.S. at 153-54. Yet the right to terminate a pregnancy is not absolute: "[A] state may regulate abortion *before viability* as long as it does not impose an 'undue burden' on a woman's right to terminate her pregnancy." *Women's Med. Prof'l*

*Corp. v. Taft*, 353 F.3d 436, 443 (6th Cir. 2003) (quoting *Casey*, 505 U.S. at 876) (emphasis added)). "[T]here 'exists' an 'undue burden' on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the '*purpose or effect'* of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016) (quoting *Casey*, 505 U.S. at 878 (emphasis added in *Hellerstedt*)). "*Casey* requires courts to consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2298.

### i. Burdens the Director's Order Imposes on Abortion Access

A delay in surgical abortion could cause a substantial risk of serious harm or serious harm to a patient's health because delaying surgical abortion increases risks associated with abortion. Although abortion is a safe medical procedure, typically with any complications successfully managed in an outpatient setting rather than an emergency room, the health risks associated with abortion increase as gestational age increases. (Doc. 42-1, Liner Decl. ¶ ¶ 22, 32); (Doc. 68-6, Norris Decl. ¶ 23); (Doc. 68-7, Keder Decl. ¶ 38). With respect to the D&E method, the method used if a provider delays an abortion until the legal limit, "the risk of injuring the cervix or uterus is greater than with a first-trimester aspiration abortion" because the D&E method requires the use of instruments. (Doc. 68-2, Liner Supp. Decl. ¶ 11). D&E procedures performed after 18 weeks also include greater risks of infection, extramural delivery, digoxin toxicity, cardiac distress, rupture of membranes, damage to maternal vessel, bleeding, and hemorrhage. (*Id.*, ¶ 12). Additionally, "[a]s the number of weeks increases, the

invasiveness of the required procedure and the need for deeper levels of sedation also increase, which carries greater risk to the patient." (Doc. 68-7, Keder Decl. ¶ 40).

Moreover, and despite the fact that abortion is generally a safe procedure with a low mortality rate, the risks of mortality associated with abortion increase as gestational age increases. (Doc. 68-6, Norris Decl. ¶ 25); (Doc. 68-7, Keder Decl. ¶ 38). "The mortality risk at 14-17 weeks is more than eight times greater than at eight weeks or less and more than 22 times greater at or after 18 weeks" and "[d]elaying an abortion by a week in the second trimester significantly increases the mortality risk." (Doc. 68-7, Keder Decl. ¶ 38). Although the mortality risk associated with abortion is low, the risk of death increases 38% each week. *Id.*

A delay in surgical abortions could also cause a substantial risk of serious harm or serious harm to a patient's health because delaying abortions would force women to remain pregnant until the viability limit and that increases the risk that women will experience pregnancy complications. If a provider delays an abortion until the viability limit, many women seeking abortions will remain pregnant for as long as three months— up to nearly 22 weeks of pregnancy. (Doc. 68-7, Keder Decl. ¶ 10). Between 10 weeks and 22 weeks, pregnant women are more prone to shortness of breath, blood clots, nausea and vomiting, dehydration, hypertension, urinary tract infections, and anemia. (*Id.*, ¶¶ 12-13). Pregnancy may also aggravate a preexisting health condition, such as high blood pressure, diabetes, kidney disease, autoimmune disorders, and asthma. (*Id.*, ¶ 14).

In addition to the increased health risks associated with a delayed surgical abortion, Ohio women seeking abortion care face the logistical obstacles to obtaining that care. These include scheduling an appointment, ensuring payment, and arranging

transportation, time off work, and possible childcare, and perhaps doing each of these things twice due to Ohio statutes. The COVID-19 pandemic will likely exacerbate these obstacles in light of the resulting work disruptions and potential resultant lost income, limited public transit availability, and the closing of schools and childcare facilities. (Doc. 42-1, Liner Decl. ¶¶ 30, 33, 34); (Doc. 68-6, Norris Decl. ¶ 38).

If all, or nearly all, surgical abortions are delayed until the viability limit, Plaintiffs' facilities could be overwhelmed, and they will be unable to accommodate all of their patients for the required two-day D&E procedures. (Doc. 68-2, Liner Supp. Decl. ¶ 14); (Doc. 68-3, Krishen Supp. Decl. ¶ 8); (Doc. 68-4, Haskell Supp. Decl. ¶ 8). If Plaintiffs are unable to accommodate all patients required to undergo a two-day D&E procedure, patients will be unable to obtain an abortion entirely. *Id.* Complicating matters, not all Plaintiffs provide D&E abortions up to the viability limit in Ohio, and roughly half of women in Ohio already live in a county with no abortion clinic. (Doc. 42-3, Krishen Decl. ¶¶ 6, 9) (Planned Parenthood of Greater Ohio); (Doc. 42-5, Burkons Decl. ¶ 6) (Northeast Ohio Women's Center); (Doc. 68-6, Norris Decl. ¶ 32). If all, or nearly all, surgical abortions are delayed until the viability limit, some women will necessarily have to travel longer distances inside of Ohio to receive abortion care. Specifically, those women in and around East Columbus and Cuyahoga Falls would be required to travel to Cincinnati, Dayton, or Cleveland for abortion care, at least twice, or travel out of the state.

Those patients who are able to obtain out-of-state abortion care and do so will face all of the above-mentioned logistical obstacles to obtaining abortion care. (Doc. 42-1, Liner Decl. ¶ 44); (Doc. 68-6, Norris Decl. ¶ 33); (Doc. 68-7, Keder Decl. ¶ 44). And, having women travel to other states to obtain abortion care is "highly undesirable from a

public health perspective, as those women also face the risk of increased exposure to COVID-19 due to their travel." (Doc. 68-6, Norris Decl. ¶ 33). The option to travel to another state to obtain abortion care during a pandemic is not a reasonably available avenue or sufficient channel for Ohio women to obtain pre-viability abortions.

Defendant Acton's March 17, 2020 and Stay at Home Orders have worked to flatten the curve. (Doc. 59-5, Fowler Decl. ¶¶ 4-5); (Doc. 68-6, Norris Decl., ¶ 13). "[F]latter curves are longer curves" though, and mitigation "measures will continue to be in place for weeks (most conservatively), and more likely, months to come." (*Id.*, ¶ 11). "Projections to understand when the pandemic will end remain extremely complicated and utterly uncertain, as they depend on unknown future societal decisions (such as how long social distancing will be maintained, and by whom) and as-yet-unknown disease factors (such as how many people were infected with SARS-CoV-2 and have now recovered, and how long immunity after infection will last)." (*Id.*, ¶ 36). Ohioans are in a long race in the fight against COVID-19 and return to normalcy and, unlike marathons or other long-distance events, this race is comprised of a wholly unknown distance. (*Id.*, ¶¶ 11, 36).

As a result, Plaintiffs, indeed, all physicians in Ohio, face the reality that the Director's Order could remain in place for a long time. Appropriately, Plaintiffs' amended policies note that their physicians should consider that the Ambulatory Surgery Center Association's COVID-19 guidance "states that consideration of whether delay of a surgery is appropriate must account for risk to the patient of delay, 'including the expectation that a delay of 6-8 weeks or more may be required to emerge from an environment in which COVID-19 is less prevalent.'" (Doc. 42-1, Liner Decl. ¶ 14, Ex. C, Ex. E); (Doc. 42-2,

France Decl. ¶ 15, Ex. C); (Doc. 42-3, Krishen Decl. ¶ 16, Ex. B); (Doc. 42-4, Haskell Decl. ¶ 17, Ex. C); (Doc. 42-5, Burkons Decl. ¶ 16, Ex. B).

Defendants concede that delaying surgical abortion imposes some degree of harm on Plaintiffs' patients. (Doc. 59, PageID 1077, 1089). Defendants assert, however, that "Plaintiffs have not shown that this delay is anymore harmful than the delay than [sic] other Ohioans are experiencing" and "women seeking abortions are being treated no differently than anyone seeking Lasik, a face-lift, or any other non-essential medical procedure at this time." (*Id.*, PageID 1084, 1089). Defendants' false equivalence between a woman seeking pre-viability abortion care during the COVID-19 pandemic and a woman seeking a face-lift during the COVID-19 pandemic ignores well-settled Supreme Court precedent on the Fourteenth Amendment's guarantee of the right to reproductive freedom. The Court questions if a more appropriate comparison is between a woman seeking pre-viability abortion care during the COVID-19 pandemic and a woman who the *Jacobson* Court contemplated could prove that Cambridge's compulsory smallpox vaccine, by reason of her condition, would seriously impair her health. *See Jacobson*, 197 U.S. at 39.

### ii.  Benefits that Director's Order Confers in Ohio

The primary benefit of the Director's Order is PPE preservation in the State. *See* (Doc. 59-1, PageID 1096). The overlapping PPE used to treat a patient with COVID-19 and provide a patient abortion care are non-sterile gloves, surgical masks, and disposable surgical gowns, as healthcare workers use different protective eyewear (face shields and goggles versus reusable eyewear after it is cleaned per CDC guidelines), masks (N95 versus surgical), and gowns (isolation versus surgical) during the two treatments.

*Compare* (Doc. 59-3, Hurst Decl. ¶ 6), *with* (Doc. 42-1, Liner Decl. ¶¶ 7, 35); (Doc. 42-2, France Decl. ¶¶ 8, 9); (Doc. 42-3, Krishen Decl. ¶¶ 10-11); (Doc. 42-4, Haskell Decl. ¶¶ 10-11); (Doc. 42-5, Burkons Decl. ¶¶ 10-11); (Doc. 68-2, Liner Supp. Decl. ¶ 16); (Doc. 68-3, Krishen Supp. Decl. ¶ 6); (Doc. 68-4, Haskell Supp. Decl. ¶ 7); (Doc. 68-6, Norris Decl. ¶ 19); (Doc. 68-7, Keder Decl. ¶¶ 34 35).

The policies that Plaintiffs adopted to conform with the Director's Order have resulted in a significant drop, 33% to 72%, in surgical abortions over the last three-weeks when compared to the immediately preceding three-weeks. (Doc. 68-1, France Supp. Decl. ¶ 6) (Preterm-Cleveland: **greater than 69% drop**); (Doc. 68-2, Liner Supp. Decl. ¶ 6) (PPSOR: **33% drop**); (Doc. 68-3, Krishen Supp. Decl. ¶ 5) (Planned Parenthood of Greater Ohio: **greater than 56% drop**); (Doc. 68-4, Haskell Supp. Decl. ¶ 6) (WMGPC: **72% drop**); (Doc. 68-5, Burkons Supp. Decl. ¶ 5) (Northeast Ohio Women's Center: **greater than 65% drop**). Plaintiffs are preserving PPE in light of the significant decrease in surgical abortions procedures at their clinics. Plaintiffs are also preserving PPE due to their policies limiting the number of people in all procedures to only those who are required. (Doc. 42-1, Liner Decl. ¶ 14, Ex. B); (Doc. 42-2, France Decl. ¶ 15, Ex. C); (Doc. 42-3, Krishen Decl. ¶ 16, Ex. B); (Doc. 42-4, Haskell Decl. ¶ 17, Ex. C); (Doc. 42-5, Burkons Decl. ¶ 16, Ex. B).

Delaying abortion services until the legal limit will not conserve PPE, as D&E abortions require more PPE due to the nature of the procedure, described above, and the fact that the procedure typically occurs over two days, thus requiring two sets of PPE to be used. (Doc. 68-6, Norris Decl. ¶ 28). "[D]elaying abortions so patients have to obtain more technically complicated, riskier procedures later in pregnancy will result in more

30

PPE use and may result in more patients needing hospital-based or other care utilizing PPE than if they had obtained an earlier abortion." (Doc. 68-7, Keder Decl. ¶ 11). Defendants appear to concede that Plaintiffs might have to use more PPEs in the upcoming weeks and months. (Sixth Circuit Docket No. 20-03365, (Doc. 16, p.4-5) ("So the fact that the order might require (some) abortionists to use more PPEs weeks or months from now (in some cases) is really beside the point.").

Patients who are waiting to obtain an abortion at the viability limit will remain users of the healthcare system as long as they are pregnant and will thus require PPE during any healthcare visits that are not conducted via telemedicine. (Doc. 42-1, Liner Decl. ¶ 37); (Doc. 68-7, Keder Decl. ¶ 27). Likewise, "requiring patients to remain pregnant longer than necessary increases the risk of pregnancy-related health conditions, which are more likely to require treatment in a hospital setting and more extensive use of PPE than surgical abortion." (Doc. 68-7, Keder Decl. ¶¶ 11, 16).

The Sixth Circuit agreed that the time restraints that the Director's Order places on Plaintiffs is an important factor in this analysis. (Doc. 57, PageID 1043) ("But it is not beside the point to question whether the Director's Order deprives a woman of her right to an abortion during the optimal 15-week period during which the aspiration method can be performed."); (*Id.*, PageID 1046-47) (urging this Court to weigh the argument that more PPEs will be required if abortions are delayed until the legal limit with the argument that procedures are being delayed with the expectation that more PPEs will be manufactured and available later for those delayed procedures) (Bush, J., concurring in part and dissenting in part). In response to the Sixth Circuit's instructions, Plaintiffs presented the foregoing evidence as to their PPE conservation. In contrast, Defendants provided no

evidence regarding Ohio's PPE production and manufacturing efforts such that the Court is convinced that, per Defendants' logic, PPE is or will be available for those surgical abortion procedures that have been or will be delayed.

Defendants present another shortcoming in response to the Sixth Circuit's direction to "consider . . . the preference of many women for having the abortion while the aspirational method can be performed, rather than the dilation and evacuation procedure." (*Id.*, PageID 1047) (Bush, J., concurring in part and dissenting in part). As stated above, the aspiration method is safer than the D&E method because it occurs in earlier gestational weeks and involves no instruments. The aspiration method also uses less PPE than the D&E method because it lasts five to ten minutes instead of, possibly, two days. (Doc. 42-1, Line Decl. ¶ 43); *cf.* (Doc. 68-8, Craig McKinney, M.D., Decl. ¶ 12) ("I [a general surgeon] factor the potential use of PPE and hospital resources into my decision about whether a particular surgery is essential. This may mean performing a less complex procedure today in order to avoid performing a more complex, risky, and time-intensive procedure later, which might involve more PPE and more staff.").

The second benefit of, and purpose for, the Director's Order is preservation of hospital capacity and resources in Ohio. (Doc. 59-1, PageID 1096). However, nearly all abortions in Ohio are provided in outpatient ambulatory surgical facilities, like Plaintiffs, and not hospitals. (Doc. 758). And, as noted, abortion is generally a safe medical procedure and any complications that do occur can typically be handled in an outpatient setting rather than an emergency room. (Doc. 42-1, Liner Decl. ¶ ¶ 22).

Defendants argue another benefit of the Director's Order is that "[d]elay of certain abortions will decrease personal interaction and contact, and prevent further viral spread."

(Doc. 59, PageID 1083). It has not escaped the Court's attention that Defendant Acton's Stay at Home Order provides exceptions for Ohioans exercising their First Amendment rights to freedom of religion, the press, and speech, but provides no such exception for Ohioans exercising their fundamental Fourteenth Amendment rights at issue here, despite the fact that those exercising First Amendment rights could also increase personal interaction, contact, and further viral spread.

For all of the reasons detailed above, the Court finds that Plaintiffs have established that enforcement of the Director's Order will likely result in an unconstitutional deprivation of their patients' Fourteenth Amendment rights because enforcement will have the effect of placing a substantial obstacle in the path of patients seeking pre-viability abortions, thus creating an undue burden on abortion access. *See Casey*, 505 U.S. at 876. The Court also finds that Plaintiffs have established that this undue burden is likely to effect "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. This factor, then, weighs in Plaintiffs' favor.

### b. Irreparable Harm

"[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *accord Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of [constitutional] freedoms . . . unquestionably constitutes irreparable injury."). Inasmuch as this Court has determined that the Director's Order likely places an undue burden on a woman's right to choose a pre-viability abortion, and thus violates her right to privacy guaranteed by the Fourteenth

33

Amendment, the Court further determines that its enforcement would, per se, inflict irreparable harm. This second factor also weighs in favor of Plaintiffs.

Moreover, Defendant Yost may refer possible violations of the Director's Order to the County Defendants for criminal prosecution. (Doc. 48 ¶¶ 19-30). Notwithstanding Defendants' concessions, Defendants have warned Plaintiffs, inspected Plaintiffs' facilities and withheld the results of those inspections, and changed interpretations of the Director's Order as applied to Plaintiffs many times. "In this environment, a provider might reasonably fear that prosecutions under the medical restrictions will proceed despite the defendants' on-the-record interpretations." *Robinson*, 2020 WL 1847128, at *14. Plaintiffs reasonably fear prosecution under the Director's Order. (Doc. 42-1, Liner Decl. ¶ 41); (Doc. 42-2, France Decl. ¶¶ 21, 22); (Krishen Decl. ¶¶ 19, 20); (Doc. 42-4, Haskell Decl. ¶¶ 23, 24); (Doc. 42-5, Burkons Decl. ¶¶ 19, 20); (Doc. 68-1, France Supp. Decl. ¶ ¶ 4,5); (Doc. 68-2, Liner Supp. Decl. ¶ 15); (Doc. 68-3, Krishen Supp. Decl. ¶ 4); (Doc. 68-4, Haskell Supp. Decl. ¶ 5); (Doc. 68-5, Burkons Supp. Decl. ¶ 4).

"But to proceed with lawful abortions, providers must be *confident* that their exercise of reasonable medical judgment will not be met with unconstitutional or bad-faith prosecution." *Robinson*, 2020 WL 1847128, at *14 (emphasis in original). "[P]hysicians acting lawfully cannot be left to the tender mercies of a prosecutor's discretion and the vagaries of a jury's decision or wrongly deterred from performing lawful procedures in the first place." *Id.* (internal citations and quotations omitted); *cf. Colautti v. Franklin*, 439 U.S. 379, 396 (1979) ("The prospect of such disagreement [about the timing of viability for a particular fetus], in conjunction with a statute imposing strict civil and criminal liability for an erroneous determination . . . , could have a profound chilling effect on the willingness

of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment.").

Plaintiffs ask for their case-by-case determinations regarding the essential nature of an abortion procedure to be treated the same as other Ohio healthcare professionals' determinations regarding the essential nature of other procedures. (Doc. 68, PageID 1235). A gynecologist in Ohio explains that she has determined—using her professional judgment and guidance from the American Society for Colposcopy and Cervical Pathology—that procedures used to remove abnormal cells that may cause cervical cancer should sometimes proceed under the Director's Order based on her patients' specific needs. (Doc. 68-7, Keder Decl. ¶ 33). Similarly, a general surgeon in Ohio explains that—using his medical training and judgment and consultation with his hospital's Operating Room Director and nurse anesthetists—he determined that surgery to remove a patient's gall bladder, "[d]ue to the risk of the patient's condition worsening and the risk that a more complex surgical procedure would be required if the surgery were delayed," should proceed under the Director's Order. (Doc. 68-8, McKinney Decl. ¶ 9).

There is no record evidence that Defendants have warned, inspected, and second-guessed the judgment of any physicians during the COVID-19 pandemic other than Plaintiffs' physicians.[19] *See* (Doc. 68-7, Keder Decl. ¶ 32) ("As a member of my facility's operating room committee and of our Surgical Executive Committee, I am unaware of any surgical procedures that have been specifically forbidden by the State. Nor am I aware of the state second-guessing the considered judgment of physicians who have determined

---

[19] During one of the March 30, 2020 phone conferences, Defendants stated that they received one complaint about one urologist, but did not and have not provided any additional information about that complaint.

a surgery or procedure essential" other than Defendants' second-guessing Plaintiffs' judgment).

Plaintiffs establish that they are at substantial risk of prosecution without an injunction. Plaintiffs' physicians—like all physicians—must use their medical training, medical experience, patients' individual physical and mental considerations, relationships with their patients, and guidance from professional organizations to make individualized, case-by-case determinations regarding whether an abortion procedure is essential. *Cf.* (Doc. 68-6, Norris Decl. ¶ 12); (Doc. 68-7, Keder Decl. ¶ 31); (Doc. 68-8, McKinney Decl. ¶ 8). Therefore, in response to the remaining issue of who gets to make the determination of what amount of harm to a patient's health justifies proceeding with a surgical abortion earlier than the legal limit, the Court concludes that the patient's physician does. This holding is consistent with the ODH's COVID-19 Checklist's instruction that "[d]ecisions remain the responsibility of providers and local healthcare delivery systems."

### c. <u>Harm to Others and Public Interest</u>

Plaintiffs have established that, absent a court order, some women in Ohio would likely face substantial obstacles that would make accessing abortion care very difficult. Plaintiffs establish "a meaningful risk of unwarranted prosecutions that deter abortion providers and, in turn, create [another] substantial obstacle for women seeking abortions." *Robinson*, 2020 WL 1847128, at *15. Finally, Plaintiffs have also established that delaying abortion services will likely do little to preserve PPE and hospital capacity and resources in Ohio. Hence, the Court finds that this factor, the balance of the hardships, weighs in Plaintiffs' favor.

36

Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014).

## III.  **CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs'[20] Motion for a Preliminary Injunction (Doc. 42)  is **GRANTED.** It is **ORDERED** that:

- If a healthcare provider determines, on a case-by-case basis, that the surgical procedure is medically indicated and cannot be delayed, based on the timing of pre-viability or other medical conditions, said procedure is deemed legally essential to preserve a woman's right to constitutionally protected access to abortions.

- The State and County Defendants; the State and County Defendants' officers, agents, servants, employees, and attorneys; and those persons in active concert or participation with them who receive actual notice of the order are **PRELIMINARILY ENJOINED** from applying and enforcing the Director's March 17, 2020 Order against Plaintiffs' physicians in such a way as to prohibit those physicians from making case-by-case determinations that a surgical abortion is essential when the procedure is necessary because of the timing vis-à-vis pre-viability; to protect the patient's health or life; and due to medical reasons (which implicate undue risk to the current or future health of the patient and the gestational age of the fetus, as determined by the physician, as it relates to the increased risk of the procedure as the pregnancy progresses).

---

[20] Plaintiff Capital Care Network of Toledo did not participate in the Motion for a Preliminary Injunction and, accordingly, is not included in this Order. (Docs. 42, 68).

- The bond requirement set forth in Federal Rule of Civil Procedure 65(c) is **WAIVED**. *See Molton Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

- Plaintiffs appear to have filed their Motion for a TRO and/or Preliminary Injunction twice. *Compare* (Doc. 40), *with* (Doc. 42). The Clerk of Court is **DIRECTED to STRIKE** (Doc. 40) from the Court's docket in this matter.

- Plaintiffs' Motion to Clarify the TRO (Doc. 54) is **DENIED as moot**.

    **IT IS SO ORDERED.**                 _s/ Michael R. Barrett_____
                                               Michael R. Barrett, Judge
                                               United States District Court